**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
**Joseph B. Sala, Ph.D. on 11/10/2017**

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 3            CASE NO: 1:16-cv-24687-WILLIAMS/Simonton
 4                         - - -
 5   EDGARDO LEBRON,                :
                                    :
 6                                  :
            Plaintiff,              :
 7                                  :
            VS.                     :
 8                                  :
     ROYAL CARIBBEAN CRUISES,       :
 9   LTD., a Liberian Corporation,  :
                                    :
10            Defendant.            :
11                         - - -
12            Videoconference deposition of JOSEPH B.
13   SALA, Ph.D., taken at Regus Business Center, 2929
14   Arch Street, Suite 1700, Philadelphia, Pennsylvania,
15   on Friday, November 10, 2017, beginning at
16   approximately 10:08 a.m., before Elizabeth Kelly,
17   Professional Reporter and Notary Public in and of
18   the Commonwealth of Pennsylvania.
19                         - - -
20
21
22
23
24
25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 2

```
 1
       APPEARANCES:
 2

 3     (VIA VIDEOCONFERENCE)
       ARONFELD TRIAL LAWYERS
 4     BY:  MATTHIAS HAYASHI, ESQUIRE
       3132 Ponce De Leon Boulevard
 5     Coral Gables, Florida 33134
       (305) 441-0441
 6
       Counsel for Plaintiff
 7

 8     (VIA VIDEOCONFERENCE)
       FOREMAN FRIEDMAN, P.A.
 9     BY:  RACHAEL MITCHELL FAGENSON, ESQUIRE
       One Biscayne Tower
10     2 South Biscayne Boulevard, Suite 2300
       Miami, Florida 33131
11     (305) 358-6555

12     Counsel for Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 3

```
 1                    I N D E X

 2                      - - -

 3    WITNESS:                              PAGE

 4    JOSEPH B. SALA, Ph.D.

 5    EXAMINATION

 6    By Mr. Hayashi                        4,190

 7    By Ms. Fagenson                         162

 8

 9

10

11                    EXHIBITS

12

13    EXHIBIT NO.       DESCRIPTION         MARKED

14    Plaintiff's Exhibit:

15    Exhibit A         Subpoena                 5

16    Exhibit B         October 25, 2017 Report  11

17    Exhibit C         Deposition Transcript
                        of Dr. Sala in Guevara Case  191
18

19

20

21

22

23

24

25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 4

```
 1                        - - -

 2                        (By agreement of counsel, the

 3            reading, signing, sealing, certification

 4            and filing are waived; and all objections,

 5            except as to the form of the question, are

 6            reserved until the time of trial.)

 7                        - - -

 8                        JOSEPH B. SALA, PH.D., having

 9                        been first duly sworn to tell

10                        the truth, was examined and

11                        testified as follows:

12                        - - -

13                        EXAMINATION

14                        - - -

15    BY MR. HAYASHI:

16        Q    Hello.  Good morning, Doctor.  How are you

17    today?

18        A    I am doing well, yourself?

19        Q    Likewise.  And can you please tell us your

20    full name for the record?

21        A    Joseph Sala.  That's S, as in Sam, A-L-A.

22        Q    Any middle name?

23        A    Benedict, B-E-N-E-D-I-C-T.

24        Q    All right.  Well, pleasure to have you

25    here today, Dr. Sala.  Could you please let us know
```

1   if you have received a subpoena duces tecum for your

2   testimony today?

3       A    Yes, I have.

4       Q    Okay.  Do you have a copy of that with

5   you?

6       A    I believe I do.  I actually don't have my

7   copy, but there is a copy next to me that the court

8   reporter has.  Can I use that one?  Or can I look at

9   that one?

10      Q    Sure.  And I'd like to mark this as

11  Plaintiff's Exhibit-1 -- or Plaintiff's Exhibit A.

12              (Plaintiff's Exhibit A was marked for

13  identification.)

14              THE WITNESS:  I have it in front of me.

15  BY MR. HAYASHI:

16      Q    Okay.  And so what you have in front of

17  you is the subpoena for your testimony today and

18  asking you to bring documents with you for this

19  deposition today; is that correct?

20      A    Correct.

21      Q    Okay.  And in the duces tecum section of

22  this subpoena, it requests that you bring your

23  entire file; is that correct?

24      A    Correct.

25      Q    Okay.  And do you have your entire here

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                   Page 6

```
 1   today?

 2        A    I have my entire file on a thumb drive.

 3   It has some videos on it.  I also have some of the

 4   materials printed out in a binder that's next to me.

 5        Q    Okay.  And do you have access to all of

 6   the documents that you have on your thumb drive?

 7   Are you able to access them during our deposition

 8   today?

 9        A    Well, if I can use the computer then

10   certainly I can look at any of the files that are on

11   it.  I have brought a significant number of those in

12   the binder that we can look at in hard copy.

13   Obviously, the videos I could not have printed out.

14        Q    Okay.  Now, let me ask you a question, are

15   you aware that counsel for the defendant sent a

16   Dropbox link to -- well, to a link that's supposed

17   to be -- well, how can I phrase it?  Let's start

18   over.  Are you aware that opposing counsel sent a

19   link to a Dropbox that says Sala digital deposition

20   file?  Are you aware of that?

21        A    I wasn't aware that they sent that to you,

22   but I had heard you discussing that prior to the

23   deposition.

24        Q    Well, okay.  Are you -- well, did you

25   compile the -- okay, let me see how I want to ask
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 7

```
 1   this.  Maybe we can just have all of the documents
 2   on Dr. Sala's thumb drive copied and sent to us just
 3   to make sure that they're the same.  I was going to
 4   ask him if the documents that opposing counsel sent
 5   are the same as the ones on the thumb drive, but
 6   since he's not aware of the Dropbox, we'd just
 7   like -- is that fine with you Dr. Sala?
 8        A    That would be fine.  Maybe it would help,
 9   I did provide a digital file to counsel.  I believe
10   with the same name as you're representing to me.  I
11   am assuming that is the one that they then forwarded
12   to you, but I was no part of the transmission of
13   that file from them to you.  That's all that, I
14   think, the discrepancy is.
15             MS. FAGENSON:  That is correct.  For the
16        record, the file that Dr. Sala provided us
17        yesterday afternoon is the file that I sent
18        this morning.  It's the same file.
19             MR. HAYASHI:  Okay.  The exact same file
20        that he has on his thumb drive now?
21             THE WITNESS:  Yes, the two were duplicates
22        of one another when I sent them to my client.
23   BY MR. HAYASHI:
24        Q    Okay.  Were there any correspondence
25   between counsel for Royal Caribbean and yourself
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 8

```
1    that have been withheld from your file today?

2         A    I don't believe so.

3         Q    Okay.  And looking at your -- looking at

4    your file, I notice that there is a -- well, there's

5    a folder inside called client -- sorry, there's a

6    folder inside that says correspondence; is that

7    correct?  Do you have recollection of that?

8         A    Yes.  And I believe in that folder is the

9    retention letter that we had sent and received back

10   from Foreman Friedman, and I believe the notice of

11   deposition that we received.

12        Q    Okay.  So there is no -- correct me if I'm

13   wrong, but is your testimony today that there has

14   been no e-mail correspondence exchanged between you

15   and counsel for defendant?

16        A    None that I can recall or found.  If there

17   were any that were, it may have been a give me a

18   call or can we find another deposition date, but

19   nothing of substance that I retained.

20        Q    Okay.  Well, we requested all -- well,

21   your entire file, and is it correct that there has

22   been no privileged log -- or let me phrase it this

23   way.  Did defense counsel request your

24   communications to review them for a possible claim

25   of privilege or anything like that?
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 9

```
 1            MS. FAGENSON:  Objection.
 2            THE WITNESS:  I don't recall any such
 3        request or having that conversation.
 4    BY MR. HAYASHI:
 5        Q    Okay.  We would like -- we would like to
 6    know of any communication between you and opposing
 7    counsel if they have a claim of privilege, I'm not
 8    sure, it may be waived by now, but we would
 9    certainly like to at least know of what type of
10    communication has taken place, and if any privileges
11    are being asserted, timely or not.  So if you could
12    look into that and get that to us, we are requesting
13    that.
14        A    Okay.
15        Q    Okay.  All right, let's move on.  Do you
16    recall a file within the folder, Sala Digital
17    Deposition File, that is titled, Client Supplied
18    Materials?
19        A    Yes.  I believe there's a folder in there
20    named that.
21        Q    Okay.  And it has three subfolders inside
22    in addition to documents --
23        A    I'm sorry.  You broke up a little bit.
24        Q    Sure.  And this subfolder, Client Supplied
25    Materials, has three subfolders in the subfolder and
```

```
 1   documents itself inside; is that correct?
 2        A    I'm not looking at it right now, but that
 3   could be.
 4        Q    Well, the three subfolders are titled,
 5   CCPD full version, Depo transcripts, and Expert
 6   reports, does that refresh your recollection?
 7        A    I believe that those exist there.
 8        Q    Okay.  And the subfolder deposition
 9   transcript, does this contain all of the deposition
10   transcripts that you have reviewed prior to forming
11   your opinions in this case?
12        A    I believe so.
13        Q    And all of the exhibits to those
14   depositions?
15        A    I believe it does.
16        Q    Okay.  I notice that the deposition of
17   Mr. Terry MacLaughlin is not in this folder; is that
18   correct?
19        A    I can't speak to the folder itself on that
20   disc; however, I do not believe I received that
21   deposition.  I can check my report to see if it's
22   listed in the materials there if you would just bear
23   with me for a moment.
24        Q    Sure, thank you.  And maybe we'll just go
25   ahead and have the report marked as Plaintiff's
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 11

```
 1   Exhibit B.

 2                 (Exhibit B was marked for

 3   identification.)

 4                 THE WITNESS:  No, I don't believe that

 5       I've received Mr. MacLaughlin's report -- I

 6       mean, I'm sorry, his deposition.

 7   BY MR. HAYASHI:

 8       Q    Okay.  Well, this brings us to my next

 9   question.  So the next subfolder is expert reports;

10   correct?

11       A    Correct.

12       Q    Okay.  And so I notice you have a file

13   titled, MacLaughlin disclosure; is that correct?

14       A    Again, as to the name of the file itself,

15   you would know better than I, but I did review a

16   report by Mr. MacLaughlin.

17       Q    And a supplemental report as well?

18       A    Correct.

19       Q    Did you review any rebuttal report of Mr.

20   MacLaughlin?

21       A    The only reports that I believe that I

22   reviewed were his original report and then a

23   supplement report.

24       Q    Are you aware that Mr. Terry MacLaughlin

25   has submitted a rebuttal expert witness report in
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 12

```
 1   this case?

 2        A    I have not received or reviewed that, no.

 3        Q    So you have not received any expert

 4   witness report authored by Terry MacLaughlin on

 5   October 25, 2017; would that be correct?

 6             MS. FAGENSON:  Objection, to form.

 7             THE WITNESS:  I have not received a

 8        rebuttal report by Mr. MacLaughlin.

 9   BY MR. HAYASHI:

10        Q    Okay.  And have you received any report by

11   Mr. MacLaughlin that is dated October 25, 2017?

12        A    No.

13             MS. FAGENSON:  Objection to form.

14             THE WITNESS:  No, I have listed the two

15        reports that I have received from Mr.

16        MacLaughlin.  I believe the dates are listed in

17        my materials as September 5, 2017 and

18        September 25, 2017.

19             MR. HAYASHI:  Okay.  And Dr. Sala's report

20        has been mark as Plaintiff's Exhibit 2; right?

21        Just want to confirm.

22             THE REPORTER:  Yes.

23             MR. HAYASHI:  Okay, thank you.

24   BY MR. HAYASHI:

25        Q    All right.  I guess let's move on.  There
```

1   is another -- so the third folder -- well, let me

2   just put it this way.  There's another folder in the

3   digital folder you prepared titled, Exponent work

4   product.  Do you recall that?

5        A    I believe -- I believe so.

6        Q    Okay.  And it has three subfolders inside,

7   one titled deposition indices, one titled

8   literature, and one titled N-E-I-S-S; is that

9   correct?

10       A    Correct.

11       Q    Okay.  Then there's also a file -- sorry,

12  what's that?

13       A    I said I believe so, that's to my

14  recollection.

15       Q    And there's a file that's -- well, there's

16  also your expert report itself that is not in a

17  subfolder, but that's in this Exponent work product;

18  is that correct?

19       A    Correct.

20       Q    And your report was authored on

21  October 25, 2017; is that correct?

22       A    Correct.

23       Q    And are you aware that this was the

24  deadline for the parties to submit there expert

25  rebuttal witness reports?

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                               Page 14

```
 1        A    I knew there was a submission date and a

 2   deadline for me.  I didn't know what, in particular,

 3   that deadline was in the larger context of the case.

 4        Q    Okay.  Do you have any knowledge of --

 5   well, let me ask you this.  Are you going to be

 6   testifying in this case as a rebuttal witness, or

 7   are you going to be testifying beyond the scope of

 8   what the experts the plaintiff has retained offered

 9   opinions on?

10        A    I'm sorry.  You broke up there.  Our audio

11   line got garbled.

12        Q    Okay.  Are you planning to offer testimony

13   that is simply limited to rebutting the opinions of

14   the plaintiff's expert in this case?

15        A    Well, I'm not entirely sure of the matter

16   in which I am planning to be called, or I would

17   defer to the attorneys as to how they intend to

18   present me at trial.  I don't know that I have the

19   legal context to make the distinction between that

20   type of testimony.

21        Q    Let me ask you this, Dr. Sala, have you

22   gone through the opinions of the experts that

23   plaintiff has offered, and are all of your opinions

24   intended to rebut a specific opinion of one of the

25   plaintiff's experts?
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 15

 1        A    Well, I do believe that the -- the
 2   opinions that I am offering are -- speak to and are
 3   in response to some of what I had seen plaintiffs
 4   contend or allege in the case, and plaintiff's
 5   experts in particular.
 6        Q    Okay.  Are there any opinions that you
 7   plan to offer that are not addressing any specific
 8   opinion of the experts of the plaintiff?
 9        A    Again, I think that the report contains
10   opinions and my analysis in it, and as expressed, I
11   believe that the opinions speak to the same issues
12   that opposing or plaintiff's experts are holding or
13   contending.
14        Q    Okay.  So they speak to the same issue,
15   but they may not necessarily be intended to rebut --
16   how can I say -- so they're speaking to the same
17   issue, and that's about as much as you're going to
18   testify; is that correct?
19             MS. FAGENSON:  Objection to form.
20             THE WITNESS:  Again, you know, I've done
21        my analysis and offered those opinions and how
22        they're intended to be used, you know, I
23        would -- I would defer to the clients.  And
24        certainly, when asked to testify, I will
25        testify as to the things that I am opining on

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                           Page 16

```
 1       here to the extent that they are termed

 2       rebuttal or what that might mean in the legal

 3       context of the case, you know, I would defer to

 4       the attorneys and to the judge.

 5            That's not my area of expertise, but I do

 6       believe that the analysis and opinions that I

 7       am offering are to the same point and largely

 8       in response to and quite possibly contradicting

 9       or in opposition to the opinions offered by

10       plaintiff's experts.

11  BY MR. HAYASHI:

12       Q    Are you aware of the area of expertise of

13  the expert that plaintiff has retained?

14       A    I believe -- I believe I am, yes.

15       Q    Okay.  Can you tell us what is the area of

16  expertise of Mr. Terry MacLaughlin?

17       A    I would have to review the report or look

18  back at the report or his deposition, or -- well, I

19  don't have his deposition.  But I would have to look

20  back at his report to see how it is claimed, but my

21  understanding and memory is that it is in the area

22  of skate rink -- ice skate rink management or

23  construction of some sort.  And I can refer back to

24  the report for more specifics of this.

25       Q    Okay.  Let me ask, do you hold your
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 17

```
 1   yourself out as an expert in ice skating management
 2   or design or construction?
 3        A    I do not.
 4        Q    Okay.  So your area of expertise is
 5   different than Mr. MacLaughlin's then; is that
 6   correct?
 7             MS. FAGENSON:  Objection to form.
 8             THE WITNESS:  My area of expertise, as
 9        stated, is in human factors, and, again, I
10        would let Mr. MacLaughlin's experience speak
11        for itself as to his education, training, and
12        experience.
13   BY MR. HAYASHI:
14        Q    You're not aware of Mr. MacLaughlin having
15   any expertise in human factors, are you?
16        A    No, it does not appear that he has any
17   expertise in human factors.
18        Q    Okay.  So then you're -- and human factors
19   is your primary expertise; is that correct?
20        A    Yes, human factors is my area of
21   expertise.
22        Q    Okay.  And what -- do you have any
23   secondary areas of expertise, secondary or, you
24   know, any subareas of expertise?
25        A    I believe that all my areas of expertise
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 18

```
 1   would be contained within the larger umbrella term

 2   of human factors.

 3        Q    Okay.  So then if Mr. MacLaughlin were not

 4   an expert in -- well, how can I say this?  So your

 5   area of expertise then is different than Mr.

 6   MacLaughlin; correct?

 7             MS. FAGENSON:  Objection to form.

 8             THE WITNESS:  Well, again, I think that

 9        I've stated what my area of expertise is.  It's

10        broadly within the realm of human factors, and

11        I would let Mr. MacLaughlin's experience,

12        training, education, speak to his specific area

13        of expertise if we're talking about just

14        distinct areas of expertise.

15   BY MR. HAYASHI:

16        Q    Well, if Mr. MacLaughlin did not -- was

17   not an expert in the human factors, hypothetically,

18   then your area of expertise would be different than

19   Mr. MacLaughlin's.  Can we say that?

20             MS. FAGENSON:  Objection to form.

21             THE WITNESS:  I would agree that we have

22        different backgrounds, experience, education,

23        and training; and so therefore, the areas we

24        claim expertise in would be distinct from one

25        another.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 19

```
 1   BY MR. HAYASHI:

 2        Q    Okay.  And are you aware of the expertise

 3   of Dr. Ling Yu?

 4        A    I believe that she is a biomedical

 5   engineer by training and has expertise in

 6   biomechanics.

 7        Q    Okay.  Do you hold yourself out as a

 8   biomedical or biomechanical engineering expert?

 9        A    No.  I am not a biomedical or

10   biomechanical engineer.

11        Q    Okay.  Do you have any experience

12   whatsoever in biomedical or biomechanical

13   engineering?

14        A    Once again, I'm not an engineer and don't

15   hold myself out to be one.  There is overlap in some

16   of the topics and issues inherently studied between

17   human factors and biomechanics.

18        Q    But correct me if I'm wrong, that would

19   all have to do with perception.  That would be the

20   areas of overlap; would that be correct?

21             MS. FAGENSON:  Objection, form.

22             THE WITNESS:  No, not exclusively.

23   BY MR. HAYASHI:

24        Q    Okay.  Well, can you just tell us what the

25   area of overlap between -- and, I guess, let's take
```

```
 1    it one by one.  What are the areas of overlap
 2    between biomedical engineering and human factors?
 3        A    Well, I was speaking more of biomechanics,
 4    not exclusively biomedical engineering, but certain
 5    areas and topics are studied by those with
 6    backgrounds strictly in biomechanics or those with
 7    human factors background, particularly balance
 8    retention, gait, balance recovery.  These are all
 9    issues that people with training, education, and
10    experience in human factors as well as in
11    biomechanics study.  Indeed, I have studied these
12    things and published on them as well.
13        Q    Okay.  But as far as the physics of the
14    human body and how the human body -- the physics of
15    the human body's movement in a physical space, that
16    wouldn't be the main focus of human factors -- of a
17    human factors analysis -- well, maybe you understand
18    what I'm trying to get at because -- let me start
19    over again.  Correct me if I'm wrong, but human
20    factors is about the perception of a person and the
21    world around them and how they may perceive things,
22    such as danger; is that correct?
23            MS. FAGENSON:  Objection to form.
24            THE WITNESS:  I think that's one aspect of
25        human factors.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 21

```
 1   BY MR. HAYASHI:

 2        Q    Well, maybe you can tell us.  What are

 3   the -- what is the focus of a human factors expert,

 4   such as you hold yourself out to be?

 5        A    Well, human factors broadly, I think, can

 6   be defined as the scientific study of how the

 7   capabilities and limitations of humans, whether they

 8   be cognitive, perceptual, developmental, physical,

 9   influence the way in which we interact with the

10   world, products, our environment, and how this can,

11   at times, affect or relate to safety.  Now, that

12   also does include some physical characteristics as

13   well, including body sizes, strengths, and some of

14   our typical sort of motions and integration across

15   perception, cognition, and motion.

16        Q    Okay.  But you don't deal in the physics

17   of the human body itself, do you?

18             MS. FAGENSON:  Objection to form.

19   BY MR. HAYASHI:

20        Q    And by "deal with" I mean you don't -- you

21   don't analyze the -- you're not a physicist;

22   correct, Doctor?

23             MS. FAGENSON:  Objection.

24             THE WITNESS:  I am not a physicist.

25
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 22

1   BY MR. HAYASHI:

2       Q    Okay.  Correct me if I'm wrong, but --

3   well, actually why don't you tell us, Doctor, what

4   is your understanding of the difference between

5   human factors and biomechanical engineering?

6       A    Well, there can be differences, and, you

7   know, I don't know that I can outline all of the

8   potential differences between the two studies.

9   There are areas of overlap, including the ones that

10  I referenced earlier, and there are areas of

11  distinction.  But as far as being able to give you

12  an exhaustive list of what both fields are or are

13  not, I don't know if I can do so at this moment.

14      Q    You wouldn't -- your expertise wouldn't

15  necessarily involve accident reconstruction, would

16  it?

17      A    Well, my expertise does have implications

18  for and is involved in broader accident

19  reconstruction efforts.  So there are human factors

20  aspects to accidents, and those are ones that I can

21  and do reconstruct.  Certain accidents involve

22  expertise outside of human factors.  And so, for

23  example, in a car accident, I would not speak to the

24  movements of vehicles and potentially the response

25  that vehicles have to crashes, but I would certainly

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 23

```
 1   perform an accident reconstruction from the

 2   perspective of driver's behaviors.

 3        Q    Okay.  So then in the case of this

 4   incident in this case, you wouldn't be offering any

 5   accident reconstruction testimony?  I mean, you

 6   aren't attempting to reconstruct the accident in

 7   this case, are you?

 8             MS. FAGENSON:  Objection to form.

 9             THE WITNESS:  Well, I don't know that I

10        understand what you are including in the

11        question as to attempt to reconstruct the

12        accident.  I certainly do think that my

13        expertise has been used and is described in the

14        report as to observations and analyses, as to

15        the accident and how it happened, and distinct

16        portions of that accident.  Particularly from

17        the perspective of human factors and

18        considering the interactions that were going on

19        between the people and the people and their

20        environment at the time.

21   BY MR. HAYASHI:

22        Q    But you're not going to get up on the

23   stand and, say, draw a picture for the jury and

24   explain the path Mr. Lebron took or -- and how his

25   ankle twisted or something like that?  Am I correct,
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 24

```
 1   I just want to make sure I understand?

 2            MS. FAGENSON:  Objection to form.

 3            THE WITNESS:  Well, I don't think that I

 4       would necessarily need to stand up in front of

 5       the jury and draw any pictures of the path that

 6       he took.  We do have the video, and we could

 7       use that as a demonstrative of what was going

 8       on at the time and what occurred at the time.

 9       Otherwise, to answer the rest of your question,

10       can you repeat or rephrase it?

11   BY MR. HAYASHI:

12       Q   Well, let me just ask it this way.  You're

13   not going to tell the jury how Mr. Lebron's ankle

14   twisted or didn't twist; is that correct?

15       A   Correct.  I'm not going to opine or try to

16   explain the movements of his ankle as it relates to

17   this -- to the actual injuries sustained.

18       Q   Correct me if I'm wrong, but your

19   testimony is going to be about Mr. Lebron's ability

20   to perceive any dangers that may have been around

21   him; is that what your testimony is going to be

22   about?

23            MS. FAGENSON:  Objection to form.

24            THE WITNESS:  I think that --

25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 25

```
 1   BY MR. HAYASHI:

 2        Q    One area, isn't it?

 3        A    That would be -- that would likely be one

 4   area.  I think that's contained within the analysis

 5   and opinions presented in my report.  I would also

 6   opine on the other -- the other topics that I

 7   discuss in the report, the analysis I provide, and

 8   the opinions reached.

 9        Q    This leads me to my next question.  Are

10   all of the opinions that you plan to offer in this

11   case contained in your expert report?

12        A    Yes.  I believe that they are to date.  If

13   asked additional questions or if additional

14   information should come to light, then -- and that

15   spurs additional opinions, then I would reserve that

16   right.  But to date, everything that I would plan to

17   testify to is included in my report.

18        Q    Okay.  Before we start talking about your

19   report directly, I notice that there -- that the

20   subfolder deposition indices, these seem to be --

21   well, what are these deposition indices of, Doctor?

22        A    The deposition indices are documents that

23   include a description of specific testimony and

24   where it appears in each deposition in order to aid

25   me in my additional and continued review of the file
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 26

```
 1   materials in order to get back to and consider

 2   relevant portions of testimony.  It explicitly --

 3   exactly as the name implies, an index into the

 4   deposition.

 5        Q    All right.  Was your review of these

 6   depositions limited to the areas that were outlined

 7   in these index -- indices, or did it go beyond them?

 8        A    I reviewed the underlying deposition

 9   testimony.  These indices, again, are -- serve as a

10   tool in order for me to get back to portions of the

11   testimony, but my review is of the testimony -- the

12   underlying testimony itself in its entirety.

13        Q    So you reviewed all the deposition

14   transcripts listed here cover to cover; is that

15   correct?

16        A    Yes.

17             MS. FAGENSON:  Object to the form.

18   BY MR. HAYASHI:

19        Q    Okay.  And there's also a folder entitled

20   literature; correct?

21        A    Correct.

22        Q    And all of these documents are referenced

23   in your report?

24        A    I believe that they are.  Excuse me for

25   one moment, my apologies, I'm a little under the
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 27

```
 1   weather today.
 2       Q    Well, I hope you feel better soon, not a
 3   problem.  Do you have a section of your report where
 4   you -- yes, actually, so you can look at your report
 5   if you'd like to refresh your recollection, but are
 6   all of these articles listed on page 19 of your
 7   report at the bottom?
 8       A    Yes.  I believe that they are.
 9       Q    While you have it in front of you, could
10   you just let me know, are all of these -- because
11   you compiled these digital documents; correct?
12       A    Yes.
13       Q    Are all of these digital articles that you
14   compiled in the literature subfolder, these
15   documents, these articles, that are referenced on
16   page 19 of your report, the three at the bottom?
17       A    I'm sorry, can you repeat that?  I --
18       Q    Yes, I would just like a clear answer.
19   Were all of the digital articles that you compiled
20   and sent to counsel for the defendant the same
21   articles -- the same three articles at the bottom of
22   page 19 of your expert report?
23       A    Yes, I believe them to be.
24       Q    Excuse me, but since you've refreshed your
25   recollection by looking at your report, can you
```

1    testify definitively, not just that you believe them

2    to be?

3         A    Well, again --

4              MS. FAGENSON:  Objection to form.

5              THE WITNESS:  -- the articles that I

6         included were -- there should be three

7         articles.  One by Dorris and Purswell, 1977,

8         entitled, Warnings and human behavior:

9         Implications for the design of product

10        warnings.  An article by Otsubo, 1988, A

11        behavioral study of warning label for consumer

12        products:  Perceived danger and use of

13        pictographs.

14             And an article by Zeitlin Z-E-I-T-L-I-N,

15        1994, Failure to follow safety instructions,

16        faulty communication or risky decisions.  And

17        those are the ones that I have in front of me,

18        and that's what I had put on the file.  So yes,

19        I believe that they are all the same.  I have

20        no reason to believe otherwise of what's in

21        your possession.

22   BY MR. HAYASHI:

23        Q    Well, then my question was, these are the

24   documents you compiled and you sent to counsel for

25   defendant, which presumably they sent to me, but

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017

1    this is what you compiled and sent to counsel for

2    defendant; correct?

3         A    Yes.

4         Q    Okay, thank you.  I also notice a

5    subfolder under Exponent work product entitled,

6    N-E-I-S-S.  Do you recall that?

7         A    Yes.

8         Q    Okay.  Where are these documents

9    referenced in your report?

10        A    They are referenced --

11        Q    Maybe I can help you.  Are they referenced

12   on page 15 and 16?

13        A    Yes.  They are referenced on page 15 and

14   16, and then I believe there's another reference.

15   It may also be on page 16.  Yes, so pages 15 and 16.

16        Q    Okay.  But you didn't list them in your

17   list of materials reviewed section on page 19;

18   correct?

19        A    You are correct.  I don't see that as a

20   bullet, the NEISS database, I do not see that as a

21   bullet on my list of materials.  My apologies for

22   that.

23        Q    Okay, thank you.  All right.  So let's

24   talk a little bit about your education and

25   experience, Doctor.  First of all, are you being

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 30

1    compensated for your work in this case?

2         A    Well, the company I work for, Exponent, is

3    being compensated for the time that I bill to this

4    project.

5         Q    Okay.  And Exponent is billing $475 an

6    hour for your work on this case; is that correct?

7         A    Yes.

8         Q    Is that what you're billing for the

9    deposition today?

10        A    Correct.  That is my bill rate for

11   deposition testimony as well as work on the case.

12        Q    Okay.  Now, is this 475 a hour divided up

13   between you and Exponent?  Do they receive a

14   portion, and you receive a portion?

15        A    No -- I'm sorry, was there an objection?

16             MS. FAGENSON:  Yeah, just objection to

17        form.  You can answer.

18             THE WITNESS:  No, I'm a salaried employee

19        of Exponent, and so my bill rate does not

20        reflect on the money I receive as compensation

21        for work I perform for Exponent.

22   BY MR. HAYASHI:

23        Q    Okay.  So then Exponent collects all of

24   this $475 an hour then; would that be correct?

25        A    Well, correct.  The -- any invoicing or

```
 1    billing associated with this matter or my work for
 2    Exponent is received by Exponent.
 3         Q    Right.  Well, presumably uses the fees
 4    that it collects to pay the salaries of its
 5    employees; correct?
 6         A    Yes.
 7              MS. FAGENSON:  Objection to form.
 8    BY MR. HAYASHI:
 9         Q    But you don't receive -- you don't receive
10    any direct cut of this hourly rate, just want to be
11    clear?
12         A    I do not.
13         Q    Okay.  And how much are you being paid by
14    Exponent?  How much is your salary?
15         A    I'm --
16              MS. FAGENSON:  Objection to form.
17              THE WITNESS:  I'm not at privilege to say.
18         That's considered confidential information and
19         competitive information for my company.
20    BY MR. HAYASHI:
21         Q    Well, how is plaintiff supposed to know
22    how much you're being compensated for purposes of
23    bias, for example?
24              MS. FAGENSON:  Objection to form.  He's
25         already answered the question.
```

```
 1              THE WITNESS:  I can't answer -- I can't
 2        answer that question that you just posed.  I
 3        can tell you what Exponent bills my time at,
 4        and that is the -- the compensation received
 5        through Exponent for my work in this matter.
 6   BY MR. HAYASHI:
 7        Q    Does the plaintiff have any way of being
 8   able to tell how much -- how much -- so there's no
 9   way for plaintiff to know what you're being
10   compensated for your work on this case is (sic)?
11              MS. FAGENSON:  Objection to form.
12              THE WITNESS:  Again, I'm not compensated
13        for my work on this case.  I'm a salaried
14        employee with duties beyond this matter.  I can
15        provide you with the bill rate that Exponent
16        charges my time for involvement.  And that
17        would be the compensation that is remitted to
18        Exponent.
19   BY MR. HAYASHI:
20        Q    Okay.  Well, let me ask this, if your
21   testimony -- well, let me ask it this way.  If you
22   offer testimony for a party and that party wins a
23   case, does that help your career?
24              MS. FAGENSON:  Objection to form.
25              THE WITNESS:  I don't think that there is
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 33

```
 1        any sort of tracking of cases I'm involved in

 2        and whether or not it's win or lose and whether

 3        or not my testimony contributed in a

 4        substantial way to that outcome.  That's not

 5        really a metric that is tracked or considered

 6        within Exponent during the review process.

 7   BY MR. HAYASHI:

 8        Q    You don't track the amount of times the

 9   cases that you've assisted on have been successful?

10             MS. FAGENSON:  Objection to form, asked

11        and answered.

12             THE WITNESS:  So I personally do not.

13        Sometimes I am informed of outcomes, and

14        sometimes I am not.

15   BY MR. HAYASHI:

16        Q    So your testimony is that it makes no

17   difference to you whether or not your testimony

18   leads to a successful outcome in a case or not?

19             MS. FAGENSON:  Objection to form.

20             THE WITNESS:  For one, I provide my

21        testimony to my client, or I provide my

22        analysis and opinions to the client.  What

23        the -- I do hope that my clients see value in

24        those analyses and opinions and it influences

25        their decision making.  But as far as, you
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 34

```
 1        know, whether this was, you know, or how this

 2        might have been beneficial to them, that's

 3        really outside of my purview.  I provide

 4        analyses and opinions, and it's the client that

 5        chooses to do what they would like with those.

 6   BY MR. HAYASHI:

 7        Q    Has your testimony ever been stricken

 8   before?

 9        A    I'm aware of one matter in which my

10   testimony was limited, yes.

11        Q    Is that a case listed in your list of

12   prior testimony that you've disclosed to us?

13        A    I don't believe it is.  I don't believe I

14   testified in that matter.

15        Q    Okay.  Do you remember if that was a case

16   in federal court or if that was in state court?

17        A    I don't know the venue off the top of my

18   head.

19        Q    Was the defendant in that case a cruise

20   line company, or was it not a cruise line company?

21        A    If my memory serves me, I don't believe it

22   was a cruise line company.  I believe it was a

23   retail box store.

24        Q    And do you recall why your testimony was

25   stricken in that case?
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 35

1      A    I believe that -- I'd be going off of

2    memory, but I believe that the judge determined

3    that, given his understanding of what evidence was

4    going to be coming in, that he didn't feel there was

5    a need to have human factors presented in the case.

6    Though, he said he reserved the right, depending on

7    how testimony did come in, whether or not to allow

8    me to testify at the time of trial.

9      Q    Do you remember where this case -- where

10   the court was that decided this case -- was this in

11   Florida, or was this in another state?

12     A    It was not in Florida.  Off the top of my

13   head, I can't remember where it was.

14     Q    Okay.  Was it not in -- and you're in

15   Philadelphia; correct?

16     A    Correct.

17     Q    Was it in Philadelphia?

18     A    I don't believe it was in Philadelphia.  I

19   only learned of this after the fact, and this was --

20   this case is many years old.  So I wasn't involved

21   at the time when the decision was being made.

22     Q    What year was this case, Doctor?

23     A    I believe it was between -- it was around

24   eight years ago or so I believe.

25     Q    So around 2009?

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 36

1   A     Around that time.

2        MS. FAGENSON:  Matthias, are you typing

3   while you ask questions?  I can't really hear

4   what's going on.

5        MR. HAYASHI:  Are you saying you can't

6   hear my questions, Rachael?

7        MS. FAGENSON:  Yeah, it seems like you're

8   typing as you're talking, so I'm having trouble

9   hearing your questions.

10       MR. HAYASHI:  I think I'm actually

11  talking -- I mean, typing more while Dr. Sala

12  is talking.  If you've been able to hear him, I

13  don't think it should be an issue.

14       MS. FAGENSON:  It's very distracting.

15  It's hard to hear.

16       MR. HAYASHI:  Sorry, I do want to take

17  notes on this.

18       MS. FAGENSON:  Can you handwrite your

19  notes so I can hear all the testimony being

20  given?

21       MR. HAYASHI:  I'll see.  Can you hear

22  that?

23       MS. FAGENSON:  Yes.

24       MR. HAYASHI:  I'm surprised that comes

25  through.  Well, we'll see.  I'll get a

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017

1     transcript of it.

2          MS. FAGENSON:  I can hear you much louder

3     than I can hear Joe so that's part of the

4     problem.

5          MR. HAYASHI:  Yeah, and we're going to get

6     a transcript of this anyway.  This might be the

7     last time we need to do this.  I'm just

8     expecting this to be on his trial testimony

9     list, and since it wasn't, I just made a note

10    because it's a little confusing why it's not on

11    there.

12         THE WITNESS:  Well, again, I did not

13    testify, so it's not on my testimony list.

14 BY MR. HAYASHI:

15    Q    I wasn't suggesting that you were pulling

16 anything from us.  I'm just saying for my own -- to

17 prevent me from being confused -- all right, let's

18 go on.  And actually, did you inspect or -- the ship

19 that Mr. Lebron fell on is the Royal Caribbean

20 Adventure of the Seas; correct, Doctor?

21    A    Yes, that's my understanding.

22    Q    Okay.  Did you inspect the Royal Caribbean

23 Adventure of the Seas?

24    A    No, I did not perform an inspection.

25    Q    Have you ever set foot on the Royal

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                               Page 38

```
 1   Caribbean Adventure of the Seas before?
 2        A    To my knowledge, I have not been on the
 3   Adventure of the Seas.
 4        Q    Have you been on any cruise ship before?
 5        A    Yes.
 6             MS. FAGENSON:  Objection to form.
 7   BY MR. HAYASHI:
 8        Q    Any Royal Caribbean cruise ship?
 9        A    I'm not positive as to what cruise ships
10   or the -- not manufacturer, cruise lines they would
11   be.
12        Q    Okay.  Have you ever gone ice skating on a
13   cruise ship before?
14        A    No, I do not believe that I have.
15        Q    Have you ever gone ice skating before?
16        A    Yes.
17        Q    There in Philadelphia I assume?
18        A    I don't think actually in Philadelphia
19   proper, but locally, and then in the areas that I've
20   lived near and around.
21        Q    All right.  Are you -- would you describe
22   yourself as a frequent ice skater?
23        A    I have ice skated recreationally.  I don't
24   think that I've tried to tally my frequency of ice
25   skating.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 39

```
 1        Q    Okay.  So just on and off, like something
 2   you might do from time to time for fun; would that
 3   be correct?
 4        A    Again, recreationally.
 5        Q    And back to your work, about how much work
 6   that you do is on behalf of a party in litigation?
 7        A    Approximately, two-thirds of the work that
 8   I do that is on behalf of a client or time that is
 9   billed to someone is in response to litigation.
10        Q    Okay.  So about two-thirds of your work is
11   related to litigation then; correct?
12        A    Again, of the billable work.  There is an
13   amount of work that is obviously not project-related
14   or is otherwise overhead.
15        Q    Okay.  Well, I guess, help me understand.
16   How is your work broken down?  Because you said
17   two-thirds of this work is -- two-thirds of your
18   project-related work is litigation; it relates to
19   litigation?
20        A    Correct.
21        Q    How much of your work is project work?
22        A    The majority of my work.  I really haven't
23   attempted to quantify the non-project related work.
24   A lot of it is related to either work on behalf of
25   the company and other roles that I serve in the
```

1   company.  Some of it is supervising others within

2   Exponent.  Some of it is research-based and so

3   performing research to further human factors

4   knowledge, attending conferences.  Some of this

5   bleeds into or just extends, and I don't know that I

6   have a number of hours that I could point to as

7   being non-project work on a yearly basis.

8        Q    Okay.  But a majority of your work is

9   project work; correct?

10       A    Correct.

11       Q    And then two-thirds of your project work

12  is related to litigation?

13       A    Approximately, yes.

14       Q    So then a substantial amount of your work

15  at Exponent is related to litigation then; is that

16  correct?

17            MS. FAGENSON:  Objection to form.

18            THE WITNESS:  Well, again, approximately

19       two-thirds of my project-related work is

20       related to litigation.

21  BY MR. HAYASHI:

22       Q    And how often do you testify or -- let me

23  ask it this way.  What percentage of your cases that

24  you testify in is on behalf of the defendant and how

25  much of the percentage of the cases that you testify

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 41

1    in are on behalf of the plaintiff?

2        A    I don't know that I have a current

3    breakdown of testimony.  However, I am engaged by

4    the defense on approximately -- probably around

5    80 percent of my litigation efforts.  Approximately

6    20 percent of my litigation efforts are in response

7    to or on behalf of plaintiff.

8        Q    In all of your -- well, do you have an

9    idea of how many cruise ship cases you've testified

10   in?

11       A    I'd have to look back at my testimony list

12   in order to get that number.

13       Q    Okay.  Well, sure, you can look at it.  It

14   appears to me that you've testified in two cruise

15   ship cases, correct me if I'm wrong.  One appears to

16   be McKinney v. Royal Caribbean Cruise Line, and the

17   other appears to be Guevara v. Norwegian Cruise

18   Line?

19       A    Yes, I believe that's correct.

20       Q    And so you never testified on behalf of

21   the plaintiff in a cruise ship case; is that

22   correct?

23       A    Those two are both on behalf of the

24   defense.

25       Q    Have you ever authored an expert report on

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 42

```
 1   behalf of the plaintiff in a cruise ship case?

 2        A    I do not believe that I have.

 3        Q    Okay.

 4        A    And, excuse me, is now an all right time

 5   if we take a short break?

 6             MS. FAGENSON:  Sure, we can take a break.

 7             MR. HAYASHI:  Yeah, sure.  Well, how do

 8        you feel about just finishing asking about

 9        these cases, and I might be able to streamline

10        a little bit more later?  But it's up to you;

11        I'm not against taking a break.  I don't think

12        this will take too long.

13             THE WITNESS:  Okay, that's fine.  We can

14        finish out this line of questioning then.

15   BY MR. HAYASHI:

16        Q    Okay, thank you.  Okay, could you tell us

17   what this McKinney v. Royal Caribbean case was

18   about?

19        A    McKinney v. Royal Caribbean, I believe

20   that involved a slip and fall on a cruise line.  I

21   don't really remember many of the details of it at

22   this point.

23        Q    Okay.  Well, what was the human factors

24   issue in this case that you were planning to

25   offer -- well, that you offered testimony about,
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 43

```
 1   excuse me?

 2        A    Again, it was, to my recollection, it was,

 3   I believe, the issues were related to a

 4   slip-and-fall event, and so it would be human

 5   factors related to gait, balance, falls.  I don't

 6   have more specifics at this point.  I would need to

 7   review file material in order to give more

 8   information.

 9        Q    So it sounds like you don't recall what

10   this case was involving.

11        A    Not specifically.

12             MS. FAGENSON:  Objection, form.

13   BY MR. HAYASHI:

14        Q    Okay.  So just that it was a slip and

15   fall?

16        A    That's my recollection at this point.

17        Q    And how about the Guevara case, could you

18   tell us what happened in that case?

19        A    I believe that the Guevara matter involved

20   a trip as a gentleman was ascending stairs on an

21   outside stairway on a cruise, and I believe it was

22   at night.

23        Q    Okay.  And do you recall what the human

24   factor opinions that you testified to were?

25        A    Again, they would likely be similar to the
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                  Page 44

```
 1   extent that I was commenting on human gait, human
 2   navigation, and I believe that in that matter there
 3   were issues related to the amount of lighting within
 4   the area and whether or not it was sufficient to
 5   drive human perception.
 6        Q    Are you sure that your testimony in these
 7   cases involved human gait, or were they just about
 8   lighting?
 9        A    Well --
10             MS. FAGENSON:  Objection to form.
11             THE WITNESS:  -- again, I think that it
12        involved navigation and human factors issues
13        related to one's gait and how someone walks
14        within an environment.  That also does include
15        the visually-guided aspects of human
16        locomotion.
17   BY MR. HAYASHI:
18        Q    These cases were primarily about the
19   perception of the plaintiff in these cases, their
20   ability -- for example, wasn't the McKinney case
21   about the ability -- didn't -- wasn't your testimony
22   regarding whether or not the plaintiff in that case
23   could see -- could see any dangerous condition on
24   the floor?
25             MS. FAGENSON:  Objection to form.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                        Page 45

```
 1              THE WITNESS:  It very well could have
 2         included that.  That sounds like something I
 3         may have been asked to address.
 4    BY MR. HAYASHI:
 5         Q    Yes.  Are you aware that when you offered
 6    testimony previously and you were asked what the
 7    issue -- what the perception issue was in the
 8    McKinney case that you testified that, to the best
 9    of your recollection, the issue related to a claim
10    that she could not see a contaminant on the floor?
11              MS. FAGENSON:  Objection to form.
12         Matthias, if you're referring to a document,
13         I'd ask that you give Dr. Sala an opportunity
14         to review whatever you're looking at.
15    BY MR. HAYASHI:
16         Q    Would you like to refresh your
17    recollection with your previous testimony, Doctor?
18         A    If you're going to ask me questions about
19    it, then I would need that document to answer those.
20    I've already said that, as I sit here, you know, my
21    recollection of what my -- the likely area I was
22    asked to review or opine on, if there's more
23    specific information, then I certainly can look at
24    that and answer your questions.
25         Q    Okay, sure.  And I'm going to use this
```

```
 1   feature that allows me to upload files.  Okay, it

 2   says the file name can't exceed 50 characters.  Why

 3   don't we --

 4        A    Is now, while you're attempting to upload

 5   this, is now an all right time that we can take a

 6   break?

 7             MS. FAGENSON:  Yeah, I was thinking the

 8        same thing.

 9                  (Discussion was held off the record.)

10   BY MR. HAYASHI:

11        Q    All right.  Hello, again, Dr. Sala.  Are

12   you ready to start again?

13        A    I am.

14        Q    Okay.  So I'd like to direct you to

15   page -- well, actually, first let me just ask you,

16   do you recall this case, Guevara versus Norwegian

17   Cruise Line?

18        A    I believe that was the case that we just

19   spoke of regarding the gentleman that tripped and

20   fell while ascending some stairs.

21        Q    Okay.  And I want to direct your attention

22   to page 56 of your deposition in this case.  Can you

23   read starting from line four all the way to -- all

24   the way down to line 23, line four through 23?

25             MS. FAGENSON:  Objection to form.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                          Page 47

```
 1              THE WITNESS:  Line four begins, answer,
 2        the next one would be McKinney v. Royal
 3        Caribbean Cruise Lines.  Question, all right,
 4        tell me what happened there?  Answer, a woman
 5        slipped on a surface or allegedly slipped on a
 6        surface and fell.  Question, okay, did that
 7        have anything to do with lighting in the area
 8        being sufficient to perceive or understand what
 9        was happening?  Ms. Fagenson, objection to
10        form.  Answer, I believe that, again, that did
11        not specifically deal with lighting levels;
12        however, the issue of whether or not the person
13        could perceive and see was part of that case, I
14        believe.  Question --
15   BY MR. HAYASHI:
16        Q    Okay, thank you.
17        A    Is there -- okay.
18        Q    You can go on.
19        A    Do you want me to read further?
20        Q    Did you read to line 23?
21        A    I -- I believe I'm on line 19 right now.
22        Q    Yes, please continue.
23        A    Question, what was the issue of perceiving
24   or seeing in that case?  And then if we scroll down
25   a little, I can't see the rest of my -- answer, to
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 48

```
 1   the best of my recollection, the issue related to a

 2   claim that she could not see a contaminant on the

 3   floor.

 4       Q   Okay.  So your testimony in this case was

 5   that the human factors issue was that the plaintiff

 6   in this case could not see a contaminant on the

 7   floor; is that correct?

 8           MS. FAGENSON:  Objection to form.

 9           THE WITNESS:  Well, I believe, that, yes,

10       that would be a relevant human factors issue or

11       something that I was called in to address.

12   BY MR. HAYASHI:

13       Q   Okay.  And you didn't testify to anything

14   about this relating to the gait of the plaintiff in

15   the McKinney case; correct?

16           MS. FAGENSON:  Objection to form.

17           THE WITNESS:  Well, I think this line of

18       questioning was specific to a certain aspect of

19       the case.  I don't think that this should hold

20       for everything that was involved.  And as I

21       stated before, I don't have a clear

22       recollection as to the entirety of that case,

23       but these questions seem to be asked specific

24       to perception and lighting.

25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 49

```
 1   BY MR. HAYASHI:

 2        Q    All right.  Well, the issue of perceiving

 3   in this case was a contaminant on the floor then;

 4   correct?

 5             MS. FAGENSON:  Objection to form.  It's

 6        also very confusing what you mean by "this

 7        case" because you're reading from a deposition

 8        transcript in the Guevara case about another --

 9             MR. HAYASHI:  McKinney.

10             MS. FAGENSON:  -- involving a different

11        case.

12             MR. HAYASHI:  I'm talking about McKinney.

13             THE WITNESS:  Right, my understanding of

14        these questions in the Guevara case were

15        specific to potential perceptual and lighting

16        issues that may have appeared in the McKinney

17        case, and I answered the specific questions.

18        The attorney in Guevara had about -- or

19        previous involvement in another case.  That's

20        all I can represent this testimony to be.

21   BY MR. HAYASHI:

22        Q    Well, right.  Well, your opinions in this

23   Guevara case, they were limited to lighting;

24   correct?

25             MS. FAGENSON:  Objection to form.
```

```
 1              THE WITNESS:  Again, I think I testified
 2         as to my recollection of what I was opining on.
 3         It included human navigation, human perception,
 4         falls.  That does include lighting, and
 5         lighting was one of the things addressed, but,
 6         you know, I think that the report and the
 7         opinions in this spanned a range of human
 8         factors issues.
 9    BY MR. HAYASHI:
10         Q    Right.  And I'm asking about the Guevara
11    case now.  The attorney in the Guevara case was
12    asking questions about lighting because you were
13    offering opinions about lighting on that case;
14    correct?
15              MS. FAGENSON:  Objection to form.
16              THE WITNESS:  I don't think I can speak to
17         the intent of the attorney asking me the
18         questions.  Yes, he did ask me questions about
19         perception and lighting, and, yes, perception
20         and lighting were issues in the Guevara case.
21    BY MR. HAYASHI:
22         Q    Did you include in your report in the
23    Guevara case any opinions on the gait of Mr. Pueblo
24    Guevara?
25         A    Again, I --
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 51

```
 1            MS. FAGENSON:  Objection to form.
 2            THE WITNESS:  I have not reviewed my
 3       opinions or my report in the Guevara matter.
 4       So to the extent that I have touched on
 5       Mr. Guevara's navigation or what he was
 6       specifically doing as he was climbing those
 7       stairs, I don't have a clear recollection as I
 8       sit here.
 9  BY MR. HAYASHI:
10       Q    You didn't offer any testimony about human
11  gait in the Guevara case; correct?
12            MS. FAGENSON:  Objection to form.
13            THE WITNESS:  I believe that I just
14       provided you an answer to that.  As I sit here,
15       I have not reviewed the entirety of my report
16       or opinions in the Guevara matter, and I don't
17       think that I can say the extent of those
18       opinions and to what degree they entailed
19       navigation, stepping behavior.  So I really
20       can't answer that question as I sit here right
21       now.
22  BY MR. HAYASHI:
23       Q    I didn't ask you about your opinions.  I
24  asked you about your testimony.
25            MS. FAGENSON:  Objection to form.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 52

```
 1            THE WITNESS:  I have not reviewed my
 2       testimony in the Guevara matter as well, and so
 3       I cannot testify as to -- or I cannot, as I sit
 4       here today, tell you the entirety of what I was
 5       asked at deposition and my responses.
 6  BY MR. HAYASHI:
 7       Q    Okay.  Would it be fair to say that the
 8  Guevara case was primarily -- was primarily about
 9  the lighting of the area that Mr. Guevara fell?
10            MS. FAGENSON:  Objection to form.
11  BY MR. HAYASHI:
12       Q    Sorry, let me clarify.  That your human
13  factors analysis was primarily concerned with the
14  adequacy or inadequacy of the lighting where
15  Mr. Guevara fell?
16            MS. FAGENSON:  Same objection.
17            THE WITNESS:  Again, I would say that I
18       have not reviewed that matter, my opinions, my
19       report, my testimony, in detail.  I do know
20       that that was a topic of it, but as I sit here,
21       I don't want to misrepresent or characterize
22       the opinions and work and analyses that
23       encompassed my opinions in that matter.
24  BY MR. HAYASHI:
25       Q    So since you didn't inspect the Royal
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                Page 53

```
 1    Caribbean Adventure of the Seas, you didn't inspect
 2    the skates that Mr. Lebron wore at the time of his
 3    incident; would that be correct?
 4        A    I believe that I reviewed the photographs
 5    that were provided and represented as Mr. Lebron's
 6    skates, but to my knowledge, the actual skates are
 7    not available for inspection.  So, no, I did not
 8    inspect the skates.
 9        Q    Okay.  Well, then your -- you had access
10    to the same evidence as far as the skates that Dr.
11    Lu had; correct?
12        A    I believe that we reviewed similar
13    materials and exhibits with respect to the skates.
14        Q    Did you examine any kind of exemplar of
15    the skates or anything like that?
16        A    I'm sorry, can you repeat that?
17        Q    Did you examine any exemplar, any sample,
18    any approximation of what Mr. Lebron's skates might
19    look like?
20        A    I did not.
21        Q    I notice that a lot of your education is
22    in the field of psychology; is that correct?
23            MS. FAGENSON:  Objection to form.
24            THE WITNESS:  I hold degrees in
25        psychology, yes.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 54

```
 1   BY MR. HAYASHI:

 2        Q    So psychology -- well, what is the

 3   relation of psychology and human factors?

 4             MS. FAGENSON:  Objection to form.

 5             THE WITNESS:  So psychology and the

 6        disciplines within psychology and related

 7        fields, like cognitive neuroscience or brain

 8        sciences, which is also something I studied in

 9        graduate school, are some of the fields and

10        disciplines that are at the core of human

11        factors.

12             It relates to human behavior, human

13        perception, human thinking, and human

14        interaction with products, systems, and

15        environments.  That is at the core of

16        psychology and relatedly the connection between

17        mind and brain and behavior.

18   BY MR. HAYASHI:

19        Q    So your education is -- would it be fair

20   to characterize your education as involving the

21   human mind?

22             MS. FAGENSON:  Objection to form.

23             THE WITNESS:  I -- well, my education and

24        training is within, in my scholastic career,

25        was as a psychology major in undergraduate
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                           Page 55

```
 1        schooling.  I then received a master's and a
 2        Ph.D. in psychological and brain sciences
 3        focusing on cognitive neuroscience from Johns
 4        Hopkins University and did a postdoctoral
 5        fellowship in related areas at Stanford
 6        University.  So, yes, most of -- a portion or a
 7        large portion of my education relates to
 8        psychology, human behavior, human perception,
 9        and the mind.
10   BY MR. HAYASHI:
11        Q    Okay.  Your focus then is on -- is more on
12   the human mind than it is on the human body.  Would
13   that be correct to say?
14             MS. FAGENSON:  Objection to form.
15             THE WITNESS:  I don't think that is
16        entirely correct to say.  I think that, again,
17        from the perceptive of human factors, we do
18        look at aspects of the human body, the
19        capabilities, the limitations of the physical
20        body, what it affords, including the
21        developmental capabilities that come online or
22        are associated with various people of various
23        ages or conditions.
24   BY MR. HAYASHI:
25        Q    But your specialty is more how that would
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 56

```
 1   relate to the human mind; correct?
 2            MS. FAGENSON:  Objection to form.
 3            THE WITNESS:  I don't know that I can --
 4         I'm appreciating your qualitative statements,
 5         they're more on or more related to the mind.
 6         My work focuses on a variety of aspects of
 7         human factors, including the interaction that
 8         someone's cognitions, experiences, perceptions
 9         have on their control and their use of
10         products, how that relates to their control
11         over their own body and how that relates to
12         either accidents or the avoidance of accidents.
13   BY MR. HAYASHI:
14         Q    What I meant is your focus is on, for
15   example, how the human mind might -- well, how the
16   body might respond to various stimuli to the mind
17   and how the mind might respond to various external
18   stimuli.  Would that be correct?
19         A    That is a focus, yes, and, you know, I
20   don't know, again, the qualifier that you're putting
21   in there regarding more on or that I'm not -- I
22   don't know that I could agree with that.
23         Q    I guess just let me -- just put it maybe
24   very simply.  Wouldn't it be fair to say that the
25   discipline of biomechanical or biomedical
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 57

```
 1   engineering is more of a focus on the human body,
 2   whereas, human factors is more on the human mind?
 3   There's maybe some overlap, but one of the
 4   differentials is that human factors is more on the
 5   human mind side of that and biomedical or
 6   biomechanical engineering is more on the human body
 7   side of that analysis.  Is that correct, or if not,
 8   let me know how you might qualify what -- if you
 9   understand what I'm trying to get at?
10              MS. FAGENSON:  Objection to form.
11              THE WITNESS:  I'm not positive that I do
12         get what you're trying to get at.  I would
13         agree that there is overlap, and that there are
14         aspects of the human body that both human
15         factors and biomechanics speak to or
16         investigate or incorporate.  There are likely
17         aspects that are -- that would be without or
18         beyond or separate from a human factors
19         expertise, but, again, I am not entirely sure
20         of how you're characterizing this.
21   BY MR. HAYASHI:
22      Q    So human factors doesn't involve any
23   greater emphasis on the human mind than does
24   biomechanical engineering?
25              MS. FAGENSON:  Objection to form.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 58

```
 1              THE WITNESS:  Again, I don't think that is
 2         the same statement that you just made.  I do
 3         think human factors incorporates and addresses
 4         things like experience and cognition to a
 5         different degree than biomechanics does;
 6         however, you know, I don't think that I am
 7         equipped to make a broad, sweeping
 8         generalization as to where that overlap occurs
 9         or ends.
10    BY MR. HAYASHI:
11         Q    Do you have any colleagues that are
12    mechanical or biomedical engineers?
13         A    Yes.
14         Q    Okay.  So biomedical and biomechanical
15    engineers are -- how can I say -- the emphasis in
16    biomedical and biomechanical has a greater emphasis
17    on the body than human factors does; correct?
18              MS. FAGENSON:  Objection to form.
19              THE WITNESS:  I really don't know that I
20         am appreciating the intricacies of your
21         question here focusing on the human body.  It's
22         very broad.  There are aspects of human factors
23         that absolutely do focus on the human body, and
24         like I said before, the capabilities and
25         limitations that imposes on how people interact
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 59

```
 1        with the world around them.

 2             There are certainly aspects of

 3        biomechanical and biomedical engineering that

 4        focuses on the human body that is distinct from

 5        human factors, but as I sit here, I don't

 6        believe that I can accept the broad statement

 7        as you phrased it.

 8   BY MR. HAYASHI:

 9        Q    So your testimony is that there's no -- no

10   difference in how much weight is afforded to the

11   human mind versus the human body between human

12   factors on the one side and biomechanical and

13   biomedical engineering on the other side; is that

14   correct?

15             MS. FAGENSON:  Objection to form.

16             THE WITNESS:  That is certainly not my

17        testimony, and those have not been the

18        questions you've been asking.

19   BY MR. HAYASHI:

20        Q    Well, do you believe that there's a

21   greater emphasis on the human mind or the human body

22   in each respective discipline?

23             MS. FAGENSON:  Objection to form.

24             THE WITNESS:  As I've stated before, I

25        think that there -- there is overlap, and the
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                                Page 60

```
 1        degree within human factors or biomechanics
 2        that one focuses and what relation that takes
 3        between -- or aspects of the human body is
 4        dependent upon that specific focus and
 5        training.
 6             I would agree that -- that human factors
 7        often will incorporate more related to the
 8        human mind, perception, cognition than some
 9        investigations that are biomechanical.  And
10        some investigations that biomechanical deal
11        with aspects of the human body that would not
12        be as typical for human factors.
13   BY MR. HAYASHI:
14        Q    Okay, thank you.  And just to be clear,
15   you haven't receive any education in engineering,
16   have you?
17             MS. FAGENSON:  Objection to form.
18             THE WITNESS:  I am not trained or educated
19        as an engineer.
20   BY MR. HAYASHI:
21        Q    Okay.  And you're not an expert in
22   engineering; correct?
23             MS. FAGENSON:  Objection to form.
24             THE WITNESS:  I do not hold myself out to
25        be one.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                         Page 61

```
 1   BY MR. HAYASHI:

 2        Q    Okay.  And since we -- and about

 3   perception and -- well, start over again.  So as far

 4   as human factors is concerned, is there a difference

 5   in the analysis -- in your analysis of Mr. Lebron's

 6   fall -- or let me just phrase it this way, Doctor.

 7   Is your analysis of Mr. Lebron's fall in any way

 8   affected by the fact that he was on a ship at sea?

 9             MS. FAGENSON:  Objection to form.

10             THE WITNESS:  I don't believe that my

11        opinions are contingent upon that fact or are

12        affected by that.

13   BY MR. HAYASHI:

14        Q    Okay.  And that's because there's no

15   reason to believe that an ice rink on a cruise ship

16   at sea would affect Mr. Lebron's perception or

17   movement differently than an ice rink on land.

18   Would that be correct?

19             MS. FAGENSON:  Objection to form.

20             THE WITNESS:  Well, I'm really not aware

21        of any evidence to suggest that there were any

22        sort of movements or condition that would

23        affect this -- his interaction or his time on

24        the ice skating rink in that manner.

25
```

1    BY MR. HAYASHI:

2        Q    So based on the evidence in the case, your

3    analysis would be the same as if his fall happened

4    on land -- on a land-based ice skating rink, excuse

5    me?

6            MS. FAGENSON:  Objection to form.

7            THE WITNESS:  I believe that my analysis

8        would be the same, yes.

9    BY MR. HAYASHI:

10       Q    And, again, you said that your analysis

11   also included human movement; correct?

12       A    I'm sorry, can you repeat that?

13       Q    You said -- or is your analysis also

14   including human movement?

15           MS. FAGENSON:  Objection to form.

16           THE WITNESS:  I'm sorry, can you -- so

17       what do you mean by "is my analysis including

18       human movement"?  I don't think I'm just -- I'm

19       just not understanding your --

20   BY MR. HAYASHI:

21       Q    Are you analyzing Mr. Lebron's movement?

22       A    So yes, I believe I include in my report

23   and incorporate into my analysis how he was moving,

24   how he was interacting at the time of the fall, and

25   also, more broadly, as he was skating around the

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                        Page 63

```
 1   rink.

 2        Q    You have experience or you list as one of

 3   the areas that you publish and presented, that

 4   you've published papers in and presented at

 5   conferences relating to human factors, you've

 6   included risk communications through warnings; is

 7   that correct?

 8        A    Yes.

 9        Q    Okay.  So about warnings, is it correct to

10   say that for a warning to be effective, it needs to

11   be specific to the danger?  Would that be correct,

12   specific to the danger presented?

13            MS. FAGENSON:  Objection to form.  Also

14        calls for a legal conclusion.

15            THE WITNESS:  Well, I don't know that I

16        can agree with you from a scientific

17        perspective.  For -- you know, there are many

18        steps involved as to whether or not a warning

19        will influence someone's behavior sufficiently

20        to modify their actions and avoid a -- either

21        an accident, danger, or injury.  Some of it

22        might relate to specificity over what is to be

23        avoided, and at other times, that would not be

24        necessary.

25
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                Page 64

```
 1   BY MR. HAYASHI:

 2       Q   I would like to draw your attention and if

 3   it hasn't been marked already, I work like to mark

 4   the deposition of Dr. Sala in the Guevara case as

 5   Plaintiff's Exhibit C, I believe it's at C now.

 6               (Discussion was held off the record.)

 7           MR. HAYASHI:  In any case, so this will be

 8       marked in your -- in the transcript, correct,

 9       as Plaintiff's Exhibit C?

10           THE REPORTER:  Yes.

11           MR. HAYASHI:  Okay, thank you.

12   BY MR. HAYASHI:

13       Q   So I would like to draw your attention to

14   page 111.  So could you read your testimony, or

15   could you read from your deposition transcript in

16   the Guevara case starting on page 17 the question

17   asked to you and then on line 20 your answer, Dr.

18   Sala?

19           MS. FAGENSON:  Objection to form.

20           THE WITNESS:  Starting on page nine -- I

21       mean, line nine, did you say?

22   BY MR. HAYASHI:

23       Q   Line 17.

24       A   Okay.  So, question, and in order for that

25   warning to be effective, it must be specific to the
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 65

1    danger presented; correct?  And answer, no, that's

2    not necessary.

3         Q    Okay.  And the hypothetical warning you

4    were discussing, it was relating to a hypothetical

5    about a driver behind a wheel; correct?

6              MS. FAGENSON:  Objection to form.

7              THE WITNESS:  From just that question and

8         answer, I cannot tell.  I can go back and read

9         before that to provide some context if you

10        would like.

11   BY MR. HAYASHI:

12        Q    Sure.  Why don't we, I guess, why don't we

13   start on page 109.  Excuse me, this is a little

14   fidgety.  Okay, so why don't you start on page -- I

15   don't know why this -- page 109 starting on line 20.

16   Are you able to see it?  I think you might be seeing

17   something slightly maybe elevated than me?

18        A    I see line 20, so I'll start at line 20.

19        Q    Okay, sure.

20        A    And, again, this is simply reading the

21   lines that you've asked me to.  If I really want to

22   have some context, I may need to read above and

23   below, but just reading from line 20, answer, and I

24   will say that 2B, as in boy, shows that this warning

25   is on the pedestal on which a globe is mounted and

1    it is as you approach the set of three stairs, the

2    pedestal to the right.  Question, okay, and what is

3    your opinion regarding that warning sign?  Answer,

4    that it is formated and presented adequately,

5    provides information as to a pedestrian walking

6    incident area, advises them of potential hazards,

7    and is adequate for its purposes.  Do you want me to

8    keep reading?

9        Q    Yeah.  If you could just read to where we

10   started from last time, I believe it was line 17.

11       A    And does that sign pertain to the

12   approach, or is it pertaining to the transition on

13   the other side of the pedestal?  Answer, I believe

14   that it pertains to the area.  Question, is there

15   any specific reference to a step down immediately

16   behind the pedestal?  I can't see anymore of the

17   screen.  Continuing on line, I think, 15, answer,

18   no, that is not explicitly referenced on it.

19       Q    And then, I guess, just for context --

20   yeah, actually, if you could continue reading, but I

21   think actually line 17 on the next page actually.

22   So if you could continue reading to line 17 on the

23   following page.

24       A    Okay.  Answer -- I just read that, I'm

25   sorry.  Question, starting on line 17 of this page,

1  question, and in order for warnings to be effective,

2  don't they have to be both contemporaneous and

3  explicit as to the danger being warned against?

4  Ms. Fagenson, objection to form.  Answer, so I

5  don't -- I don't agree with that statement.  I think

6  there -- I think that there are a number of factors

7  that go into the -- and then if you could move it

8  down again.  No, I need it --

9       Q    Up a little bit.

10      A    Yeah, up a little bit.  I'll just start

11  over at line 22.  Answer, so I don't -- I don't

12  agree with that statement.  I think that there are a

13  number of factors that go into the effectiveness of

14  a warning and most of them are from scientific

15  literature on the receiver end -- I'm sorry,

16  receiver end and not under the influences of the

17  format or presentation of the warning itself.  So --

18  can you scroll down?

19      Q    Sure.

20      A    So, no, I don't think I can agree with

21  your statement about it for it to be effective.

22  Question, and you said the receiver end.  What do

23  you mean the receiver end?  Answer, so the driver

24  behind whether or not any warning would be effective

25  depends on the person that is receiving the warning,

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 68

```
 1   so whether a person is looking for and attending to
 2   it, is willing to have that information change their
 3   behavior, and ultimately change their behavior based
 4   on the information presented to them.  I think that
 5   brings us to where we were before, and --
 6        Q    Just for context why don't you read up to
 7   line 20?
 8        A    Question, and in order for that warning to
 9   be effective, it must be specific to the danger
10   presented; correct?  Answer, no, that's not
11   necessary.
12        Q    Okay.  And have your opinions on the
13   effectiveness of warnings changed from the time you
14   offered testimony in the Guevara case to today?
15             MS. FAGENSON:  Objection to form.
16             THE WITNESS:  No, and I think what I
17        testified to before was completely consistent
18        with this.
19   BY MR. HAYASHI:
20        Q    Okay.  And you don't hold yourself out as
21   an expert in architectural standards.  Do you,
22   Doctor?
23        A    No, I do not believe that I have.
24        Q    Okay.  Now, next in your report, well,
25   starting, I guess, let's -- starting on page two of
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 69

```
1   your report, you have a description of Mr. Lebron's

2   incident before you discuss -- before you have a

3   section on incident, background, and review (sic).

4   There's a little bit of discussion about Mr. Lebron

5   and his incident; correct?

6        A    Yes, I believe I see that.

7        Q    (By Ms. Fagenson): I'm sorry, what are we

8   looking at?

9             MR. HAYASHI:  The top of page two, the

10        section starting at the top before incident,

11        background, and overview.

12             MS. FAGENSON:  Okay.

13   BY MR. HAYASHI:

14        Q    Are you planning to testify to what you

15   have written here, Doctor, or is this just for

16   background?

17             MS. FAGENSON:  Objection to form.

18   BY MR. HAYASHI:

19        Q    Your report?

20        A    I'm sorry.  I don't know that I'm

21   understanding your distinction.  I think that this

22   is background and information on which presents my

23   understanding and facts in the case.  I likely will

24   incorporate that background, that factual

25   information, and that -- that as a basis to my
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 70

1    testimony.

2         Q    So you are planning to testify on this

3    factual background, tell the jury about this factual

4    background?

5              MS. FAGENSON:  Objection to form.

6              THE WITNESS:  Again, I believe that I will

7         be, during the testimony, if asked about or if

8         I need to incorporate certain facts of the

9         case, I would plan on having that as part of my

10        testimony.  I don't know that -- how else to

11        describe that.

12   BY MR. HAYASHI:

13        Q    Sure.  Well, this summary of this

14   factual -- the summary of your understanding of the

15   facts of this case, is this intended to rebut any

16   opinions or factual summary of any of the experts in

17   Mr. Lebron's case?  Any of the experts Mr. Lebron

18   retained excuse me?

19        A    I believe that facts in the case are

20   reviewed and I'm reciting facts in the case to serve

21   as a basis for my analysis, which as I've stated

22   before, are going to be responding to or in

23   comparison to opinions presented by others in the

24   case.  So I don't know the -- I'm not understanding

25   the distinction you're trying to make here.

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 71

```
 1        Q    Let me just ask you this.  Are you aware
 2   of this summary of your understanding of the facts?
 3   Are you aware that this summary is any different
 4   than that provided by the experts Mr. Lebron has
 5   retained?
 6             MS. FAGENSON:  Objection to form.
 7             THE WITNESS:  I -- as I sit here, I don't
 8        know whether experts retained on behalf of Mr.
 9        Lebron would take issue with any of these
10        facts.
11   BY MR. HAYASHI:
12        Q    Okay.  And so you have a section titled
13   incident, background, and overview; correct?
14        A    Yes.
15        Q    Now, are you planning to go over all of
16   these facts with the jury or all of this -- your
17   understanding of the facts?
18             MS. FAGENSON:  Objection to form, asked
19        and answered.
20             THE WITNESS:  I haven't planned out what
21        my testimony in front of the jury will be and
22        nor do I know, necessarily, what I'll be asked
23        either on direct or cross.  This is, again,
24        laying out some facts in the case that I think
25        are relevant to the analyses that I have
```

```
 1         presented.  So I don't -- I can't, as I sit

 2         here right now, say what precisely the

 3         testimony itself will be at the time of trial.

 4    BY MR. HAYASHI:

 5         Q    Okay.  So just so we're clear, this

 6    section that starts on page two of your report

 7    titled, incident, background, and overview and

 8    ending on page nine of your report where the next

 9    section is knowledge or -- actually, let me start

10    over again.  So on page two, you have an entire

11    section titled, incident, background, and overview;

12    correct?

13         A    There is a --

14              MS. FAGENSON:  Objection.

15              THE WITNESS:  -- bold heading on page two

16         that says incident, background, and overview,

17         yes.

18    BY MR. HAYASHI:

19         Q    Right.  That's the beginning of a whole

20    section of your report; correct?

21         A    Yes, that is a section within the report.

22         Q    Okay.  And that section extends all the

23    way to page nine of your report; correct?

24              MS. FAGENSON:  Objection to form.

25              THE WITNESS:  The -- that section does
```

1        extend through page nine where there's another

2        bold heading section.  Within those pages,

3        there are a number of subheadings that outline

4        information about various aspects of the

5        incident, background, and overview.

6   BY MR. HAYASHI:

7        Q    Okay.  Well, my question is, this

8   section -- this entire section that goes page two to

9   page nine of your report that has the bold heading,

10  incident, background, and overview, is it correct

11  that this section is just intended to be a

12  recitation of the facts of Mr. Lebron's case as you

13  understand them; is that correct?

14            MS. FAGENSON:  Objection to form.

15            THE WITNESS:  I believe that this section

16       is laying out factual information and pieces of

17       evidence that I reviewed in the matter.  Going

18       line -- going line by line, there -- I can't

19       say whether or not without going line by line

20       as to whether there is also some -- some aspect

21       of this that relates to either an opinion or an

22       analysis, but this section largely outlines

23       facts and evidence from case materials.

24  BY MR. HAYASHI:

25       Q    Okay.  Please tell me, because I might be

1   a little confused, are you saying that you may have

2   some opinions in this section, that starts on page

3   two and ends on page nine?

4        A    Again, I'm just saying that for the

5   purposes of this question, I haven't reread that

6   entire section, and so I believe that this section

7   outlines facts and evidence that I am using in my

8   analysis.  Whether a particular analysis begins

9   within this section, without going through it line

10  by line, I wouldn't be able to tell you that right

11  now.

12       Q    Okay.  And I just briefly want to talk

13  about this section right above incident, background,

14  and overview on page two, right next to footnote

15  two, not at the bottom of your page but at the top

16  of your page, it says daughter, and then it has

17  footnote two.  Are you seeing where I'm talking

18  about?

19       A    Yes.

20       Q    Okay.  So I want to talk just briefly

21  about this section.  Could you read to us starting

22  right after the second footnote there down to the

23  third footnote?

24            MS. FAGENSON:  Objection to form.

25            THE WITNESS:  So I believe you're asking

1       me to read the sentence that begins, Accident

2       records?

3    BY MR. HAYASHI:

4        Q    Yes, and it should end with the word

5    "fall."

6        A    Accident records and statements from Mr.

7    Lebron describe his incident having occurred as the

8    result of, quote, loss of balance, as well as him

9    falling when trying to hold and prevent his daughter

10   from falling, and then there's the footnote three.

11       Q    Okay.  Now, is your testimony that Mr.

12   Lebron testified that his incident occurred as a

13   result of him trying to hold and prevent his

14   daughter from falling?

15            MS. FAGENSON:  Objection to form.

16   BY MR. HAYASHI:

17       Q    Is that your understanding of the facts of

18   this case?

19       A    That is not what I've stated in this.  I

20   specifically point to accident records and

21   statements.  And I cite to them and, in fact, the

22   next sentence says that his deposition testimony was

23   different from that.

24       Q    Okay.  And please excuse me, I suppose I

25   may have just misunderstood it, but you were not

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 76

```
 1    intending to say that Mr. Lebron -- in other words,

 2    Mr. Lebron did not testify that his fall occurred

 3    because he was trying to hold his daughter,

 4    allegedly; correct?

 5              MS. FAGENSON:  Objection to form.

 6              THE WITNESS:  I don't believe that his

 7         deposition testimony is consistent with your

 8         statement.

 9    BY MR. HAYASHI:

10         Q    Right.  Mr. Lebron never claimed that his

11    incident occurred because -- was allegedly trying to

12    hold onto his daughter to prevent her from falling.

13              MS. FAGENSON:  Objection to form.

14              THE WITNESS:  Again, I don't know that

15         that statement is correct.  I believe that at

16         deposition he testifies that -- or I'd have to

17         check for the specific testimony, but I believe

18         that his deposition testimony says that he --

19         his fall was initiated by some other reason and

20         not due to trying to hold his daughter up from

21         her falling.  Statements elsewhere, I think,

22         disagree with that.

23    BY MR. HAYASHI:

24         Q    Okay.  Well, you don't know about any

25    other testimony he may have offered outside of his
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                            Page 77

```
 1   deposition; correct?

 2            MS. FAGENSON:  Objection to form.

 3            THE WITNESS:  I don't know if he was

 4        deposed on other matters and commented on this.

 5        As far as testimony goes, what we have is

 6        documented statements provided at the time of

 7        the incident that is -- are either in exhibits

 8        or testified to by others.

 9   BY MR. HAYASHI:

10        Q    Well, right, but whatever Mr. Lebron said

11   earlier, it wasn't in the context of being under

12   oath in a court case setting; correct?

13            MS. FAGENSON:  Objection to form.

14            THE WITNESS:  Again, I only know of the

15        one deposition in this matter that he has

16        given.  I can't comment on things outside of

17        that.

18   BY MR. HAYASHI:

19        Q    You're not trying to say that, for

20   example, any statements he may have made to the

21   security officer were testimony.  You're not trying

22   to say that; correct?

23            MS. FAGENSON:  Objection to form.

24            THE WITNESS:  I am not representing them

25        as what he has said at deposition or that he
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 78

```
 1        was being deposed at the time that he made

 2        those statements immediately after the fall.

 3   BY MR. HAYASHI:

 4        Q    Okay.  Excuse me, Dr. Sala, just looking

 5   at my notes.  Okay, you also have a section here

 6   titled testimony of Mr. Lebron on page -- starting

 7   on page four; correct?

 8        A    Yes.

 9             MS. FAGENSON:  Objection to form.

10   BY MR. HAYASHI:

11        Q    Everything you've written here in your

12   report is your understanding of what Mr. Lebron

13   testified in this case in his deposition; is that

14   correct?

15             MS. FAGENSON:  Objection to form.

16             THE WITNESS:  So my intention is to

17        include his testimony.

18   BY MR. HAYASHI:

19        Q    Right.  So this -- correct me if I'm

20   wrong, but this section is essentially outlining

21   your review of Mr. Lebron's deposition transcript

22   and laying out the testimony of Mr. Lebron in his

23   deposition as you understood it; is that correct?

24        A    Many of the what -- many of the facts

25   within the testimony.  Obviously, his testimony was
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 79

1   much longer, and there may be things that I am not
2   explicitly referencing in here that are relevant,
3   but that was the intention.
4        Q    Wait, that last part you said, are you
5   saying there are parts of Mr. Lebron's deposition
6   testimony that are relevant that you didn't include
7   here?
8             THE WITNESS:  Oh -- I'm sorry, was there
9        an objection?
10            MS. FAGENSON:  Yes, there was.  Just to
11       form.
12            THE WITNESS:  What I'm saying is that his
13       deposition testimony is obviously much longer
14       than my presentation of it here today and
15       whether there are pieces or aspects of that
16       testimony that would be relevant to questions I
17       am asked, they may exist outside of some of the
18       factual information I detail here.
19            I have reviewed the testimony, and
20       certainly we can discuss aspects of it that are
21       outside of this recitation here, but my intent
22       was to include the aspects of the testimony, my
23       understanding of it, and how it applies to my
24       analyses.
25

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 80

1   BY MR. HAYASHI:

2       Q    Your analysis -- how it applies to your

3   analysis in this report; correct?

4       A    Correct.

5       Q    Okay.  So I just want to be clear, so on

6   page five of your report, can you read starting at

7   footnote 51, again, not in the -- at the bottom

8   where it lists page number of the transcript, but in

9   the -- let me see here, I guess, the third paragraph

10  where it starts, he testifies -- yeah, and if you

11  could end where it says, himself, and then it has a

12  citation to footnote 52?

13      A    He testifies that he tried to get someone

14  to help him with his skates by looking around, but

15  he did not see anyone, so he put his skates on

16  himself.

17      Q    Okay.  So just so we're clear, this is

18  your opinion on what Mr. Lebron's testimony was;

19  correct?

20           MS. FAGENSON:  Object to the form.

21           THE WITNESS:  I believe this is --

22           MR. HAYASHI:  Your testimony --

23           THE WITNESS:  -- this is my recitation of

24      what I saw in the testimony.

25           MR. HAYASHI:  Okay.

```
 1            THE WITNESS:  And I'm obviously siting to
 2       the portion of his testimony that I believe
 3       this is in reference to.
 4  BY MR. HAYASHI:
 5       Q    Now, the next part of -- well, could you
 6  now read the next sentence where it starts Mr.
 7  Lebron and ends with skate?
 8       A    Mr. Lebron recalls that he first put his
 9  skate on his right leg, followed by his left, and
10  that the sizing of skates appear to be appropriate
11  for him as his foot fit in the skates.
12       Q    And did Mr. Lebron actually say the words
13  "appropriate for him" or "appropriate for me"?
14       A    I can go back and look at that testimony
15  to see what he specifically said.
16       Q    Sure.
17       A    So he testifies -- so the question was
18  asked, did the foot fit in the skates?  Yes.  Do you
19  have any reason to doubt they were size
20  ten-and-a-half?  No.  Other than the shoelaces, they
21  appeared to fit properly?  Yes.
22       Q    Okay, thank you for that.  So we're clear,
23  he testified that they appeared to fit properly
24  other than the shoelaces on the skate; correct?
25       A    Well, that was -- the question that was
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 82

1   asked was other than the shoelace, they appeared to
2   fit properly, and he answered, yes.
3        Q    Well, right.  So he's answering yes to the
4   question that was asked, he is -- he is testifying
5   that -- how should I put it?  Mr. Lebron is clearly
6   not saying that the shoes -- that the skates fit
7   properly when you consider the shoelaces that he
8   alleges are defective, just so we're clear?
9             MS. FAGENSON:  Objection to form.
10            THE WITNESS:  Right.  I think the question
11        was specific to the sizing of the skate.
12   BY MR. HAYASHI:
13        Q    Right, right.  And just so -- exactly, so
14   we're clear that Mr. Lebron, he's consistently
15   testified that his shoe -- I mean, sorry, his skate
16   did not have adequate lacing; correct?
17            MS. FAGENSON:  Objection to form.
18            THE WITNESS:  I am aware of his --
19        portions of his testimony where he is alleging
20        that the lacing on the one skate was
21        insufficient for him to lace them above the
22        ankle.  I believe this question and answer was
23        with respect to the size.
24   BY MR. HAYASHI:
25        Q    Right.  So you're not trying to say that

```
 1   this citation to his deposition transcript suggests
 2   that in any way the lacing was proper?
 3        A    No --
 4             MS. FAGENSON:  Objection to form.
 5             THE WITNESS:  -- I believe that I
 6        reference it in my report as, And that the
 7        sizing of the skates appear to be appropriate
 8        for him as his foot fit in the skates.
 9   BY MR. HAYASHI:
10        Q    Okay.  So then you're -- okay, thank you.
11   And on page six of your report, starting in the
12   middle paragraph, the second paragraph, actually,
13   the last sentence where it says "he describes,"
14   could you just read that quickly?
15        A    He describes that he had a feeling of
16   being rushed -- of being rushed to get onto the
17   rink.
18        Q    Okay.  And on page seven of your report,
19   could you read starting on the second paragraph
20   right after the citation of footnote 77 where it
21   says "he felt" and ending with the word "ankle" at
22   the end of the paragraph where it has a citation of
23   footnote 79?
24        A    He felt that his right skate became stuck
25   and that he could not recover from his loss of
```

1    balance or get his foot out of place when the skate

2    felt stuck, so all of his body fell on his ankle.

3          Q    And can you continue to the end of the

4    paragraph?

5          A    His instinct was to try and recover his

6    balance with his other foot, but because his right

7    foot was stuck, he fell completely onto the ice with

8    his body and buttocks and all of his weight fell

9    onto his right ankle.

10         Q    Okay.  And, again, this is your

11   understanding of what Mr. Lebron testified to in his

12   deposition; correct?

13              MS. FAGENSON:  Objection to form.

14              THE WITNESS:  I believe that this is what

15         he stated in his deposition.

16   BY MR. HAYASHI:

17         Q    And could you read the following paragraph

18   where you left off, all the way from "in his

19   testimony" to the words "lose his balance"?

20         A    In his testimony, excuse me -- in his

21   testimony, Mr. Lebron did not perceive his daughter

22   losing her balance in the moments before his fall,

23   does not think he was trying to grab her, and

24   further, does not recall telling anyone that he was

25   trying to stop his daughter from falling.  I'm

1   sorry, did you want me to keep reading to the end of

2   that paragraph?

3         Q    Yes, sir.

4         A    He thinks that he fell because he did not

5   have enough support in his ankle due to the lace,

6   which caused him to lose his balance.  He further

7   states that a defect in the ice, specifically a deep

8   area, caused him to be unable to recover his balance

9   causing him to fall.  He testifies that it was the

10  combination of the conditions of the skate and the

11  ice which causes him to lose his balance.

12        Q    And, again, this is your understanding of

13  what Mr. Lebron said in his deposition?

14        A    I believe that is consistent with his

15  deposition testimony.

16        Q    And on the next paragraph, just so we're

17  clear, you say Mr. Lebron testified that prior to

18  his fall, he didn't see or feel any problems with

19  the ice; correct?

20        A    Correct.

21        Q    Just so we're clear, he did testify that

22  he noticed problems with the ice after he fell;

23  correct?

24             MS. FAGENSON:  Objection to form.

25             THE WITNESS:  I think that we need to look

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 86

```
 1      at specific areas and portions of his
 2      testimony.  I believe that portions where he
 3      was asked about this defect he states he did
 4      not see anything.  I believe when -- what he
 5      was assessing at the time was that he felt his
 6      clothes were excessively dirty as he was down
 7      on the ice, but I think that those are two
 8      separate points.
 9 BY MR. HAYASHI:
10      Q    Well, the ice being dirty would be a
11 problem with the ice; correct?
12      A    The -- I don't think that the level of
13 dirt on an ice is something within my area of
14 expertise where I would claim whether or not that
15 was a, quote, unquote, problem with the ice.  That's
16 not something that I've looked into.
17      Q    Okay.  What I am just trying to say -- so
18 we are clear, that he did testify that he noticed
19 that the ice was dirty when he fell; correct?
20           MS. FAGENSON:  Objection to form.
21           THE WITNESS:  Again, I don't believe that
22      was when he fell.  I think that he made a
23      comment that after the incident, his clothing
24      was, in his mind, excessively dirty.  And he is
25      attributing that to being on the ice.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 87

```
 1   BY MR. HAYASHI:

 2        Q    Okay.  And also, just for clarity sake,

 3   Mr. Lebron did clearly testify that he -- that he

 4   felt a groove in the ice, as you seem to call it a

 5   deep area, but Mr. Lebron has been consistent in

 6   testifying that he felt a, what you refer to as a

 7   deep area, I believe he referred to it as a groove

 8   in the ice; is that correct?

 9             MS. FAGENSON:  Objection to form.

10        Misstates his testimony.

11             THE WITNESS:  I would defer back to his

12        underlying testimony as to where and how he

13        testifies to this.  My recollection is that he

14        describes that he felt his foot get stuck.

15        There may be points at which he attributes this

16        to a definable aspect of the ice, but I do

17        think that consistently through his testimony

18        he never states that he saw what this defect

19        was either prior to or during or after his

20        fall.

21   BY MR. HAYASHI:

22        Q    Right.  Well, let me put it this way.

23   You -- since he's attributing one of the causes of

24   his fall to being this, what you would -- a deep

25   area, he is aware of this, even if he -- even if he
```

```
 1   didn't see it.  We're clear about that; right?
 2            MS. FAGENSON:  Objection to form.
 3            THE WITNESS:  I'm not clear on that.
 4   BY MR. HAYASHI:
 5       Q   Yes.  He's testifying that it's there,
 6   okay; right?
 7            MS. FAGENSON:  Objection to form.
 8            THE WITNESS:  Again, if you want to point
 9       to a specific area in the testimony, certainly
10       I can review that.  However, my understanding
11       is that he testifies as to the feeling that his
12       foot is stuck, and he states that he never saw
13       or observed anything that his foot was stuck
14       in.  He attributes this to a deep area, a
15       groove, at some point, and if there's more
16       specific -- or a portion of the testimony you
17       want to ask specifically about, I'd be happy to
18       review it.
19   BY MR. HAYASHI:
20       Q   Well, right.  Well, I believe we're
21   speaking about the same parts of his -- we're most
22   likely speaking about the same parts of his
23   deposition testimony that you've cited to because
24   you cite to this deep area, just so we're clear, he
25   refers to that as a groove in his deposition
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017

```
 1   testimony?

 2           MS. FAGENSON:  Object to the form.

 3           THE WITNESS:  I'll certainly look back and

 4       see how he phrases it.

 5   BY MR. HAYASHI:

 6       Q   Well, I don't think that's necessary.  The

 7   point is that Mr. Lebron testified that his skate

 8   got stuck in what you're referring to as a deep

 9   area; correct?

10       A   Again, as I've stated, I believe that his

11   testimony is that he felt as if his foot was stuck.

12   He never saw or observed the thing that he believes

13   his foot got stuck in, and he makes an attribution

14   that there was a deep area.

15       Q   Well, maybe this will help.  Would you

16   like to review Mr. Lebron's deposition transcript

17   starting on page 118 on line 21 and ending on page

18   119, line 5?

19       A   I think that for additional context, it

20   would be helpful for me to continue past that point.

21   I'll read from starting on line 22, his answer,

22   Well, when I fell, everything was all dirty, and

23   because of that dirt, then I perceived that it

24   didn't have the adequate maintenance.  And where the

25   skate got stuck, that was an area that was deep
```

1   enough that I wasn't able to get my skate out so I
2   could regain my balance.
3            So I suppose that the rink must
4   receive some type of treatment or maintenance so
5   that these grooves don't exist to avoid this type of
6   fall.  Question, describe any type of groove you saw
7   on the ice.  Answer, I didn't perceive any grooves
8   in the ice.
9            (Indecipherable cross-talk between
10  counsel.)
11  BY MR. HAYASHI:
12       Q    Sorry, Dr. Sala, before we go on, I just
13  asked you about this section.  I'll be, you know,
14  courteous enough to let you finish, but I would like
15  to ask you just a question about this before you go
16  on; is that --
17       A    Right, no, I understand.  I'll answer your
18  question.  However, you were asking me about a
19  segment of the deposition that, in response to the
20  series of questions and answers that we just had, I
21  think, mischaracterized what was being conveyed to
22  the very point we were talking about.  And so I just
23  wanted to clear that in follow up to that portion of
24  the question, there was an explicit statement made
25  by Mr. Lebron that he didn't perceive any grooves in

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 91

```
 1    the ice.
 2        Q    All right.  And so you're planning to read
 3    to line nine then?  I just wanted to know exactly
 4    how far you're planning to read so I could --
 5        A    I can stop there, and certainly, if we
 6    need to go further, I can continue to read, but if
 7    you'd like to ask additional questions, then we can
 8    move on.
 9        Q    Okay.  I don't want you to think I was
10    trying to be rude or anything like that.
11        A    No, that's all right.
12        Q    You know, I would like to know if you're
13    planning to read additional lines, how far you're
14    planning to read, because I would like to review
15    this myself, but -- so you were planning -- so you
16    planned and you did read to line 9 on 19; correct?
17        A    Correct.
18        Q    Okay.
19             MS. FAGENSON:  And did the --
20             MR. HAYASHI:  And I understand --
21             MS. FAGENSON:  For the record, did the
22        court reporter actually get it all down?
23             THE REPORTER:  His reading?  Yes.
24             MS. FAGENSON:  Well, I know Mr. Hayashi
25        and I were both speaking at the same time, so I
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 92

```
 1        just wanted to make sure you actually recorded
 2        what he was reading.
 3   BY MR. HAYASHI:
 4        Q    And actually, I mean, actually, for
 5   further context, Dr. Sala, could you actually read
 6   the entire paragraph that starts on line 8 all the
 7   way down to line 14 actually?
 8        A    Yes.
 9             MS. FAGENSON:  Can we have him read the
10        question and the answer?
11   BY MR. HAYASHI:
12        Q    Let's start on line 6.
13        A    Question, describe any type of groove that
14   you saw on the ice.  Answer, I didn't perceive any
15   grooves in the ice.  When I'm standing on the ice,
16   since the rink is all white, there's no way that you
17   could perceive while you're standing at eye-level
18   any type of groove.  That's why I don't think that
19   the fact that I didn't perceive them doesn't mean
20   that they didn't exist or that they weren't -- or
21   that there weren't any more.
22        Q    So Mr. Lebron couldn't perceive the groove
23   standing on the ice since the rink is all white;
24   correct?
25             MS. FAGENSON:  Objection to form.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 93

```
 1   BY MR. HAYASHI:

 2        Q     Eye level?

 3        A     I believe that is what he stated.  That's

 4   his deposition testimony.

 5        Q     Right.  He didn't say anything about not

 6   being able to feel his skate in the groove in this

 7   paragraph; correct?

 8             MS. FAGENSON:  Objection to form.

 9             THE WITNESS:  He is saying that he didn't

10        perceive any grooves and that he then makes a

11        further statement about not being able to see

12        them because of what he believes is an

13        inability to detect a groove on ice.

14   BY MR. HAYASHI:

15        Q     When he's standing from eye level,

16   correct, when he's standing at eye level?

17        A     That is his statement.

18        Q     Right, but just before that, he does

19   clearly say, starting on line 24 on page 118, And

20   where the skate got stuck -- and actually, this is

21   going to continue on to page 119, line 2.  So he

22   does say, And where the skate got stuck, that was an

23   area that was deep enough that I wasn't able to get

24   my skate out so that I could regain my balance;

25   correct?
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017

```
 1        A     That is his statement.

 2        Q     Exactly.  And he's never said that he

 3   couldn't -- that he wasn't able to feel his skate

 4   getting stuck in that area that was deep enough so

 5   that he couldn't regain his balance; correct?

 6        A     I'm sorry, can you repeat that?

 7        Q     He never said that he couldn't feel this

 8   deep area; correct?

 9        A     I would --

10              MS. FAGENSON:  Objection to form.

11              THE WITNESS:  So in this portion right

12        here, he doesn't talk about feeling, he just

13        simply makes a statement that in this area his

14        skate got stuck.  And he attributes that to

15        being a deep area that he was not able to get

16        his skate out of.  I don't have any more

17        information from this as to perceptions as to

18        what he was feeling at the time.

19   BY MR. HAYASHI:

20        Q     Okay.  Well, he was able -- from this

21   paragraph, it's clear that he's detecting that there

22   is a deep area because he can't get his skate out of

23   that?

24              MS. FAGENSON:  Objection to form.

25              THE WITNESS:  I don't think that is clear
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                               Page 95

```
 1        or explicit.  I think he has a feeling that his
 2        skate got stuck, and again, he attributes it to
 3        a deep area.  I don't know that the veracity
 4        between that feeling of a skate being stuck and
 5        the existence of a deep area are not
 6        necessarily the same thing.  He can make the
 7        statements, but he does not provide additional
 8        information as to what led him to that
 9        conclusion.
10   BY MR. HAYASHI:
11        Q    You're only reason to doubt this is his
12   statement on page 119, lines 8 through 9, where he
13   said, I didn't perceive any grooves in the ice;
14   correct?
15             MS. FAGENSON:  Objection to form.
16             THE WITNESS:  No, I don't think that
17        that's -- I think that certainly those -- that
18        sentence stands for itself.  He's saying that
19        he did not see any grooves on the ice, or he
20        did not perceive any grooves on the ice.
21   BY MR. HAYASHI:
22        Q    Well, okay, and let's just be clear about
23   this.  He was asked to describe any type of groove
24   that he saw on the ice; correct?
25        A    Correct.
```

1              MS. FAGENSON:  Objection to form.

2   BY MR. HAYASHI:

3       Q    And to that, he answered, I didn't

4   perceive any grooves in the ice; correct?

5       A    Correct.

6       Q    And with his qualifications, we've already

7   gone over further; correct?

8              MS. FAGENSON:  Objection to form.

9              THE WITNESS:  I'm sorry, what was the --

10  BY MR. HAYASHI:

11      Q    Meaning the rest of the paragraph, lines 8

12  through 14?

13      A    Yes.  He said everything -- he said

14  everything in lines 8 through 14.

15      Q    Okay.  And your testimony is still that

16  Mr. Lebron -- or sorry -- and is it -- in your

17  understanding of Mr. Lebron's testimony, just so

18  we're clear, is it that Mr. Lebron testified that

19  prior to his fall, he did not see or feel any

20  problems with the ice?

21             MS. FAGENSON:  Objection to form.

22             THE WITNESS:  My testimony is, as I've

23        stated before, that he feels like his skate got

24        stuck.  He attributes this to being a groove.

25        He did not see any groove before or after the

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 97

1            fall or during the fall.  That is what his

2            testimony states.  He attributes this to being

3            a groove or a deep area in the ice according to

4            his testimony.

5      BY MR. HAYASHI:

6            Q    I guess what I'm trying to ask, is just

7      having reviewed this right now, would you like to

8      add any other qualifications to this statement here

9      on the last paragraph on page seven, the first

10     sentence on the last paragraph on page seven, or do

11     you still standby that recitation or that -- your

12     understanding of Mr. Lebron's testimony, or would

13     you like to add any qualification to that?

14           MS. FAGENSON:  Objection to form.

15           THE WITNESS:  So can you direct me to

16           which sentence on page seven you are asking if

17           I wanted to add a qualifier to?

18     BY MR. HAYASHI:

19           Q    Well, let me just read it for you.  It's

20     pretty short; is that okay?

21           A    That's fine.

22           Q    So you write, Mr. Lebron testifies that,

23     prior to his fall, he did not see or feel any

24     problems with the ice.  And do you feel the need to

25     add any qualifications to that sentence that you

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017

```
 1   wrote?

 2             MS. FAGENSON:  Objection to form.

 3             THE WITNESS:  No.  I think that it holds.

 4        Particularly, I would point to where I'm citing

 5        to in pages 104 and 105 for that.  He makes the

 6        explicit statement starting on page 105, line

 7        5, Before the fall, I didn't see any problems

 8        with the ice.  I didn't feel any problems with

 9        the ice.

10   BY MR. HAYASHI:

11        Q    Well, he also says that when he fell, the

12   skate was locked into the ice; correct?

13             MS. FAGENSON:  Objection to form.

14             THE WITNESS:  Yes, he says that.

15   BY MR. HAYASHI:

16        Q    And he says that after saying I didn't

17   feel any problems with the ice; correct?

18             MS. FAGENSON:  Objection to form.

19             THE WITNESS:  Correct.

20   BY MR. HAYASHI:

21        Q    And he also says, When I fell, I saw there

22   was a problem.

23             MS. FAGENSON:  Objection to form.

24             THE WITNESS:  I'm sorry, where --

25
```

```
 1   BY MR. HAYASHI:

 2        Q    So right before he says, When I fell, the

 3   skate was locked into the ice, he testifies, When I

 4   fell, I saw there was a problem.

 5        A    I see that, yes.

 6        Q    Okay.  And you still standby the

 7   observation that you made in your report that we

 8   were discussing?

 9        A    Yes.

10             MS. FAGENSON:  Objection to form.

11   BY MR. HAYASHI:

12        Q    Okay.  And just so we're clear, this is

13   just based on your reading of Mr. Lebron's

14   transcript; correct?

15             MS. FAGENSON:  Objection to form.

16             THE WITNESS:  I believe that this is

17        consistent with his testimony.

18   BY MR. HAYASHI:

19        Q    Well, right.  This isn't, again, this is a

20   recitation of what you understand the facts of Mr.

21   Lebron's testimony to be.  This is not an opinion on

22   human factors that you're offering; is that correct?

23             MS. FAGENSON:  Objection to form.

24             THE WITNESS:  Well, these are -- these are

25        facts that are in this case.  These are -- this
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                           Page 100

```
 1        is testimony and evidence in the case.  And

 2        these are relevant to and serve as part of the

 3        basis for human factors analyses and opinions.

 4   BY MR. HAYASHI:

 5        Q    Right.  This is your understanding of a

 6   fact.  This isn't one of your conclusions, just so

 7   we're clear; correct?

 8             MS. FAGENSON:  Objection to form.

 9             THE WITNESS:  I'm sorry, again, this is

10        information that's coming from the testimony.

11        I didn't create these words.

12   BY MR. HAYASHI:

13        Q    So, okay, just so we're clear, this is

14   just coming from your reading of the deposition

15   transcript, you're telling me, you're telling

16   Ms. Fagenson, you're telling anybody who reads your

17   report how you read the testimony of Mr. Edgardo

18   Lebron in his deposition transcript; correct?

19             MS. FAGENSON:  Objection to form.

20             THE WITNESS:  I believe that I have stated

21        before, this is -- this is -- these are

22        references and citations to testimony that he

23        made during his deposition.  I don't know how

24        else to say it.

25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 101

```
 1   BY MR. HAYASHI:

 2        Q    So this is your understanding of what his

 3   deposition testimony was then; correct?

 4             MS. FAGENSON:  Objection to form, asked

 5        and answered.

 6             THE WITNESS:  I believe that I've answered

 7        this.  These are references.  This is my

 8        recitation of some of the facts and evidence

 9        and testimony in the case that serve as a basis

10        and an understanding of the situation and

11        accident that we have occurring here.

12   BY MR. HAYASHI:

13        Q    Okay.  I think a simple yes would have

14   sufficed, but thank you.

15             MS. FAGENSON:  Motion to strike,

16        argumentive.

17   BY MR. HAYASHI:

18        Q    Okay.  On page eight of your report, I'm

19   going to read this myself.  I'm going to try to move

20   a little bit faster.  You indicate on page eight of

21   your report, the second paragraph, and it starts

22   with, Mr. Lebron is also observed.  Do you see that?

23        A    I believe so.  Are you talking about the

24   the sentence in the paragraph begins with, In review

25   of the closed-circuit video footage?
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 102

```
 1        Q    Yes.  And I suppose, actually, can you
 2   just read it?  Well, I'll read.  So you put in your
 3   report, Mr. Lebron is also observed on multiple
 4   occasions stumbling and wavering while skating
 5   around the rink as well as regaining his balance
 6   after he appears to nearly fall in some instances.
 7   On some occasions, he appears able to stabilize
 8   himself while grasping the side wall, and in other
 9   instances, he is observed moving his arm about in an
10   attempt to stabilize himself; correct?
11        A    Yes.
12        Q    Okay.  Are you aware that Royal
13   Caribbean -- another expert of Royal Caribbean,
14   David Wescott, has offered the opinion that Mr.
15   Lebron had no difficulty skating around the rink?
16             MS. FAGENSON:  Objection to form.
17             THE WITNESS:  I'm not positive of
18        Mr. Wescott, I believe is how you referred to
19        him, his opinion or his specific testimony in
20        it, but I don't necessarily think that this is
21        in contradiction.  I mean, I think that having
22        some destabilizations and being able to
23        maintain one's balance and -- it would be
24        consistent with that.
25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                     Page 103

1   BY MR. HAYASHI:

2       Q    Okay.  Well, if Mr. Wescott did indicate

3   that Mr. Lebron didn't have any near-fall

4   experiences, then you would be disagreeing with him;

5   correct?

6            MS. FAGENSON:  Objection to form.

7            THE WITNESS:  I think that it would depend

8        on the description of near fall.  I think that

9        people can have balance disturbances.  What he

10       might consider a near fall or be defining as a

11       near fall, I would leave to him to

12       characterize.  I can only comment on what I

13       observed in the video.

14  BY MR. HAYASHI:

15      Q    In this section of your report, in the

16  same paragraph on page eight where you say, During

17  the time Mr. Lebron was observed, no other patient

18  was observed to have a near-fall or fall event in

19  the area where Mr. Lebron eventually fell.  Well, I

20  mean, are you -- do you see that statement of yours

21  in your report?

22      A    Yes.

23      Q    Okay.  So my question is, again, this is

24  your recitation of what you believe the facts of the

25  case to be; correct?

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 104

```
 1              MS. FAGENSON:  Objection to form.
 2              THE WITNESS:  These are observations I
 3         made in my review of the video footage.
 4   BY MR. HAYASHI:
 5         Q    Okay.  Is this a human factors opinion
 6   that you have in this case?
 7              MS. FAGENSON:  Objection to form.
 8              THE WITNESS:  These are my observations.
 9         I don't know how else to state it.  This is
10         what I observed, and I'm recounting what I see
11         in the video.
12   BY MR. HAYASHI:
13         Q    These would then be the building blocks
14   for a human factors opinion that you have, not an
15   opinion in and of itself.  Would that be correct?
16              MS. FAGENSON:  Objection to form.
17              THE WITNESS:  They are my observations
18         and, yes, I used them as part of my analysis,
19         as you've stated, building blocks.  They are
20         observations, so inherently they involve an
21         interpretation or, in some sense, an opinion as
22         to what I am observing.
23   BY MR. HAYASHI:
24         Q    Right.  That's one of the bases of your
25   opinion -- your opinions; correct?
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 105

```
 1      A    I believe I've described what they were.

 2      Q    Okay.

 3      A    Would now be an all right time to take

 4  another quick break?

 5               (Discussion was held off the record.)

 6  BY MR. HAYASHI:

 7      Q    So starting at the top of page nine of

 8  your report, you state that from -- so describing

 9  Mr. Lebron's fall, you state that from the footage,

10  his legs appear to slide forward from underneath him

11  and he is observed falling onto his backside;

12  correct?

13      A    Correct.

14      Q    Okay.  So that's your understanding of Mr.

15  Lebron's fall itself; correct?

16      A    Again, that was an observation I made from

17  my review of the footage.

18      Q    Okay.  And this brings us to the next

19  section of your report which is titled -- which is a

20  bolded title, Knowledge, Experience, and Awareness

21  of Mr. Lebron, and that's another section of your

22  report; correct?

23      A    Correct.

24      Q    Okay.  Now, are you aware of -- or was

25  this section intended to -- well, are you aware of
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 106

```
 1   any testimony or opinions of any of the experts of

 2   Mr. Lebron that are in any way inconsistent with

 3   this section?

 4           MS. FAGENSON:  Objection to form.

 5           THE WITNESS:  I'm sorry, can you either

 6      repeat that or rephrase?

 7   BY MR. HAYASHI:

 8      Q    Are you aware of any statements,

 9   testimony, or opinions of plaintiff's experts that

10   you believe are inconsistent with this section of

11   your report?

12      A    Well, I think that there are some opinions

13   that speak to the adequacy of either some

14   information or knowledge of potential either hazards

15   or -- I'm not sure of the exact phrasing used in all

16   the expert reports, but certainly, I think that

17   these pieces of factual information and my analysis

18   does speak to those aspects of opinions.  So I do

19   think that it's relevant.

20      Q    Well, right, but you don't know if Mr.

21   Lebron's experts disagree with this -- with your

22   understanding of the facts you've laid out here;

23   correct?  Or your understanding of the facts here;

24   correct?

25           MS. FAGENSON:  Objection to form.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 107

```
 1              THE WITNESS:  I don't know, as I sit here,
 2         whether the facts that I reference here would
 3         be disputed by -- disputed specifically by
 4         opposing experts.
 5    BY MR. HAYASHI:
 6         Q    Okay.  So next, you have another section
 7    on page ten, another bolden section, Safety,
 8    Policies, and Procedures of Royal Caribbean; is that
 9    correct?
10         A    Yes.
11         Q    Okay.  It goes from page ten to page 11;
12    correct?
13         A    Yes.
14         Q    Okay.  And, again, this is a recitation of
15    your understanding of the facts of Mr. Lebron's
16    case; correct?
17              MS. FAGENSON:  Objection to form.
18              THE WITNESS:  I believe, again, that this
19         is my presentation of facts and evidence
20         relating to the heading that I outlined here in
21         the report.
22    BY MR. HAYASHI:
23         Q    Okay.  And you indicate under the
24    subheading, Ice Skating Equipment Maintenance, that
25    according to the Royal Caribbean entertainment and
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                        Page 108

```
 1   guest activities manual section on ice skating,

 2   under the equipment section it states that, Ice

 3   skates should be in good, safe, working condition

 4   and replaced when necessary.  And that there should

 5   be several parts of skates of each size to

 6   accommodate guests; is that correct?

 7        A    Yes, I believe so.  As long as it came

 8   through that you were saying there should be several

 9   pairs.  I thought I heard parts.

10        Q    Well, if I did, then it says pairs.  Let

11   the record reflect that, and that's what you

12   indicate; right?

13        A    Yes.

14             MS. FAGENSON:  Objection to form.

15   BY MR. HAYASHI:

16        Q    Okay.  And so just so we're clear, this is

17   Royal Caribbean's policy -- this is your

18   understanding of what Royal Caribbean's policy is

19   that the skates should be in good, safe, working

20   condition and replaced when necessary; correct?

21        A    I think the sentence stands for itself,

22   yes, that's what I'm citing to.  I am citing to

23   the -- the testimony of Mr. Noel and exhibits and/or

24   an exhibit in his deposition.

25        Q    Okay.  And also that's -- if inspection
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017

1    reveals that the ice skates are not fit for use,

2    they should be immediately disposed of and

3    replacements ordered.  Likewise, your understanding

4    is that this is a policy of Royal Caribbean;

5    correct?

6        A    I, again, am citing to underneath the

7    equipment maintenance, what the policy states.

8        Q    And you also state that procedures for ice

9    cast members handling ice skates include a visual

10   inspection of all skates when handling the skates to

11   the guest, presumably, it meant handing; correct?

12       A    Yes.

13       Q    Okay.  And that a quick visual inspection

14   will also exist when the skates are placed back on

15   the rack.  This will note the condition of the

16   blades and the boot straps; correct?

17       A    Yes.  I believe that is accurate.

18       Q    Okay.  So it's your understanding that

19   this visual inspection would be to determine if the

20   skates are in good working order, that that would be

21   a part of what they would inspect for, prior to

22   handing skates to the guests?

23       A    I'm sorry, can you repeat that?

24       Q    Well, aligning this with your observation

25   in the paragraph above, just so we're clear, is your

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                           Page 110

```
 1   understanding that, prior to handing guests skates
 2   to skate with, that a visual inspection has to occur
 3   to determine that the skates are in good, safe,
 4   working condition prior to handing them to the
 5   guests?
 6             MS. FAGENSON:  Objection to form.
 7             THE WITNESS:  I would defer to the
 8        composer of this or someone that was involved
 9        with the policies to state what the explicit
10        intent was.  I think that, yes, that serves the
11        function of providing a visual check to -- as a
12        -- to notice whether or not they are visually
13        in good working condition.
14   BY MR. HAYASHI:
15        Q    And it does say here that the policy is to
16   note the condition of the blades and the boot
17   straps; correct?
18             MS. FAGENSON:  Objection to form.
19             THE WITNESS:  I think, again, the quote
20        reads as it's written.  So the quote speaks for
21        itself, and I would agree that it serves that
22        function.
23   BY MR. HAYASHI:
24        Q    Right.  And the documents state if there's
25   a problem with a specific skate or a pair of skates
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017

```
 1   they will be removed from inventory immediately for

 2   attention; correct?

 3        A    For attention, yes.  I believe that's what

 4   it states.

 5        Q    Okay.  And Mr. Noel stated that Royal

 6   Caribbean employees are not to issue skates with

 7   broken laces to their passengers; correct?

 8        A    I believe that is consistent with his

 9   testimony.

10        Q    Right.  So my question is, if this -- if

11   Royal Caribbean did issue skates to Mr. Lebron with

12   broken laces, then that would be in violation

13   with -- of Royal Caribbean's policy; correct?

14             MS. FAGENSON:  Objection to form.

15             THE WITNESS:  Again, I think that the --

16        whether or not it violated the policy would be

17        dependent upon what the laces were, and how

18        they were issued, and whether they were, well,

19        in violation of the visual inspection being

20        described here.

21             That would be a determination for the ice

22        skate handler, Mr. Noel.  My understanding is

23        that immediately after the event, the skates

24        were looked at by Mr. Noel and others and

25        determined that they could be put back into
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 112

```
 1        service.  That's the evidence that I have

 2        around this matter.

 3   BY MR. HAYASHI:

 4        Q    But Mr. Noel could be mistaken; correct?

 5             MS. FAGENSON:  Objection to form.

 6             THE WITNESS:  I don't think I have any

 7        opinion on that.

 8   BY MR. HAYASHI:

 9        Q    Well, you believe that Mr. Lebron was

10   mistaken as to some of his memory of the events in

11   this case; correct?

12             MS. FAGENSON:  Objection to form,

13        misstates his testimony.

14             THE WITNESS:  So is there something in

15        specific that you're talking about?

16   BY MR. HAYASHI:

17        Q    No.  Just that there was some testimony

18   that Mr. Lebron offered that you believe he's

19   mistaken on; correct?

20             MS. FAGENSON:  Objection to form.

21             THE WITNESS:  Well, I think that as in

22        most -- most memories of an event, there can be

23        confusion, or there can be some mistaken

24        aspects.  I think that I cite to some portions

25        of this where it's clear there was a missed
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017

```
 1       memory or remembrance of the incident.  I
 2       detail some of those in the report.  So there
 3       is that.
 4  BY MR. HAYASHI:
 5       Q    Okay, okay.  You have a next section
 6  called -- a bold section, Safety Information
 7  Available to Mr. Lebron; correct?
 8       A    Yes.
 9       Q    Okay.  And a subsection, Ice Skating
10  Equipment, and there's a subsection, Ice Skating
11  Equipment Maintenance; correct?  Well, sorry, no.
12  I'm actually going back, or am I?  Sorry, there's a
13  subjection, Safety Video, underneath this whole
14  heading; correct?
15       A    Yes.
16       Q    Okay.  In your human factors -- in the
17  experience you have in human factors, have you ever
18  been called on to assist in the production of a
19  warning video?
20       A    Can you repeat that?
21       Q    Have you ever assisted in the production
22  of a warning video and used your human factors
23  experience in doing so?
24       A    There have been times that I've been asked
25  to either comment or participate in production of
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 114

1   some either information or video or recitation of

2   instructions and safety information broadly.

3        Q    Okay.  In general, safety videos are

4   intended to address potential problems that people

5   may encounter; correct?

6        A    That certainty could be one of the reasons

7   for producing one.

8        Q    Right.  And this -- what you term safety

9   video, depicting a person tightening his or her

10  laces around the boot of an ice skate, this is

11  presumably to instruct a -- well, it's your

12  understanding that this is to instruct somebody on

13  how to lace their skates?  Let me just put it that

14  way.

15            MS. FAGENSON:  Objection to form.

16            THE WITNESS:  Well, I think that it does

17       do that.  I think that it provides a

18       demonstration of how properly to lace one's

19       skates and what's intended to be the lacing of

20       a skate.

21  BY MR. HAYASHI:

22       Q    Okay.  And presumably this showing of

23  somebody tying laces around his or her skates, it's

24  shown because it could be dangerous for somebody to

25  skate without laces that are laced adequately?

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                     Page 115

```
 1              MS. FAGENSON:  Objection to form, calls
 2        for a legal conclusion.
 3              THE WITNESS:  I think that the production
 4        and demonstration is to do just that,
 5        demonstrate what the proper lacing is, the
 6        benefits to that could be multi-faceted, but
 7        it's clear from the video how to properly lace
 8        one's skates.
 9   BY MR. HAYASHI:
10        Q    And that's just based on your review of
11   the video; correct?
12              MS. FAGENSON:  Objection to form.
13              THE WITNESS:  Well, it -- yes, I reviewed
14        the video and that was my conclusion about the
15        video.
16   BY MR. HAYASHI:
17        Q    And next you have a section, a subsection
18   entitled Waiver.
19        A    Yes.
20        Q    There is -- and you have a list of bullet
21   points of what the waiver instructs or what you
22   believe the waiver instructs to passengers; correct?
23        A    Correct.
24        Q    Okay.  Now, there is no bullet point in
25   your list of bullet points about, for example, make
```

```
1    sure that the laces are not broken, are even in
2    length, and that you can tie them all the way to the
3    top; correct?  There's no bullet point addressing
4    that.
5        A    I do not see a bullet point with that
6    specific information.
7        Q    The waiver did not address that specific
8    information; correct?
9             MS. FAGENSON:  Objection to form.
10            THE WITNESS:  I do not believe that is
11            included in the waiver, that specific
12            information.
13   BY MR. HAYASHI:
14       Q    Okay.  And your next section is entitled,
15   Human Factors Analysis; correct?
16       A    Yes.
17       Q    Now, these are conclusions that you have
18   in this case; correct?
19       A    I believe that this does present the
20   culmination of the facts with the human factors
21   expertise and training in an analysis and presents
22   more formalized opinions.
23       Q    Okay.  So the first paragraph here, if --
24   are you aware that any of the experts retained by
25   Mr. Lebron would disagree with your analysis here in
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 117

```
 1   this paragraph?
 2            MS. FAGENSON:  Objection to form.
 3            THE WITNESS:  Again, as I sit here, I am
 4       not aware of whether or not the opposing
 5       experts would disagree or dispute my
 6       contentions here.
 7   BY MR. HAYASHI:
 8       Q    And you don't -- do you know if any of the
 9   experts retained by Mr. Lebron would disagree with
10   any of the analysis that you've included in this
11   human factors analysis section?
12       A    Well, I do think that the opinions that
13   I'm offering are contrary to the opinions and
14   assertions of the experts being held.  So I can't
15   specifically state as to what aspects or
16   disagreements they would hold with individual lines
17   or contentions that I have within this section, but
18   I do believe that the opinions and analysis run
19   contrary to what I have seen in plaintiff's expert's
20   opinions.
21       Q    Well, you do have a section here by
22   presenting safety information -- this is the second
23   paragraph on page 13, By presenting information
24   requiring guests to read and acknowledge rules and
25   information, Royal Caribbean communicated to patrons
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 118

1    rules for safe interactions on and off the ice,

2    proper ways to wear equipment (e.g., ice skates) and

3    provided guidance to speak with the ice rink staff

4    if guests had questions or needed help.  Presumably,

5    plaintiff's experts would disagree with that

6    conclusion yours; correct?

7            MS. FAGENSON:  Objection to form.

8            THE WITNESS:  I might expect they would.

9    BY MR. HAYASHI:

10       Q    Okay.  But -- right, and also, information

11   also about Mr. Lebron's signing -- signed

12   information that informed guests of dangers and

13   hazards relating to activities, such as ice

14   skating -- well, I guess this whole paragraph.

15   Could you tell us, Doctor, what methodology did you

16   utilize to reach the conclusions here in this

17   paragraph, the second paragraph of your human

18   factors analysis?

19       A    So this is similar to methodologies I use

20   to analyze other matters, hazards, or interactions

21   people have with either warnings or environments.  I

22   use the background, literature, education,

23   experience as investigating human factors and the

24   science that underlies that in order to provide

25   the -- or in order to interpret some of and apply

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 119

```
 1   some of the case facts to an evaluation of human

 2   performance and behavior.

 3              It really is much like one would do

 4   in a meta analysis or utilizing the general

 5   scientific method to evaluate different hypotheses

 6   as to whether or not additional or alternative

 7   information would avert or change behaviors or

 8   whether the information was sufficient.  We analyze

 9   pieces of the information, like the video, the

10   waivers, identify what it declares.

11              We identify the actions on behalf of

12   the receiver of that information and look to see

13   whether or not the either failings that eventually

14   occur are a result of a deficiency in the

15   information or in some behavioral component that has

16   been identified in scientific literature with

17   respect to how people interact with safety

18   information.

19              And that's what's laid out here is

20   that what I have found with respect to the safety

21   information is that the failings to be aware of some

22   of this are due to and detailed in Mr. Lebron's

23   attention and own either experiences or

24   familiarities or biases in approaching this

25   activity, rather than the information available to
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 120

1   him, either through a video, the waiver, or just the

2   experience that he has himself immediately

3   interacting with his own skates and skating around

4   the rink.

5       Q   Just briefly, before I go further, on the

6   second paragraph, you say, In addition, safety

7   information would have been presented visually in

8   the skating rink area, including a demonstration of

9   how to properly lace and tie ice skates.  You're

10  aware that the other expert of Royal Caribbean, Dave

11  Wescott, admits that the purported safety video

12  cannot be seen playing on the CCTV footage of Mr.

13  Lebron's incident.  Are you aware of that?

14          MS. FAGENSON:  Objection to form.

15          THE WITNESS:  I am not aware of what he

16      may have testified to that effect.  I don't

17      know what he has used for that basis.

18  BY MR. HAYASHI:

19      Q   Well, is your testimony that you can see

20  the purported safety video playing on the CCTV

21  footage?

22      A   I don't believe that I was able to make

23  out the specifics of it, of what was playing, but I

24  do believe I saw a number of monitors.  However, the

25  quality of the video, I don't think that I could

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 121

```
 1   tell what was playing on it.
 2        Q    So then how do you know safety
 3   information -- well, so is your testimony just that
 4   safety information should have been presented or
 5   that you actually believe that it was presented
 6   visually in the ice skating rink area?
 7              MS. FAGENSON:  Objection to form.
 8              THE WITNESS:  I believe that the
 9        presentation of it -- it's described that that
10        is how that information is presented, where
11        it's presented.  I believe that there's some
12        testimony suggesting that that was playing at
13        the time.  However, I have not, as you say, in
14        the CCTV itself, I don't believe that I could
15        make out specific scenes in the video to
16        identify it.
17   BY MR. HAYASHI:
18        Q    Do you remember who testified -- who, if
19   anybody, testified that the safety information was
20   presented visually in the skating rink area?
21        A    I can -- I can go back and review to find
22   what I was referencing there if you'd like.
23        Q    Well, you don't include a footnote
24   citation to this statement, do you?
25        A    No.  In the section that we're currently
```

1    talking about on page 13 and past, I don't believe

2    that I am citing to anyone specifically there.

3         Q    So we wouldn't know from looking at your

4    report who's testimony, if anybody's, you're

5    referencing; correct?

6              MS. FAGENSON:  Objection to form.

7              THE WITNESS:  Again, if you'd like, I can

8         review portions of this testimony to -- that

9         will maybe elucidate that.

10   BY MR. HAYASHI:

11        Q    No.  My question is just very specific.

12   From looking at your report, not anything external

13   to your report, one wouldn't be able to tell what

14   testimony you may or may not be basing this opinion

15   on; correct?

16             MS. FAGENSON:  Objection to form.

17             THE WITNESS:  So in -- when I am

18        discussing the safety video, I am referencing

19        Mr. Noel's testimony.  He does talk about the

20        safety video and where it would be playing.  I

21        can review his testimony to see what he offers

22        as to the time of the incident.  If you'd like,

23        I can do that now and clarify.

24   BY MR. HAYASHI:

25        Q    Okay.  What page numbers are you referring

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 123

```
 1   to?

 2       A    Well, in the -- in my report on page 11, I

 3   cite to a number of pages that Mr. Noel -- where the

 4   safety video was discussed with Mr. Noel, and what

 5   I'm offering to do is I can certainly look back to

 6   see specifically what is being referenced in these.

 7       Q    Sure.

 8       A    I believe the testimony I was referring to

 9   that was referenced in my report is that of Mr. Noel

10   where he says that the video is constantly -- or the

11   video is always playing at every session.  It's on

12   page 54.  Mr. Noel states that that video is playing

13   every session.

14       Q    And that's in response to the question,

15   Are you involved in reviewing this video?

16       A    Yes, but he makes as a statement, at every

17   session, as in, he's reviewing it at every session;

18   the video is always playing.

19       Q    But he doesn't say it's always playing in

20   the rink, does he?

21           MS. FAGENSON:  Objection to form.

22           THE WITNESS:  I believe that that's how

23       it's being described as where it was located

24       and where it is intended to play and is

25       consistent with others visits and reports of
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 124

```
 1       where they saw it being played.
 2   BY MR. HAYASHI:
 3       Q    He doesn't use the word "rink" in this
 4   statement, does he?
 5            MS. FAGENSON:  Objection to form.
 6            THE WITNESS:  Within this question and
 7       answer, I do not see him saying rink.
 8   BY MR. HAYASHI:
 9       Q    In fact, he wasn't even asked if it was
10   playing at every session; correct?
11            MS. FAGENSON:  Objection to the form.
12            THE WITNESS:  That was not included in the
13       question.  That's his statement.
14   BY MR. HAYASHI:
15       Q    Any other testimony of Mr. Noel that you
16   believe supports that this purported safety video
17   was playing at the time of Mr. Lebron's incident?
18       A    No.  As I sit here, I believe that is the
19   testimony that I was thinking of.
20       Q    Okay, all right.  Hopefully, I'm close to
21   being done, but it has been 30 minutes.  So if you
22   do want to take a break, I will, you know, be
23   courteous enough to offer to take a break.  Of
24   course, I do have a little more to go over.
25       A    Then maybe if we could just then take a
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 125

```
 1   short break.

 2        Q    Okay, absolutely.

 3             (Discussion was held off the record.)

 4   BY MR. HAYASHI:

 5        Q    Okay, all right.  Now, tell us, Dr. Sala,

 6   what -- or actually before we go further, you don't

 7   actually name Mr. Terry MacLaughlin in your report,

 8   other than your -- other than your documents

 9   reviewed section where you reference that you

10   reviewed his report; correct?

11        A    I don't believe I specifically reference

12   his name, no.

13        Q    But you do reference Dr. Lu's name;

14   correct?

15        A    That I do.

16        Q    All right, you have a section of your

17   report addressing opinions offered by Dr. Lu;

18   correct?

19        A    Well, I think that there's a paragraph or

20   so that specifically addresses some of the

21   statements made by Dr. Lu explicitly.  However, I

22   think that in reference to other opinions by Mr.

23   MacLaughlin, I think that the opinions are -- that I

24   am holding and the analysis that I am holding are in

25   opposition to them without explicitly stating line
```

1    by line his name or finding.

2         Q    Okay.  But you don't have a section of

3    your report addressing Mr. MacLaughlin like you have

4    a section of your report addressing Dr. Lu; correct,

5    just by name, I mean?

6         A    By name, correct.

7         Q    Okay.  So then from looking at your

8    report, you do not state which experts' opinions --

9    any of these opinions may be contrary to, or whether

10   or not even the experts of plaintiff would disagree

11   with any of these findings or opinions; correct?

12             MS. FAGENSON:  Objection to form.

13   BY MR. HAYASHI:

14        Q    You don't state that is my question.

15        A    In answer to your question, I don't

16   necessary think that I can state specifically what

17   another person would agree with or disagree with as

18   I'm writing it.  I would wait for that person to

19   respond to say whether or not they disagree with it.

20        Q    Well, are you aware that -- well, you

21   haven't reviewed the rebuttal report of Mr.

22   MacLaughlin; correct?

23        A    I have not.

24        Q    So if his report does reference the

25   specific testimony and the specific experts that he

```
 1   disagrees with, then certainly that shows that an
 2   expert report could be written in such a way to make
 3   that; correct?
 4        A    No, but I think --
 5             MS. FAGENSON:  Objection to form.
 6             THE WITNESS:  -- there's confusion again.
 7        You asked me if I wrote about what opinions as
 8        I was writing them another person would
 9        disagree with.  If he's writing a rebuttal
10        report and he choses to call out specific and
11        explicit references to someone that he
12        disagrees with in his review of materials up to
13        that point, then so be it.
14             I certainly -- again, I think that with
15        some aspects of Dr. Lu's testimony, I do the
16        similar thing towards the end of my report.
17        What I'm saying is that I've written my report;
18        sitting here, I can't necessarily say line by
19        line what others will disagree with and why.
20   BY MR. HAYASHI:
21        Q    Okay.  You also state that by presenting
22   safety information and requiring guests to read and
23   acknowledge rules and information, Royal Caribbean
24   communicated to patrons rules for safe interactions
25   on and off the ice, proper ways to wear equipment,
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 128

```
 1   e.g. skates -- ice skates, and providing guidance to
 2   speak with ice rink staff if guests had questions or
 3   needed help; correct?
 4        A    Yes.
 5        Q    But you don't actually say here that this
 6   safety information was adequate for the patrons;
 7   correct?
 8             MS. FAGENSON:  Objection to form.
 9             THE WITNESS:  I believe that I do.  In the
10        summary of opinions and conclusions, I state
11        the safety information and instructions
12        provided by Royal Caribbean regarding proper
13        lacing was reasonable and adequate in terms of
14        format, content, and location.
15   BY MR. HAYASHI:
16        Q    Okay.  So that's not this section.  You're
17   going to page 18?
18        A    I'm going to the summary of the opinions
19   and conclusions.
20        Q    Okay.  But that's not -- but it's not
21   stated here in your human factors analysis section;
22   correct?
23        A    Well, I think that is my -- that's the
24   sum, and so hence the summary of my human factors
25   opinion.  If it -- if you're contending that it was
```

```
 1   not explicit and did not come through as such with

 2   these words, it is offered in the summary stating

 3   explicitly that.

 4        Q    You also state that, Research demonstrates

 5   that people familiar -- and this is on page 14, the

 6   top paragraph, Research demonstrates that people

 7   familiar or that have experience with products and

 8   activities presumably already know or think they

 9   know the hazards and rules for use, so safety

10   information tends not to be attended or heeded;

11   correct?

12        A    Correct.

13        Q    Now, you don't state -- you don't state

14   that this would mean that somebody who has prior

15   experience, it would automatically be their fault if

16   they -- if they perhaps did not attend or heed

17   safety information as much as somebody who had less

18   experience; correct?

19             MS. FAGENSON:  Objection to form, calls

20        for a legal conclusion.

21             THE WITNESS:  I'm sorry, I think I lost

22        the question somewhere in there.  Can you

23        either rephrase or repeat it?

24   BY MR. HAYASHI:

25        Q    You don't say here in this paragraph --
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 130

```
 1   well, let's just take Mr. Lebron as an example.
 2   Suppose that Mr. Lebron did assume that his
 3   experience with roller skating gave him more
 4   experience with ice skating, and let's suppose, for
 5   the sake of argument hypothetically, that he did not
 6   attend certain safety information or heed that
 7   information as much as somebody who, say, didn't
 8   have such roller skating experience, what you put
 9   here in your report in this sentence that we just
10   read, that doesn't say that it would be Mr. Lebron's
11   fault for not attending to or heeding the
12   information as much as somebody with less roller
13   blading experience would; correct?
14           MS. FAGENSON:  Objection to form.
15           THE WITNESS:  Again, I'm not -- so nowhere
16       in this am I attributing fault or saying
17       someone's at fault.  What I'm stating is that
18       when we look at human behavior, human
19       attention, human actions, we find that people
20       that feel they are experienced and familiar
21       with an activity or with equipment or products,
22       they tend to disregard, to not attend to, and
23       to believe that their own abilities are
24       sufficient to manage risks associated with
25       that.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                            Page 131

```
 1              And so again when you are looking at the
 2         adherence or the attention to safety
 3         information, what we find is those with
 4         experience or familiarity tend to not look for,
 5         not follow, and use their own or their own
 6         perceived abilities to manage risk and provide
 7         safety.
 8    BY MR. HAYASHI:
 9         Q    And that's only reasonable, right, I mean,
10    if somebody has more experience in something, they
11    may not need a -- to heed warnings or -- what is it,
12    attend or heed certain safety information.
13    Presumably, they'd already have knowledge of it
14    more; correct?
15              MS. FAGENSON:  Objection to form.
16              MR. HAYASHI:  More so.
17              THE WITNESS:  Again, I don't know that I
18         can agree that that would hold.  I think that
19         oftentimes what we do see is accidents
20         happening when people believe that they are
21         experienced and familiar and can control risks
22         and overestimate their ability to do so.  Hence
23         making riskier decisions, engaging in riskier
24         activities or not following basic safety
25         information because they feel they don't need
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                            Page 132

```
1        to.
2   BY MR. HAYASHI:
3        Q    All right.  So you're not offering any
4   opinions on whether or not it would be the
5   responsibility of the person who may have a -- who
6   may believe that he has, hypothetically speaking,
7   more experience than he may actually have in a
8   certain activity, such as ice skating, you're not
9   offering any opinion on whether or not it's the
10  responsibility of that person or whether it's the
11  responsibility of the organization that is offering
12  the skates to the person to be able to correct for
13  any misconceptions about levels of experience.
14  Would that be correct?
15            MS. FAGENSON:  Objection to form.
16  BY MR. HAYASHI:
17       Q    Or should I maybe restate that?
18       A    Can you restate that, please?
19       Q    Yeah.  It seems to me -- maybe this will
20  just answer my question, you're not offering
21  opinions on whose responsibility -- on whether or
22  not -- how can I say this?  You're not offering
23  opinions on whose fault it would be if an accident
24  occurred or somebody may have presumed that they had
25  more experience?
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                   Page 133

1        A    I'm sorry, you may have frozen.  Are you

2    done with your --

3        Q    I'm thinking.  Let me rephrase that, that

4    people are familiar -- let's get back on track.

5    You're not saying anything about whether -- you're

6    just stating what you believe to be a fact here;

7    correct?  That research demonstrates that people

8    familiar or that have experience with products and

9    activities presumably already know or think that

10   they know the hazards and rules for use, so safety

11   information tends not to be heeded; correct?

12       A    I am presenting some scientific literature

13   and understanding that comes from researching these

14   topics and from an expertise in human factors.  This

15   is, I believe, something that helps in an

16   appreciation and an understanding of this event, and

17   would -- that the jury would benefit from knowing

18   what science has to inform us about human behavior.

19            As I stated before, I'm not

20   attributing fault in this.  That's not necessarily

21   my role here.  The jury will ultimately determine,

22   as they see it, fault and responsibilities.  That's

23   not what my expert opinion is itself going to

24   conclude.

25       Q    Okay.  Have you ever rollerbladed before,

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 134

```
 1   Dr. Sala?

 2       A    I'm sorry, can you repeat that?  I was

 3   drinking.

 4       Q    Have you ever rollerbladed before?

 5       A    Yes, I have.

 6       Q    Okay.  You don't state that in your

 7   report, though; correct?

 8       A    That I've rollerbladed before?

 9       Q    Yeah, that you have any experience in

10   rollerblading.

11       A    No.  I don't believe that I state that in

12   my report.

13       Q    Okay.  And are you basing any of your

14   opinions about the similarity or non-similarity of

15   rollerskating and ice skating with your own personal

16   experience rollerblading or ice skating?

17       A    I don't think that I have offered such

18   analyses or opinions in this report based on that.

19       Q    Okay.  You state that someone with Mr.

20   Lebron's knowledge and experience would be expected

21   not to continue to wear the skates if Mr. Lebron

22   noticed that there may have been something wrong;

23   correct?

24       A    Can you point me to, specifically, where

25   you were looking for that?
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 135

 1      Q    Yeah, page 14, second paragraph starts

 2  with, With this knowledge and experience, it would

 3  be expected that a user would not continue to wear

 4  this skate in this condition, but instead either

 5  discontinue wearing the skate, return, or exchange

 6  the skate or seek assistance from an employee in the

 7  area.  So that's your statement in your report;

 8  correct?

 9      A    Yes.

10      Q    Okay.  Now, what do you base this opinion

11  on?

12      A    Well, this is, again, aligning the -- what

13  we know of Mr. Lebron's experience and intention and

14  appreciation of the laces with what he was

15  experiencing at the moment.  So we know that as he

16  went to lace these, according to his testimony, he

17  perceived that the laces were too short to be laced

18  properly, to be laced as he intended, to be laced

19  consistently with every other time he has laced a

20  skate.  And that, in fact, he looked around but

21  decided -- couldn't find anyone, decided to use it

22  anyway.

23           He then had consistent experiences

24  that this felt loose to him, and he had multiple

25  opportunities to correct this.  Someone with the

1    level of experience in engaging in a sport and

2    appreciating the desire to have a skate fully laced

3    with the opportunities and perceptions that were

4    afforded to Mr. Lebron, I would expect that person

5    to be able to reconcile and rectify the situation he

6    was experiencing.  There are certainly -- you may

7    chose not to for a variety of reasons, but those are

8    then choices, like we've discussed before, about

9    feeling one could manage the risk, but in full

10   appreciation of what that was.

11       Q    Mr. Lebron never actually testified that

12   he had any problem like this with skates having

13   laces that couldn't be tied up all the way with

14   roller skates in the past, did he?

15       A    I don't believe that he provides that

16   testimony.

17       Q    Okay.  So this could have been a new

18   experience for him, both as to ice skating and to

19   rollerblading; correct?

20       A    I believe that his testimony does

21   demonstrate that he appreciated this was contrary to

22   how the skates should be but decided to go against

23   that knowledge and experience and continue to skate

24   with it.

25       Q    And my question was, he may not have

1  experienced a skate not having laces that could be

2  laced all the way to the top prior to this incident

3  either on roller skates or on ice skates.  That is

4  correct, isn't it?

5       A    That's possible.  I think that would be

6  consistent with his statement that every time he

7  would skate, he would lace it all the way up.  He

8  showed an understanding and an appreciation of that

9  being the desired and intended state, and that

10 having the laces only go to the ankle was contrary

11 to that and was, in fact, something amiss.

12      Q    Every time prior, he could have the actual

13 ability to lace his skates all the way to the top.

14 There may not have been a defect like this prior;

15 correct?

16      A    That is -- that is a potential.

17           MS. FAGENSON:  Objection to form.

18 BY MR. HAYASHI:

19      Q    So then he may not have known how much

20 this inability to lace his skates all the way may

21 have affected his ability to skate or his likelihood

22 of falling --

23           MS. FAGENSON:  Objection to form.

24           MR. HAYASHI:  -- correct?

25           THE WITNESS:  Well, I think you're

```
 1          confusing a direct experience of having a lace
 2          be in a non-fully laced position with an
 3          appreciation of what that might mean.  Just the
 4          mere fact that he always intended it that way,
 5          acknowledged that it was something wrong, and
 6          then went skating on it, made specific note a
 7          number of times in his deposition that it felt
 8          loose to him, I think speaks against that.
 9  BY MR. HAYASHI:
10      Q    But he never said that he knew that
11  having -- not being able to lace his skates all the
12  way to the top would make him more likely to fall
13  either in roller skating or ice skating; correct?
14      A    I don't think that there's testimony that
15  he's saying that.
16      Q    Right.  So any testimony that may suggest
17  that -- that he knew it was properest to have to --
18  or to lace his skates all the way to the top on his
19  roller states, that could have been that it was
20  proper for comfort.  I mean, it could have been;
21  correct?
22      A    So I -- again, I would point to specific
23  portions of this experience he was having.  He at
24  least did look to see if there was somebody that
25  could help him.  He decided against it ultimately,
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 139

```
 1    but he has an appreciation that this was not the
 2    intended way to lace them.
 3              It's also contrary to the safety
 4    information that was being provided that he did not
 5    afford himself but that too would demonstrate that
 6    the lacing that was -- that he could achieve
 7    according to his testimony was incorrect.
 8        Q    He could have been looking for somebody
 9    because his ankles hurt; correct?
10              MS. FAGENSON:  Objection.
11              THE WITNESS:  If that -- so if that was
12         the cause for looking for someone, then, yes,
13         and quite frankly, then that would be something
14         that would need to be rectified.  If one's
15         ankles are hurting, then that would certainly
16         relate to the ability to skate.
17    BY MR. HAYASHI:
18        Q    He could have had minor discomfort.  Hurt
19    may be a strong word, but we don't know; right?
20        A    Well, I'm only responding to the question
21    that you asked.
22        Q    Right.  He could have had minor discomfort
23    in his ankles.  He could have felt a little -- he
24    could have had some discomfort.  He could have been
25    looking for somebody for that reason; right?
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 140

1            MS. FAGENSON:  Objection to form.

2            THE WITNESS:  I -- your -- I don't

3       understand what you're actually asking.  It

4       is -- I didn't see any testimony regarding

5       minor discomfort as to why he was looking for

6       someone.  What I was familiar with was that he

7       noticed that the skate couldn't lace all the

8       way, felt this was improper and not how he

9       intended it, and he was looking for someone

10      with respect to that.

11   BY MR. HAYASHI:

12      Q    Well, he may not have ever testified that

13   he was looking for somebody because the skates

14   weren't comfortable, but he also never testified

15   that he was looking for somebody because he felt it

16   was unsafe to go out on the ice in that condition;

17   correct?

18            MS. FAGENSON:  Objection to form.

19            THE WITNESS:  I'm not aware of that

20      testimony either.

21   BY MR. HAYASHI:

22      Q    Okay.  So it could have just as easily

23   been one or the other then; correct?

24            MS. FAGENSON:  Objection to form.

25            THE WITNESS:  Again, I can only -- and I

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 141

```
 1      believe I did state what he stated in his
 2      testimony.  His testimony will stand for what
 3      it is.
 4  BY MR. HAYASHI:
 5      Q   And you don't state here that -- you next
 6  put in your report, If the laces of one of Mr.
 7  Lebron's ice skates were in a condition consistent
 8  with that described by Mr. Lebron at deposition, Mr.
 9  Lebron had sufficient knowledge and understanding of
10  the status of the laces and the condition it imposed
11  on the fit of his ice skate, to have appreciated
12  that the lacing was not appropriate and contrary to
13  the desired state; correct?
14      A   Correct.
15      Q   But you don't actually put here that Mr.
16  Lebron appreciated that the lack of the skates being
17  tied up all the way was unsafe; correct?
18      A   Can you point me, again, to where you were
19  reading from?
20      Q   Page 14, second paragraph, the word
21  "unsafe" doesn't appear in this -- in this --
22      A   Correct.
23      Q   -- sentence at the end of this paragraph;
24  correct?
25      A   Correct.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                  Page 142

1        Q    So it could have been inappropriate

2   because it was uncomfortable; correct?

3             MS. FAGENSON:  Objection to form.

4   BY MR. HAYASHI:

5        Q    Just from reading this paragraph?

6        A    I am not stating whether it was --

7   anything about comfort or discomfort.  What I am

8   saying is that Mr. Lebron had a desired state that

9   was consistent with his previous experience that was

10  also consistent with the information being presented

11  by Royal Caribbean and what he was able, according

12  to his testimony, to achieve was contrary to that.

13            And that he disregarded his own

14  perceptual information and his experience about the

15  desired state and Royal Caribbean's information

16  about how to lace the skates and continue with the

17  activity with the skates laced to the ankle as he

18  described given his testimony.

19       Q    Move to strike as non-responsive.  You

20  don't state that it was unsafe for Mr. Lebron to go

21  out onto the ice rink with his ice skates not tied

22  all the way to the top; correct?

23       A    I may -- I do not make an overall or

24  general statement about whether going onto the ice

25  with your ice skates laced only half way is safe or

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 143

1   unsafe.

2        Q    You don't state that Mr. Lebron was or

3   should have been aware that it was unsafe to do so,

4   or that it might have been unsafe to do so; correct?

5        A    I don't make an explicit statement there

6   about how that would relate to safety.

7        Q    And now let's go back to this N-E-I-S-S

8   database that we talked a little about earlier.  So

9   you state that the results of a query for injury

10  associated with ice skating demonstrates that across

11  this time period more than 80 percent of the more

12  than 20,000 annual injuries associated with ice

13  skating are also associated with a fall.  However,

14  of these injuries, none of the records reviewed

15  implicate or reference the lacing of an ice skate;

16  correct?

17       A    Correct.

18       Q    And do you know whether or not lacing of

19  the skate is something that would have been

20  reported?

21       A    It very well could be.  So the way that

22  the narratives come in is the nurses that are coding

23  this data and taking the information are recording

24  the information that the patient provides to them

25  and answers to their question.  And so everything

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017

```
 1   relevant to the, quote, unquote, association or

 2   causation of the accident, the nurses will record

 3   into their narrative.

 4        Q    Okay.  But we wouldn't know whether or not

 5   everybody would have reported if there was an issue

 6   with their lacing; correct?

 7        A    So, again, the -- I'm sorry, was there an

 8   objection?

 9             MS. FAGENSON:  Yes.

10             THE WITNESS:  The information may not have

11        been volunteered by all that believe that to be

12        or where that was an issue, I think what is of

13        note is that none of the records reference

14        lacing to be an issue.

15   BY MR. HAYASHI:

16        Q    Well, just because the records don't

17   reference anything of lacing, that doesn't mean that

18   lacing wasn't an issue in any of these injuries;

19   correct?

20             MS. FAGENSON:  Objection to form.

21             THE WITNESS:  So again, I think I've

22        stated what is available to someone when

23        investigating these, that there is no evidence

24        from the databases that improper or not lacing

25        one's skates presents a unique hazard pattern
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 145

1        identifiable within these databases.  There's

2        no record in the database that we've queried to

3        specifically state laces being associated more

4        with falls than any other number of reasons.

5   BY MR. HAYASHI:

6        Q    This wasn't a checklist, right, that, for

7   example, balance, you know, softness of the ice, wet

8   ice, lacing, there wasn't like a checklist that

9   addressed each possible issue that they could be

10  encountering; correct?

11       A    No, there is not a checklist.

12       Q    Okay.  So it's possible that if it wasn't

13  a checklist format some of the people -- or some of

14  the nurses indicating, you know, providing this data

15  might have realized, oh, the lacing might have been

16  an issue, but without being prompted, they might not

17  have thought of that; correct?

18            MS. FAGENSON:  Object to the form.

19            THE WITNESS:  So again, the nurses are

20       recording the information provided by the

21       person, and so if -- they're not conjecturing

22       or speculating as to what the conditions were

23       at the time.  They're recording what the person

24       told them about the accident and injury.

25

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 146

1    BY MR. HAYASHI:

2        Q    And the people themselves, if there was a

3    checklist, then they might have seen, you know,

4    problem with the lacing; that might have prompted

5    them to realize, you know, yeah, lacing of the

6    skates might have actually contributed to my injury;

7    right?

8        A    I don't really think I can comment on a

9    completely different way of recording the data

10   that's associated with this database.  This is a

11   tool that has been used and an analysis that has

12   been performed for years, and the database looked at

13   in this way by experts, such as myself, and by

14   governmental agencies investigating accidents.

15            So while there would be different

16   ways to collect that data.  I don't think I can

17   comment on whether or not including a checklist

18   would prompt someone to report something.

19   Obviously, Mr. Lebron has alleged that this was

20   related to the lacing, and he did not have a

21   checklist in front of him.  He recognized that

22   himself, I'm assuming.

23       Q    Right.  So let's put it this way at least.

24   This wasn't the type of case where 20,000 people

25   were asked whether or not lacing had anything to do

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 147

```
 1   with their -- their ice skating injuries, and 20,000
 2   people said no.  We're not dealing with a situation
 3   like that.  Can we agree on that?
 4        A    That was --
 5             MS. FAGENSON:  Objection to form.
 6             THE WITNESS:  That's not the data that I'm
 7        using here.
 8   BY MR. HAYASHI:
 9        Q    Right.  That's not the situation we're
10   looking at.  That's not the data we're looking at;
11   correct?
12        A    Correct.
13        Q    Okay, okay.  And next you have a
14   consideration of opinions offered by Dr. Lu, and I
15   think we already discussed some of this, but Dr. Lu
16   is a biomedical and biomechanical expert; correct?
17        A    I believe that's her experience,
18   biomedical training, and I believe that she is being
19   presented for biomechanical expertise.
20        Q    Okay.  And you are not a biomechanical or
21   a biomedical expert; correct?
22             MS. FAGENSON:  Objection to form.
23             THE WITNESS:  I think we've covered this.
24        I don't hold myself out to be a biomedical or
25        biomechanical engineer.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 148

```
 1   BY MR. HAYASHI:
 2       Q    Okay.  And do you feel qualified to offer
 3   opinions that Dr. Lu's analysis with her expertise
 4   is inadequate?
 5       A    Well, I believe that I am pointing to
 6   areas that I am rebutting her opinions or I am
 7   commenting on her opinions from a human factors
 8   perspective.  And I don't believe that she considers
 9   very important aspects because she is not trained in
10   human factors.
11               And I think that my science and my
12   analyses will speak to and comment on the same
13   aspects of this case that she is unaware of because
14   she does not have the experience in human factors.
15   Moreover, also, in reviewing her testimony, I point
16   to some of the inconsistencies that she herself has
17   in what she claims to have looked at, and then the
18   opinions that she is offering related to them.
19       Q    So are you testifying that Ms. Lu is not
20   applying biomechanical or biomedical engineering
21   correctly to the facts of this case?
22       A    I am commenting on the inconsistencies of
23   what she is stating she knows and what she has done
24   with the opinions that she is reaching within her
25   testimony and her report.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 149

1      Q    So you have no opinion about whether or

2  not Dr. Lu is appropriately applying the specialties

3  of biomedical and biomechanical engineering to the

4  facts of this case.  Is that correct, or is that not

5  correct?

6      A    So --

7           MS. FAGENSON:  Objection to form.

8           THE WITNESS:  -- again, I am commenting on

9      the -- what she is working with and what she

10     has done in the case.  For example, she rests

11     all of her -- she explicitly states she rests

12     all of her analyses on the assumption that --

13     that the laces were not laced entirely or that

14     they were only laced to -- or that they were

15     only laced half way, not acknowledging or

16     assessing whether or not a properly laced

17     skate -- how that would have performed in an

18     instance like this.  That is not necessarily an

19     application of biomechanical engineering

20     specific to the case facts, but in evaluation

21     of the case facts themselves.

22  BY MR. HAYASHI:

23     Q    And if she did actually account for the

24  possibility that somebody could get injured even if

25  their skates were laced up all the way, would your

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                        Page 150

```
 1    critique of her opinions even be valid then?
 2        A    Well, again -- I'm sorry, go ahead,
 3    Rachael.
 4            MS. FAGENSON:  No, go ahead.
 5            THE WITNESS:  I believe that -- that in --
 6        I gave one example.  I think that there are
 7        others.  For -- in another instance, Dr. Lu
 8        purports to discuss how the structure and the
 9        material of the skate itself would impact the
10        very thing she's opining on, but then she says
11        that she never inspected it, never had an
12        exemplar, never considered it.
13            And when asked about, well, where on the
14        range, she actually puts it on more towards the
15        very soft range that she expected would have
16        minimal impact.  And so with the information
17        that she is saying is important -- so with the
18        information she states is important, she
19        doesn't have that in order to complete the
20        analysis she herself says would rely on that
21        information.  That again, it's not specific to
22        the biomechanical application, but rather her
23        own statements as to what her methodology would
24        require.
25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 151

1    BY MR. HAYASHI:

2        Q    All right.  Dr. Lu believes that she has

3    adequately applied the principles of biomechanical

4    and biomedical engineering to the facts of this

5    case.  Are you or are you not of the opinion that

6    she is wrong?

7        A    Again, I am pointing to the

8    inconsistencies that she has within her testimony

9    about what she says she had available to her and

10   what she would need to do the analysis that she said

11   she could perform.

12       Q    Dr. Sala, with all due respect, you're not

13   answering my question, and this deposition is going

14   to go on until you can give me an opinion whether

15   you have any opinion -- if the answer is no, just

16   let me know that it's no.  If the answer is yes,

17   tell me yes, but do you -- are you of the opinion

18   that Dr. Lu is wrong that she has applied the

19   principles of biomedical and biomechanical

20   engineering adequately to the facts of this case?

21       A    And again --

22            MS. FAGENSON:  Objection to form,

23       argumentive.

24            THE WITNESS:  -- I am not commenting on

25       the biomedical and biomechanical aspects of her

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 152

```
 1        analysis.  She provides an analysis of how the
 2        injury has occurred, what happened, how the
 3        ankle responded to forces.  That is not
 4        anything that I am commenting on.  I am
 5        commenting on the more general scientific
 6        methodology of what she states she has used or
 7        would need to use and what she had available to
 8        her in reaching other opinions.  That's -- that
 9        is my -- that is the best I can describe it.
10  BY MR. HAYASHI:
11        Q    So you're not questioning her application
12  of her biomedical and biomechanical expertise to the
13  facts of this case?
14        A    To the ankle injury and how it occurred,
15  correct.
16        Q    Okay, thank you.  There's discussion later
17  that in page 17 at the end of your report -- well,
18  at the end of, sorry, this analysis of Dr. Lu.  So
19  you state, However, she fails to consider Mr.
20  Lebron's skating behaviors in the time prior to this
21  fall and does not take into account the numerous
22  times he appears to lose balance while skating and
23  the results in wavering and possible maneuvers he
24  makes in which he is able to successfully regain his
25  balance; correct?
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                           Page 153

```
 1      A    Yes, I believe that's consistent with what
 2   I've written there.
 3      Q    Now, Mr. Lebron has not testified to any
 4   of these previous times that he lost his -- that he
 5   may have lost his balance, there was any deep ice or
 6   groove in the ice or anything like that; correct?
 7           MS. FAGENSON:  Objection to form.
 8           THE WITNESS:  Yeah, I am not aware of any
 9       such testimony.
10   BY MR. HAYASHI:
11      Q    Okay.  So Mr. Lebron, when he may have
12   lost his balance on a previous occasion, there may
13   not have been a deep ice or a groove in the ice on
14   those occasions; correct?
15           MS. FAGENSON:  Objection to form.
16           THE WITNESS:  Well, I would agree.  I
17       don't think that there's any evidence of any
18       grooves or -- grooves or deformities in the ice
19       at any point.
20   BY MR. HAYASHI:
21      Q    Well, I understand that that is your
22   position, Doctor, but if there was a groove in the
23   ice or deep ice, however that -- maybe make it more
24   simple.  If there was a groove in the ice where Mr.
25   Lebron was unable to regain his balance but there
```

```
 1   wasn't a groove in the ice in the other areas that
 2   he may have lost his balance, that would be a
 3   difference between where he ultimately fell and
 4   where he didn't; yes or no?
 5              MS. FAGENSON:  Form.
 6              THE WITNESS:  So just so I can the
 7         hypothetical.  You're giving me a hypothetical
 8         of there being a groove in one area and not a
 9         groove in another and asking if that is a
10         difference between those two areas?  In that
11         hypothetical, yes.
12   BY MR. HAYASHI:
13       Q    And also you mention that Dr. Lu describes
14   that she uses common sense, and then you have a
15   reference to footnote 137, which is again the last
16   paragraph --
17       A    Yes.
18       Q    -- on page 17.  That could be common sense
19   for a biomedical and biomechanical engineer;
20   correct?
21       A    I don't believe that fits with the series
22   and context of those questions, but if you choose to
23   assert that, I don't think that it was specified
24   otherwise.
25       Q    We can at least agree she did not
```

```
 1   specifically state -- I mean, well, we can agree

 2   that it's possible she might have meant that it's

 3   common sense for a biomechanical or biomedical

 4   expert?

 5       A    Again, I don't believe that fits with the

 6   context of the questions and the answers.

 7       Q    Let's take a quick look.  So it's page 49

 8   through 50; correct?

 9       A    49 to 50, yes.

10       Q    So I'm going to read and, correct me if

11   I'm wrong, does it start on page 49 line 17?

12       A    I'm looking at it myself, bear with me for

13   one moment.  So I believe it's referenced on page --

14   begins in her answer on page 48 around line 23 she

15   begins her answer with the word "so," and she's

16   talking about the design of ice skate boots.  Would

17   you like me to read from there?

18       Q    Not necessarily.  Well, where the word

19   "common sense" appears is starting on line 19 page

20   49 where she asked -- or she answers, any articles.

21   No, I can't think of any article right now to pull

22   out of any textbook to give you that.  It's

23   basically common sense because if no protection to

24   the ankle when you ice skate or roller skate or

25   anything, type of a movement on a slippery surface,
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 156

1   you're using your muscle control to protect to use

2   the ankle to control and keep balance -- keep

3   yourself balancing from falling.  And just so we're

4   clear that use of the word "common sense" is what

5   you're referring to?

6        A    That is the specific reference to common

7   sense, and, I mean, she does not note that it's

8   biomechanical knowledge or principles in

9   biomechanics.  She used common sense.

10       Q    Okay.  But the whole context, I mean,

11  everything she's talking about is about the

12  biomechanics of Mr. Lebron's fall; correct?

13       A    No.  She's actually referencing -- she was

14  saying that the design of skates was based on this,

15  and when pressed as to what she has to support that,

16  she says, in essence, no article, no literature,

17  just common sense because that's when you look at

18  it, that's what it sounds like.

19       Q    History of ice skating and the reasons --

20  and the purposes and intent of ice skating.  Okay,

21  so then your opinion is that -- is that Ms. Lu may

22  not be qualified to offer opinions on the purpose

23  and intent of ice skating boot design?  Is that

24  clear?  Just so we're clear, is this a --

25       A    Well, this is, again, it was -- it's -- I

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 157

```
 1    think it's at least to the point that what she is

 2    using to make these assessments is not a

 3    biomechanical analysis or a biomechanical expertise,

 4    but she's relying on common sense to say, well, you

 5    know, high laces make sense.  And there's no, as you

 6    were stating before, I'm not commenting on the

 7    biomechanical nature of it.  There is no

 8    biomechanical nature.  She has said that she is

 9    relying on common sense for this.

10        Q    First of all, suppose that -- suppose that

11    -- no.  Suppose that Dr. Lu wasn't qualified to

12    testify about the purpose and intent of ice skating

13    boot designs, that wouldn't mean that her testimony

14    about how Mr. Lebron fell, the mechanics of how his

15    body behaved according to his testimony, and the

16    other evidence in the case, that doesn't speak to

17    those opinions, does it?

18        A    Again, I am not commenting on the

19    mechanics of the fall itself and how the ankle moved

20    and how the injury occurred.  That's not what I'm

21    addressing here.

22        Q    All right.  So you're not rebutting all of

23    Dr. Lu's opinions, just certain specific opinions

24    that are addressed here in this section; is that

25    correct?
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 158

1        A    I believe that my report in its entirety

2   will stand on it's own as to the opinions that I'm

3   holding and where they are contrary to the opinions

4   held by opposing experts.

5        Q    Okay.  So we can tell from reviewing your

6   report then; correct?

7        A    Yes, and also the answers to all of the

8   questions here today and at this deposition.

9        Q    Okay.  But all -- any way -- well,

10  actually, let me just ask you this, is it improper

11  for experts to rely on common sense if something is,

12  in fact, common sense?

13       A    I don't know that that is something that I

14  can offer comment on.  What is proper and improper

15  for experts within a legal and litigation context to

16  rely on, I think is a subject matter for the court

17  to decide.

18       Q    Do you ever rely on common sense -- or did

19  you rely on uncommon sense at all in forming your

20  opinions in your report here today?

21       A    I don't believe that I'm referencing or

22  stated anything is based on common sense here.  I am

23  providing the analysis based on the facts and the

24  evidence and scientific understanding and my human

25  factors analysis.

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 159

1      Q    I'm not asking -- so you have not

2    considered -- you have not used any common sense in

3    formulating the opinions in your report?

4              MS. FAGENSON:  Objection to form.

5              THE WITNESS:  I don't -- I don't

6         understand what you're even asking with that

7         question, I'm sorry.

8    BY MR. HAYASHI:

9      Q    I'm asking if you've used any common sense

10   in formulating the opinions in your report.  Isn't

11   that kind of a common sense question?

12             MS. FAGENSON:  Objection to form,

13        argumentive.

14             THE WITNESS:  Again, I have stated, I rely

15        on the facts that are present.  I rely on my

16        education, training, experience.  I rely on the

17        scientific analysis.  Oftentimes, these might

18        be in support of or consistent with common --

19        common sense, in quotes, or, you know, one's

20        common knowledge and appreciation, but no, I

21        don't believe that I base opinions or am here

22        to relay what is common sense to the jury.

23   BY MR. HAYASHI:

24     Q    How about the principle that the future

25   will generally be like the past, is that something

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 160

```
 1   that you've considered at all in forming your
 2   opinions?
 3           MS. FAGENSON:  Objection to form.
 4           THE WITNESS:  I'm sorry.  I don't
 5       understand what you're asking.
 6   BY MR. HAYASHI:
 7       Q    Sure.  In scientific research, experiments
 8   have to be repeated; correct?
 9       A    Well, there's the concept of them being
10   repeatable and replicable.
11       Q    Well, right, but when the studies are
12   done, experiments are repeated over a course of
13   time; correct?
14       A    They can be.  Some experiments are fairly
15   novel, and, you know, they might not be repeated
16   exactly as they were or derivations of them might be
17   repeated so I'm not -- not following exactly what
18   you're questioning here.
19   BY MR. HAYASHI:
20       Q    Are you familiar with David Hume at all,
21   Dr. Sala?
22       A    Excuse me?
23       Q    Are you familiar at all with the
24   philosopher, David Hume?
25       A    The name sounds familiar.  I honestly have
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 161

```
 1   to say that I can't recall specifics of his work.

 2        Q    Okay.  Maybe that's why you're having a

 3   hard time understanding what I'm trying to ask you,

 4   but suffice it to say nothing that could be

 5   considered common sense has been used in formulating

 6   the opinions in your report; correct?

 7             MS. FAGENSON:  Objection to form.

 8             THE WITNESS:  Again, I am not solely

 9        relying or recounting or recanting common

10        sense.  There are some aspects of an analysis

11        that will be consistent with or reinforce what

12        can be asserted as common sense, but I am not

13        pointing to common sense as a basis and the

14        support for a -- for an entire opinion.

15             MR. HAYASHI:  I believe that's all I have

16        for now.  Ms. Fagenson may have some follow-up

17        questions.  That's all I have for now, unless

18        Ms. Fagenson has some follow-up questions?

19             MS. FAGENSON:  I do have some follow-up

20        questions, Joe.  Did you want to take a quick

21        break or are you good to go?

22             THE WITNESS:  I think I'm all right, we

23        can move on if you'd like.  If you want a

24        break, we can take one as well.  It's up to

25        you.
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 162

```
 1            MS. FAGENSON:  Okay, no.  I think I'm all
 2       right.  We can move along.
 3            MR. HAYASHI:  Yeah, I'm fine to move
 4       along.
 5            THE WITNESS:  And I should ask also,
 6       Madame Court Reporter, are you all right?
 7            THE REPORTER:  I'm good.
 8            THE WITNESS:  Okay.
 9            MS. FAGENSON:  Thanks, Joe.
10                     -  -  -
11                 CROSS EXAMINATION
12                     -  -  -
13  BY MS. FAGENSON:
14       Q    I just want to clear up something for the
15  record before we get started, too.  Your report was
16  authored on October 25, 2017; correct?
17       A    Correct.
18       Q    Mr. Hayashi had asked you some questions
19  about a rebuttal report from Mr. MacLaughlin that
20  was dated October 25th.  Do you recall those
21  questions?
22       A    Yes, I do.
23       Q    Okay.  And would I be correct that the
24  reason that that's not referenced in the report is
25  because it was offered the same day?
```

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 163

```
 1        A    I believe that the question was whether
 2   those reports seem to be authored the same day and
 3   whether that was why it was not referenced.  Likely
 4   to be so if we had simultaneous reports and report
 5   disclosure dates, I couldn't review his before I
 6   issued mine.
 7        Q    Okay.  And I believe Mr. MacLaughlin's
 8   deposition was completed either the same day or the
 9   day before that, October 24th.  So the reason that
10   there's no reference to Mr. MacLaughlin's deposition
11   testimony in your rebuttal report is because that
12   was not available at that time; correct?
13        A    The timing would imply that, yes.
14        Q    Okay.  Bear with me, I am just looking
15   through my notes.
16        A    Take your time.
17        Q    I'm going to try to minimize what I need
18   to ask you as much as possible.
19        A    That's fine.
20        Q    So we can get you out of here today --
21   scheduled for us to accommodate this deposition
22   today, and I appreciate that.
23             MR. HAYASHI:  And I do as well, Dr. Sala.
24             THE WITNESS:  Certainly, no, we're all in
25        this together.
```

1   BY MS. FAGENSON:

2        Q    And also just to clear up for the record,

3   Mr. Hayashi had asked you some questions about your

4   testimony list involving the case of McKinney and

5   the Guevara case.  And you weren't able to testify

6   about the exact opinions you rendered in that case

7   because you don't have those reports or your

8   deposition testimony regarding those cases in front

9   of you; correct?

10       A    Correct.  And I did not review them

11  explicitly before this deposition.

12       Q    Okay.  So your testimony is based on your

13  recollection now, years later, about what you

14  testified in those cases and the opinions you

15  rendered, but it may not be exhaustive of all the

16  types of opinions that you rendered in those cases?

17       A    Correct.

18       Q    And were any of your opinions stricken or

19  limited in either of those cases?

20       A    Not to my knowledge.

21           MS. FAGENSON:  Matthias, if you wouldn't

22       mind possibly muting your computer if you're

23       going to be typing during my questioning.

24           MR. HAYASHI:  I'm actually -- I'm going to

25       put on my headphones.  I'm hoping that this

1          will help.  At least -- well, I -- actually, I

2          haven't been typing so I don't know what you're

3          hearing now.  If you're talking about those

4          other noises, I believe the headphones should

5          solve that problem.

6    BY MS. FAGENSON:

7          Q    Mr. Hayashi had asked you some questions

8    about whether you believe the safety video --

9    whether there's any evidence in this case that the

10   safety video was actually played on the date of Mr.

11   Lebron's incident.  Do you remember those questions?

12         A    Yes.

13         Q    Okay.  In preparing your report in this

14   case and rendering the opinions that you did about

15   the instructions given to Mr. Lebron in the safety

16   video, I assume that you reviewed the entire safety

17   video; correct?

18         A    Correct.

19         Q    Did you also review the entirety of the

20   deposition testimony of Mr. Noel?

21         A    Yes.

22         Q    All right.  And if you need to reference

23   it, feel free.  Mr. Noel's deposition testimony is

24   on page 54 where Mr. Hayashi pointed you and you

25   spoke about the testimony of Mr. Noel on page 54.

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 166

1    His testimony is that the video was playing during

2    open skate sessions; correct?

3         A    Yes.

4         Q    Okay.  His testimony was not that it's

5    playing on every single camera in the entire -- or

6    every single screen in the entire venue; correct?

7         A    I don't believe it to be.

8              MR. HAYASHI:  Form.

9    BY MR. HAYASHI:

10        Q    Okay.  So if the CCTV video only shows --

11   if you can only view a couple of the screens that

12   are located in this video of the ice rink arena, you

13   know, and let's assume for the purposes of this

14   question that those particular cameras that you can

15   see on the CCTV don't show the video being played,

16   that doesn't necessarily mean that the video was not

17   being played in the venue at the time of Mr.

18   Lebron's incident; correct?

19        A    Correct.

20             MR. HAYASHI:  Form.

21   BY MS. FAGENSON:

22        Q    And, in fact, Mr. Noel, who was there on

23   the date of the incident, his testimony is that it

24   was playing in the venue on the date of the

25   incident.

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                         Page 167

```
 1            MR. HAYASHI:  Form.
 2            THE WITNESS:  That is consistent with my
 3       recollection of his testimony.
 4  BY MS. FAGENSON:
 5       Q    And I just want to be clear that your
 6  opinions in this case are in response to both of
 7  plaintiff's experts in this case, correct, even
 8  though you reference Ms. Lu by name more frequently
 9  in your report than you do Mr. MacLaughlin?
10       A    Yes.
11            MR. HAYASHI:  Form.
12  BY MS. FAGENSON:
13       Q    Okay.  I'm going to keep this as brief as
14  possible.  Let's just go through what your opinions
15  are in this case, and I will direct you to --
16            MR. HAYASHI:  That doesn't sound very
17       brief.
18  BY MS. FAGENSON:
19       Q    I'll direct you to page 18 of the summary
20  of your opinions, and we can kind of start by going
21  through those.  If you could read for me your first
22  opinion in this case.
23       A    The safety information and instructions
24  provided by Royal Caribbean regarding proper lacing
25  was reasonable and adequate in terms of format,
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                            Page 168

1    content, and location.  If the laces of one of Mr.

2    Lebron's ice skates were in a condition consistent

3    with that described by Mr. Lebron at deposition, it

4    would have been clear, readily observable, and

5    apparent to anyone attempting to lace the skate that

6    one could not achieve an appropriate lacing as

7    instructed.

8         Q    And what is the factual basis for that

9    opinion?

10        A    The factual basis is the information

11   provided within the video, the observations that are

12   referenced by -- or the descriptions referenced by

13   Mr. Lebron, and my review of that video and the same

14   information as to its appropriateness for its

15   intended purpose of instruction on lacing.

16        Q    Okay.  So essentially your review of the

17   safety video and your review of both Mr. Lebron's

18   deposition testimony but also the other statements

19   he's made in this case?

20        A    Correct.

21        Q    Okay.  And the specifics of the video --

22   well, first, let me -- strike that.  Let me start

23   with this.  Both the video and the descriptions by

24   Mr. Lebron are referenced in your report as basis

25   for your opinions?

1      A    Correct.

2      Q    Okay.  And specifically, you go into

3  detail about what you observed, and you summarize in

4  your very report here what you gleaned from the

5  safety video when you reviewed it and what you

6  gleaned from Mr. Lebron's various statements both

7  formal and informal in this case?

8      A    Correct.

9      Q    Okay.  Is there anything that is not

10  referenced in the report here that you relied upon

11  in rendering this opinion?

12      A    I don't believe so.  Obviously, everything

13  also incorporates my knowledge, training, education,

14  and experience in the field of human factors.

15      Q    And is this opinion that you've rendered

16  in bullet point one on page 18 of your report

17  rendered to a reasonable degree of scientific

18  certainty?

19      A    Yes.

20          MR. HAYASHI:  Form.

21  BY MS. FAGENSON:

22      Q    Can you tell us a little bit about the

23  analysis you used in formulating this opinion?

24      A    I believe that in discussion with

25  Mr. Hayashi, I referenced the scientific method and

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017

1  evaluation of the safety information in and of

2  itself in comparison to what would be needed to

3  convey that information.  And then looking at case

4  facts and aligning them with what we know about

5  human behavior from scientific literature and

6  research and investigation and research that I've

7  performed in the context of human factors, and

8  coming to a more likely than not conclusion as to

9  whether or not the information is adequate and

10  reasonable to convey information and be appreciable

11  by those attending to it.

12            And whether or not the condition that

13  Mr. Lebron was describing, given his testimony and

14  the implications of what that means with how the

15  laces would appear in comparison to the depiction in

16  the video and one's own personal experience as to

17  whether or not that could be readily observable or

18  was within the human capacity to appreciate.

19      Q    Okay.  And your opinion is that it was?

20      A    Yes.

21      Q    And that opinion is to a reasonable degree

22  of scientific certainty?

23      A    Yes.

24      Q    Any literature that you're relying upon

25  has been referenced in your report?

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                               Page 171

1        A    Yes.

2        Q    And with respect to your second opinion,

3   can you please read that for me?

4        A    If the laces of one of Mr. Lebron's ice

5   skates were in a condition consistent with that

6   described by Mr. Lebron at deposition, Mr. Lebron

7   had sufficient knowledge and understanding of the

8   status of the laces and the condition it imposed on

9   the fit of his ice skate to have appreciated that

10  the lacing was not appropriate and contrary to the

11  desired state.

12       Q    And what is the basis for that opinion?

13       A    Again, that is consistent with the --

14  well, that is based on the factual information that

15  was provided through the testimony as to what Mr.

16  Lebron has testified to as the condition the lace

17  and the ice skate were in at the time of his lacing,

18  as well as when we first entered and continued to

19  skate along the ice.  It's also consistent with

20  his -- and based on his testimony as to his

21  knowledge and experience and familiarity with the --

22  with skating in-line or roller blading context and

23  his level of experience with that.

24            And then, again, as stated above, it

25  is incorporating the analysis side of it that is a

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 172

1    comparison of the stated condition that he

2    appreciated, his own statements, and what was both

3    desired and intended by Mr. Lebron for an

4    appropriate skate lacing, the fit it imposed upon

5    him while skating, and the desired stated

6    communicated by Royal Caribbean.

7         Q    Okay.  And your opinion is that if the

8    laces were, in fact, in the condition that Mr.

9    Lebron testified to at his deposition, that he

10   should have appreciated that and -- or he would have

11   appreciated that?

12        A    Correct.

13             MR. HAYASHI:  Form.

14   BY MS. FAGENSON:

15        Q    Can you explain to the jury a little bit

16   about why it is you believe he should have

17   appreciated that?

18        A    Well, again, he had -- he had knowledge

19   and experience from previous experiences that he

20   considered to be the same as or strikingly similar

21   to ice skating.  He approached ice skating as he --

22   given his context of being a, quote, unquote, master

23   rollerblader.  And he also provided specific

24   comments about the differences in the lacing that he

25   was able to achieve with his left and his right foot

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                                   Page 173

 1    himself, commenting that the one was not right or

 2    was not correct and not as he intended and had

 3    experienced lacing it.

 4              He then further went on to describe

 5    that his perception and the feel of the skate while

 6    skating was loose, and he mentioned this a number of

 7    times, both as he first entered the ice and he

 8    continued, which is in direct contradiction to,

 9    again, his desired state and his other state and was

10    contrary to what one would expect from a fit for a

11    skate.

12       Q    And that opinion is also to a reasonable

13    degree of scientific certainty?

14       A    Yes.

15            MR. HAYASHI:  Form.

16    BY MS. FAGENSON:

17       Q    And all the basis, all the materials that

18    you've relied upon in rendering that opinion are

19    referenced in your report?

20       A    Yes.

21            MR. HAYASHI:  Form.

22    BY MS. FAGENSON:

23       Q    Is there anything that you've relied upon

24    in rendering that opinion that was not referenced in

25    the report?

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 174

1      A     I don't believe so.

2      Q     Okay.  Can you please read your third

3   opinion for us?

4      A     Given the information available from

5   documentation at the time of the incident, testimony

6   following the incident, publically available injury

7   data associated with ice skating, and closed-circuit

8   video footage of the time immediately prior to and

9   of the incident itself, there is no scientific

10  reason to believe that Mr. Lebron's fall or

11  inability to recover from his fall was caused by the

12  lacing of his ice skate.

13     Q     And I know you kind of lay it out a little

14  bit here, but can you please tell us for the jury

15  what are the facts and basis for this particular

16  opinion?

17     A     Certainly.

18           MR. HAYASHI:  Form.

19           THE WITNESS:  As laid out in the -- the

20        bullet point there, documentation at the time

21        of the incident with that, specifically, I'm

22        referencing the accident report and statements

23        made and documented at the time regarding how

24        and why Mr. Lebron fell.  It's referenced he

25        lost balance that he was providing support to

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                              Page 175

```
 1   his daughter that was falling.

 2        And notably, there's a lack of any

 3   information regarding the status of the laces.

 4   Testimony following the incident, we have

 5   testimony from people like Mr. Noel and the

 6   doctor involved in the care affirming that the

 7   veracity of these statements that were made and

 8   how they were recorded.

 9        The publically available injury data that

10   I'm referencing is the NEISS analysis, which

11   clearly show that falls while skating occur and

12   there's no evidence within them that the --

13   that these events and these falls occur

14   specifically due to or only due to lacing

15   issues with the skates.

16        The video footage itself and immediately

17   prior does show that a number of patrons,

18   including Mr. Lebron, will have balance issues.

19   It demonstrates ways and manners that people

20   utilize to recover and to prevent falling -- to

21   either prevent falling or recover from falling.

22   This includes balance recovery techniques.  The

23   maneuvering of one's arm in order to maintain

24   balance or the reaching out for a support

25   structure, like the wall.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 176

```
1              Of note, is at the time of the incident,
2        what we do see is that Mr. Lebron, from both
3        the CCTV and the, I believe, it's a phone
4        footage, that Mr. Lebron is in contact, has one
5        of his hands, I believe, his right hand
6        occupied by his daughter's hands.  It appears
7        that she does have a moment of instability.  We
8        can see a leg of hers kick out.  Immediately
9        prior to Mr. Lebron himself beginning to fall.
10             His other hand is towards the center of
11       the ice, and so in this particular instance, we
12       have a destabilizing event that causes and
13       begins Mr. Lebron's fall backwards.  And he has
14       limited ability and mechanisms by which to
15       prevent this fall given that he is holding onto
16       his daughter, and his other hand is nowhere
17       near the wall.
18             So given the culmination of this and all
19       of the information that we have available, that
20       is how we reached the conclusion that there is
21       no scientific reason to believe that Mr.
22       Lebron's fall or inability to recover was
23       caused by the lacing of his skate.
24  BY MS. FAGENSON:
25       Q    Sorry, so that opinion is based on your
```

1    review of these documents and your analysis in terms

2    of your experience in human factors and applying

3    that experience to the facts of this case?

4         A    Yes.

5              MR. HAYASHI:  Form.

6              MS. FAGENSON:  I'm sorry, was there an

7         objection?

8              MR. HAYASHI:  Form.

9              MS. FAGENSON:  Okay, sorry, I missed it.

10   BY MR. HAYASHI:

11        Q    And that opinion is to a reasonable degree

12   of scientific certainty?

13              THE WITNESS:  Yes.

14              MR. HAYASHI:  Form.

15   BY MS. FAGENSON:

16        Q    And Mr. Hayashi had asked you some

17   questions about the veracity of Mr. Lebron's depo

18   testimony, and he asked you a number of questions

19   specific about the deposition testimony.  Do you

20   recall those questions?

21        A    I recall some of them.

22        Q    Okay.  That's fair enough.  And those

23   questions that Mr. Hayashi asked you didn't include

24   the statements that Mr. Lebron had made to ship

25   personnel following -- immediately following his

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 178

```
 1   incident on the date of the incident; correct?

 2       A    Correct.

 3       Q    Okay.

 4            MR. HAYASHI:  Form.

 5   BY MS. FAGENSON:

 6       Q    And, in fact, were the statements that he

 7   made -- well, let me ask you this first.  You've

 8   reviewed the various statements that Mr. Lebron made

 9   to personnel on the date of this incident; correct?

10       A    Yes.

11            MR. HAYASHI:  Form.

12   BY MS. FAGENSON:

13       Q    Okay.  And where can those statements be

14   found for purposes of the record?

15       A    So I believe that there are some of them

16   in the medical investigation report.  I might have

17   the specific name of the document wrong.  If you

18   give me a moment, I can probably get the official

19   title of the document, but it's, I believe, the

20   guest injury statement is one place in which it is

21   included.

22       Q    And just so we're clear for the record,

23   what is included in the guest injury statement?

24       A    In the guest injury statement, there are

25   references to the fact that Mr. Lebron -- the reason
```

1    or cause for Mr. Lebron's fall being loss of

2    balance.  Also a reference that no -- no implication

3    of the equipment, and then, I believe that is the --

4    included -- what is included in the guest injury

5    statement.

6              Also, there is a remarks page, and I

7    believe this might also be the guest injury

8    statement that is a recitation of an interview and

9    statements being made where Mr. Lebron has stated he

10   was skating with his -- he's referred to as

11   Mr. Nuaverz (ph) in this remarks section.  It says,

12   Mr. Nuaverz stated that he was skating with his

13   daughter and that she was about to fall and that

14   when she tried to hold her up to prevent the fall,

15   he himself then fell, injuring his right leg.

16   Q    Okay.  Those statements in that remark

17   section, I believe it's a portion of the accident

18   report that was produced in this case.

19   A    Thank you.

20   Q    Is it your understanding that those

21   remarks were reported by the chief safety officer,

22   David Ferrie, who investigated Mr. Lebron's incident

23   on the date of his incident?

24   A    Yes.

25              MR. HAYASHI:  Form.

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                     Page 180

```
 1   BY MS. FAGENSON:

 2        Q    Did you also review --

 3             MR. HAYASHI:  Form.

 4             MS. FAGENSON:  -- Mr. Ferrie's deposition

 5        testimony in this case?

 6             THE WITNESS:  Yes.

 7             MR. HAYASHI:  Form, form.

 8   BY MS. FAGENSON:

 9        Q    And is part of the basis of your opinion

10   number three Mr. Ferrie's deposition testimony about

11   his conversations with Mr. Lebron?

12        A    Yes.

13             MR. HAYASHI:  Form.

14   BY MS. FAGENSON:

15        Q    And, you know, while Mr. Lebron may have

16   changed his story now, you know, or later in this

17   case at his deposition, would you agree that his

18   recollection of what happened at the time of the

19   incident on the date of the incident would be more

20   reliable and accurate than what he testified to

21   after he filed the litigation?

22        A    Well, certainly, we know as --

23             MR. HAYASHI:  Form, outside the scope of

24        direct.

25             THE WITNESS:  -- as time passes between an
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017

```
 1        event and one's recollection of it, there are

 2        various ways that our memory can fail or lead

 3        to errors.  We can either have just the passage

 4        of time, plus also we tend to recreate our

 5        memories, and we can actually insert new ideas

 6        based on our own retelling or information that

 7        we believe to come across after the fact.

 8   BY MS. FAGENSON:

 9        Q    So if Mr. Lebron testified at his

10   deposition that he couldn't recall whether he was

11   skating with his daughter or whether she fell or

12   not, what he said in his statements on the day on

13   the incident would be more reliable to you?

14        A    Certainly, it would be more

15   contemporaneous --

16             MR. HAYASHI:  (inaudible) outside of the

17        scope of direct.

18             THE REPORTER:  What --

19             MR. HAYASHI:  I'm trying to see if I can

20        look at the -- sorry, my voice is kind of

21        delayed.  Are you getting my objections?

22             THE REPORTER:  I've been getting them,

23        yes.

24             MR. HAYASHI:  Okay, well, I just said form

25        and outside of scope of direct.  I may not have
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 182

1       said "and," but I intended to.

2               THE REPORTER:  Okay.

3               MS. FAGENSON:  Okay.  And I missed Dr.

4       Sala's answer to the question.

5               THE WITNESS:  Yes, the passage of time

6       would have introduced more opportunity for

7       errors.

8   BY MS. FAGENSON:

9       Q    Okay.  And, in fact, with respect to that

10  particular testimony, it's also contradicted by the

11  video itself in your opinion; correct?

12      A    Correct.

13              MR. HAYASHI:  Form and outside the scope

14      of direct.

15  BY MS. FAGENSON:

16      Q    And can you tell us what your review of

17  the CCTV showed?

18      A    So my review of the CCTV --

19              MR. HAYASHI:  Form.

20              THE WITNESS:  -- showed that Mr. Lebron

21      entered the ice with his daughters, that

22      immediately surrounding their entrance there

23      were -- there was a separation in time and

24      distance between the next patrons that enter.

25      He first accompanied his daughters along the

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 183

```
1     wall.  Eventually, he can be seen leaving his

2     daughters and skating by himself around the

3     rink.

4          This continues for approximately, I

5     believe, 12 to 13 minutes as he alternatively

6     skates by himself or while holding the hands of

7     one of his daughters.  As I testified before,

8     during portions of this video he can be seen

9     making some corrective actions either

10    manipulating his arms to keep from falling or

11    supporting himself on the rink wall.

12         And then as we move closer in time to the

13    incident itself, he can be observed skating

14    with one of his daughters, hold her hand.  At

15    the time of the incident, you can see his

16    daughter has -- is holding onto the wall.  We

17    see one of her legs come up from underneath her

18    out in front.

19         Soon thereafter, we see Mr. Lebron's leg

20    also come out in front of him as he begins to

21    fall backwards, still holding his daughter's

22    hand, and he falls down onto his right leg, and

23    then there is a response to it.

24  BY MS. FAGENSON:

25         Q    And would you say that that video is
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 184

```
 1   consistent with what Mr. Lebron reported on the date

 2   of this incident?

 3        A    Yes, it is.

 4             MR. HAYASHI:  Form, outside of scope of

 5        direct.

 6   BY MS. FAGENSON:

 7        Q    And Mr. Lebron never reported that there

 8   was any defect with the ice itself or any issues

 9   with his skates on the date of his incident;

10   correct?

11        A    Correct.

12             MR. HAYASHI:  Form, outside of scope of

13        direct.

14   BY MS. FAGENSON:

15        Q    And, in fact, at his deposition, David

16   Ferrie testified that he specifically asked Mr.

17   Lebron if there was any issue with his equipment and

18   he stated no; correct?

19        A    That is my understanding.

20             MR. HAYASHI:  Form, outside of scope of

21        direct.

22   BY MS. FAGENSON:

23        Q    Okay.  And did that formulate a basis of

24   this opinion?

25        A    Yes.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 185

1      Q    Okay.

2           MR. HAYASHI:  Form.

3  BY MS. FAGENSON:

4      Q    Anything else, besides what we've just

5  talked about that formulates the basis of your

6  opinion number three?

7      A    I believe that we have discussed all the

8  bases.

9      Q    Okay.  And all of those bases that we just

10  discussed are contained in your written report here;

11  correct?

12     A    Correct.

13          MR. HAYASHI:  Form.

14  BY MS. FAGENSON:

15     Q    Is there anything that formulated the

16  basis of this third opinion that we have not

17  discussed or that is not contained in your report?

18     A    I do not believe so.

19          MR. HAYASHI:  Form.

20  BY MS. FAGENSON:

21     Q    And can you tell me about what your fourth

22  opinion is?

23     A    The fourth bullet point and opinion is,

24  Dr. Lu's opinions and testimony regarding the impact

25  of Mr. Lebron's lacing of his skate on the incident

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017

1  at hand are not supported by case facts or

2  scientific analyses, research, and are speculative.

3      Q    Okay.  And I know you talked about -- a

4  little bit about this opinion with Mr. Hayashi, so I

5  will try to keep it brief, but I do want, for

6  clarity of the record, to go over this a little bit

7  one more time with you.  And if you could explicitly

8  state for the jury what are the bases for your

9  opinion that Dr. Lu's opinion and testimony are not

10  supported by the facts of this case?

11      A    Certainly, so as I state in the -- in my

12  report, Dr. Lu has not inspected the laces -- or I'm

13  sorry, has not inspected the skates and cannot offer

14  any testimony as to material aspects of those skates

15  or of how the -- any lacing of that skate through to

16  the top of the skate, what effect that would have

17  had on the stability and/or rigidity of the skate,

18  and how this would have affected the incident.

19          She herself makes statements in her

20  deposition to that fact and makes statement as to

21  her inability to say whether the lacing would have

22  caused or prevented a fall from occurring.  She

23  also, as I stated before, fails to -- to reference

24  specific -- or reference scientific research and

25  literature in support of some of the other

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                          Page 187

1  assertions she makes, like statements she makes in

2  her deposition testimony regarding the intent and

3  design history of skates incorporating lacing up

4  through the ankle.

5      Q    Okay.  So I guess that kind of covers --

6  it's a little bit duplicative of my next question

7  which is, you know, the analysis that you used in

8  formulating this opinion is sort of looking at the

9  evidence and applying it to the facts of this case;

10 correct?

11     A    Correct.

12          MR. HAYASHI:  Form.

13 BY MS. FAGENSON:

14     Q    Okay.  And anything in addition to that

15 that you did in terms of your methodology in

16 rendering this opinion?

17     A    Yes.  I've also applied my own area of

18 expertise in human factors to assess aspects of this

19 that she does not and does not have -- does not

20 consider and does not have the expertise to

21 consider.  For example, she has made comments about

22 the ability of the lacing to have avoided or to have

23 recovered from this fall, yet she does not take into

24 account any of the analyses and observations that I

25 have stated regarding the means by which Mr. Lebron

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                                    Page 188

```
 1   and other patrons have successfully recovered from

 2   falls in the CCTV and that none of those methods

 3   were available to Mr. Lebron due to how he was

 4   skating at that particular instance.

 5        Q    Okay.  And all of those bases for your

 6   opinions and the analysis, is that all contained

 7   within your written report?

 8        A    Yes.

 9             MR. HAYASHI:  Form.

10   BY MS. FAGENSON:

11        Q    Is there anything in this -- anything that

12   formulated the basis of this fourth opinion, this

13   forth bulleted opinion that was not contained in

14   your report?

15        A    I do not believe so.

16        Q    This fourth opinion, is that an opinion

17   you have to a reasonable degree of scientific

18   certainty?

19        A    I'm sorry, there was some interference.

20   Were you asking whether the opinion was held to a

21   reasonable degree of scientific certainty?

22        Q    Yes.

23        A    Yes, it is.

24             MR. HAYASHI:  Form.

25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                        Page 189

```
 1   BY MS. FAGENSON:

 2        Q    And do you have any other opinions in this

 3   case other than what we have discussed during my

 4   cross-examination today?

 5        A    I do not believe so.

 6        Q    And I just want to be clear for the

 7   record.  It's your opinion that, based on the

 8   evidence in this case, you cannot say that if the

 9   skate Mr. Lebron was wearing was laced all the way

10   up to the top as he would have liked, that the

11   injury would not have occurred?

12        A    I don't believe that --

13             MR. HAYASHI:  Objection.

14             THE WITNESS:  I don't believe that one can

15        speculate as to whether or not this fall and

16        accident and injury would have occurred if the

17        skate was fully laced.

18   BY MS. FAGENSON:

19        Q    Okay.  So not only can you not render that

20   opinion you believe that nobody can render that

21   opinion based on the evidence in this case?

22        A    Based on the evidence and the analyses

23   I've seen to date, correct.

24             MS. FAGENSON:  Okay.  Just looking through

25        my notes; I think I'm just about done.  Okay, I
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 190

```
 1        think that's all I have.  Mr. Hayashi may have

 2        a couple of quick follow-up questions for you.

 3                      -  -  -

 4                REDIRECT EXAMINATION

 5                      -  -  -

 6   BY MR. HAYASHI:

 7        Q    Actually, just one follow-up question, Dr.

 8   Sala, and thank you for your time today.  The word

 9   "rebuttal" does not appear anywhere in your report;

10   correct?

11             MS. FAGENSON:  Objection to form, outside

12        the scope of my cross.

13             THE WITNESS:  I would have to review the

14        report.  I cannot specifically recall a spot

15        where I have written that, but if you'd like, I

16        can read through my report and verify.

17   BY MR. HAYASHI:

18        Q    Do you have a digital copy of your report?

19        A    I do not have a digital copy with me.

20   Although, I have one on my flashdrive, but I don't

21   have a -- I'd have to figure out how to open it on

22   this computer if you'd like.

23        Q    That may be faster.  If you'd like, you

24   can open up the document in digital form and do a

25   word search.
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Page 191

1      A    I have -- I performed a find on the

2   digital document, and I did not see the word

3   "rebuttal" anywhere in it.

4      Q    And, in fact, the word "rebut" also does

5   not appear anywhere in your report; correct?

6      A    Correct.

7           MR. HAYASHI:  All right.  I believe that's

8      all I have.

9           MS. FAGENSON:  Thank you very much for

10      your time today, Dr. Sala.  We appreciate it.

11           THE WITNESS:  Thank you.

12           (Discussion was held off the record.)

13           (Exhibit C was marked for identification.)

14           THE REPORTER:  Counsel, did you need

15      copies of this?

16           MS. FAGENSON:  Yes, we will need a copy.

17      We'll order.

18           MR. HAYASHI:  Us as well.

19           (Discussion was held off the record.)

20           (Deposition ended at 3:24 p.m.)

21

22

23

24

25

```
 1               C E R T I F I C A T E

 2

 3   COMMONWEALTH OF PENNSYLVANIA  :

 4                                 :    SS

 5   COUNTY OF PHILADELPHIA        :

 6

 7

 8                          I, ELIZABETH KELLY,

 9   Professional Reporter - Notary Public, within and

10   for the Commonwealth of Pennsylvania, do hereby

11   certify that the proceedings, evidence, and

12   objections noted are contained fully and accurately

13   in the notes taken by me of the preceding

14   deposition, and that this copy is a correct

15   transcript of the same.

16

17

18

19   _____

20   ELIZABETH KELLY

21   Professional Reporter

22   Notary Public

23

24

25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Index: $475..9

Exhibits

SalaJ A    3:15
  5:11,12

SalaJ B    3:16
  11:1,2

SalaJ C    3:17
  64:5,9
  191:13

$

$475    30:5,
  24

1

104    98:5

105    98:5,6

109    65:13,
  15

11    107:11
  123:2

111    64:14

118    89:17
  93:19

119    89:18
  93:21
  95:12

12    183:5

13    117:23
  122:1
  183:5

137    154:15

14    92:7
  96:12,14
  129:5
  135:1
  141:20

15    29:12,
  13,15
  66:17

16    29:12,
  14,15

17    64:16,23
  66:10,21,
  22,25
  152:17
  154:18
  155:11

18    128:17
  167:19
  169:16

19    27:6,16,
  22 29:17
  47:21
  91:16
  155:19

1977    28:7

1988    28:10

1994    28:15

2

2    12:20
  93:21

20    41:6
  64:17

65:15,18,
  23 68:7

20,000
  143:12
  146:24
  147:1

2009    35:25

2017    12:5,
  11,17,18
  13:21
  162:16

21    89:17

22    67:11
  89:21

23    46:24
  47:20
  155:14

24    93:19

24th    163:9

25    12:5,11,
  18 13:21
  162:16

25th    162:20

2B    65:24

3

30    124:21

3:24    191:20

4

475    30:12

48    155:14

49    155:7,9,
  11,20

5

5    12:17
  89:18 98:7

50    46:2
  155:8,9

51    80:7

52    80:12

54    123:12
  165:24,25

56    46:22

6

6    92:12

7

77    83:20

79    83:23

8

8    92:6
  95:12
  96:11,14

80    41:5
  143:11

9

9    91:16

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Index: A-l-a..affirming

95:12

---

**A**

---

A-l-a    4:21

**abilities**
  130:23
  131:6

**ability**
  24:19
  44:20,21
  131:22
  137:13,21
  139:16
  176:14
  187:22

**absolutely**
  58:23
  125:2

**accept**    59:6

**access**    6:5,7
  53:9

**accident**
  22:15,18,
  23  23:1,5,
  6,12,15,16
  63:21
  75:1,6,20
  101:11
  132:23
  144:2
  145:24
  174:22
  179:17
  189:16

**accidents**
  22:20,21
  56:12
  131:19
  146:14

**accommodate**
  108:6
  163:21

**accompanied**
  182:25

**account**
  149:23
  152:21
  187:24

**accurate**
  109:17
  180:20

**achieve**
  139:6
  142:12
  168:6
  172:25

**acknowledge**
  117:24
  127:23

**acknowledged**
  138:5

**acknowledging**
  149:15

**actions**
  63:20
  119:11
  130:19
  183:9

**activities**
  108:1
  118:13
  129:8
  131:24
  133:9

**activity**
  119:25
  130:21
  132:8
  142:17

**actual**    24:17
  53:6
  137:12

**add**   97:8,
  13,17,25

**addition**
  9:22 120:6
  187:14

**additional**
  25:13,15,
  25  89:19
  91:7,13
  95:7 119:6

**address**   45:3
  48:11
  114:4
  116:7

**addressed**
  50:5 145:9
  157:24

**addresses**
  58:3
  125:20

**addressing**

15:7 116:3
125:17
126:3,4
157:21

**adequacy**
  52:14
  106:13

**adequate**
  66:7 82:16
  89:24
  128:6,13
  167:25
  170:9

**adequately**
  66:4
  114:25
  151:3,20

**adherence**
  131:2

**admits**
  120:11

**Adventure**
  37:20,23
  38:1,3
  53:1

**advises**   66:6

**affect**   21:11
  61:16,23

**affected**
  61:8,12
  137:21
  186:18

**affirming**
  175:6

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Index: afford..apologies

afford 139:5

afforded
59:10
136:4

affords
55:20

afternoon
7:17

agencies
146:14

ages 55:23

agree 18:21
56:22
57:13 60:6
63:16
67:5,12,20
110:21
126:17
131:18
147:3
153:16
154:25
155:1
180:17

agreement
4:2

ahead 10:25
150:2,4

aid 25:24

aligning
109:24
135:12
170:4

allege 15:4

alleged
146:19

allegedly
47:5 76:4,
11

alleges 82:8

alleging
82:19

alternative
119:6

alternatively
183:5

amiss 137:11

amount 33:8
39:13
40:14 44:3

analyses
23:14
33:24 34:4
52:22
71:25
79:24
100:3
134:18
148:12
149:12
186:2
187:24
189:22

analysis
15:10,21
16:6 20:17
25:4,7
33:22
52:13 57:7

61:5,7
62:3,7,10,
13,17,23
70:21
73:22 74:8
80:2,3
104:18
106:17
116:15,21,
25 117:10,
11,18
118:18
119:4
125:24
128:21
146:11
148:3
150:20
151:10
152:1,18
157:3
158:23,25
159:17
161:10
169:23
171:25
175:10
177:1
187:7
188:6

analyze
21:21
118:20
119:8

analyzing
62:21

and/or

108:23
186:17

ankle 23:25
24:13,16
82:22
83:21
84:2,9
85:5
137:10
142:17
152:3,14
155:24
156:2
157:19
187:4

ankles
139:9,15,
23

annual
143:12

answering
82:3
151:13

answers
90:20
143:25
155:6,20
158:7

anybody's
122:4

anymore
66:16

apologies
26:25
29:21

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017        Index: apparent..aspects

apparent
  168:5

appeared
  49:16
  81:21,23
  82:1

appears
  25:24
  41:14,15,
  17 102:6,7
  152:22
  155:19
  176:6

application
  149:19
  150:22
  152:11

applied
  151:3,18
  187:17

applies
  79:23 80:2

apply  118:25

applying
  148:20
  149:2
  177:2
  187:9

appreciable
  170:10

appreciated
  136:21
  141:11,16
  171:9
  172:2,10,

11,17

appreciating
  56:4 58:20
  136:2

appreciation
  133:16
  135:14
  136:10
  137:8
  138:3
  139:1
  159:20

approach
  66:1,12

approached
  172:21

approaching
  119:24

appropriately
  149:2

appropriatenes
s  168:14

approximately
  39:7
  40:13,18
  41:4,5
  183:4

approximation
  53:18

architectural
  68:21

area  16:5,
  12,15,21
  17:4,8,20

18:5,9,12,
18 19:25
25:2,4
44:4 45:21
47:7 52:9
66:6,14
85:8 86:13
87:5,7,25
88:9,14,24
89:9,14,25
93:23
94:4,8,13,
15,22
95:3,5
97:3
103:19
120:8
121:6,20
135:7
154:8
187:17

areas  17:23,
25 18:14,
23 19:20
20:1,5
22:9,10
26:6 38:19
55:5 63:3
86:1 148:6
154:1,10

arena  166:12

argument
  130:5

argumentive
  101:16
  151:23
  159:13

arm  102:9
  175:23

arms  183:10

article
  28:10,14
  155:21
  156:16

articles
  27:6,13,
  15,19,21
  28:5,7
  155:20

ascending
  43:20
  46:20

aspect  20:24
  48:18
  73:20
  87:16

aspects
  22:20
  44:15
  55:18 56:6
  57:14,17
  58:22 59:2
  60:3,11
  73:4
  79:15,20,
  22 106:18
  112:24
  117:15
  127:15
  148:9,13
  151:25
  161:10
  186:14

187:18

**assert**
154:23

**asserted**
9:11
161:12

**assertions**
117:14
187:1

**assess**
187:18

**assessing**
86:5
149:16

**assessments**
157:2

**assist**
113:18

**assistance**
135:6

**assisted**
33:9
113:21

**association**
144:1

**assume**  38:17
130:2
165:16
166:13

**assuming**
7:11
146:22

**assumption**

149:12

**attempt**
23:11
102:10

**attempted**
39:23

**attempting**
23:6 46:4
168:5

**attend**
129:16
130:6,22
131:12

**attended**
129:10

**attending**
40:4 68:1
130:11
170:11

**attention**
46:21
64:2,13
111:2,3
119:23
130:19
131:2

**attorney**
49:18
50:11,17

**attorneys**
14:17 16:4

**attributes**
87:15
88:14

94:14 95:2
96:24 97:2

**attributing**
86:25
87:23
130:16
133:20

**attribution**
89:13

**audio**  14:10

**authored**
12:4 13:20
41:25
162:16
163:2

**automatically**
129:15

**avert**  119:7

**avoid**  63:20
90:5

**avoidance**
56:12

**avoided**
63:23
187:22

**aware**  6:15,
18,20,21
7:6 11:24
13:23
16:12
17:14 19:2
34:9 45:5
61:20
71:1,3

82:18
87:25
102:12
105:24,25
106:8
116:24
117:4
119:21
120:10,13,
15 126:20
140:19
143:3
153:8

**Awareness**
105:20

———————
**B**
———————

**B-e-n-e-d-i-c-
t**  4:23

**back**  8:9
16:18,20,
23 26:1,10
39:5 41:11
65:8 81:14
87:11 89:3
109:14
111:25
113:12
121:21
123:5
133:4
143:7

**background**
20:7 69:3,
11,16,22,
24 70:3,4

71:13
72:7,11,16
73:5,10
74:13
118:22

**backgrounds**
18:22 20:6

**backside**
105:11

**backwards**
176:13
183:21

**balance**
20:7,8
43:5 75:8
84:1,6,19,
22 85:6,8,
11 90:2
93:24 94:5
102:5,23
103:9
145:7
152:22,25
153:5,12,
25 154:2
156:2
174:25
175:18,22,
24 179:2

**balancing**
156:3

**base** 135:10
159:21

**based** 62:2
68:3 99:13
115:10

134:18
156:14
158:22,23
164:12
171:14,20
176:25
181:6
189:7,21,
22

**bases** 104:24
185:8,9
186:8
188:5

**basic** 131:24

**basically**
155:23

**basing**
122:14
134:13

**basis** 40:7
69:25
70:21
100:3
101:9
120:17
161:13
168:8,10,
24 171:12
173:17
174:15
180:9
184:23
185:5,16
188:12

**bear** 10:22
155:12

163:14

**beginning**
72:19
176:9

**begins** 47:1
74:8 75:1
101:24
155:14,15
176:13
183:20

**behalf** 39:6,
8,24 40:24
41:1,7,20,
23 42:1
71:8
119:11

**behaved**
157:15

**behavior**
28:8 51:19
54:12,17
55:8 63:19
68:3 119:2
130:18
133:18
170:5

**behavioral**
28:11
119:15

**behaviors**
23:2 119:7
152:20

**believes**
89:12
93:12

151:2

**Benedict**
4:23

**beneficial**
34:2

**benefit**
133:17

**benefits**
115:6

**bias** 31:23

**biases**
119:24

**bill** 30:3,
10,19
32:15

**billable**
39:12

**billed** 39:9

**billing**
30:5,8
31:1

**bills** 32:3

**binder** 6:4,
12

**biomechanical**
19:8,10,12
22:5 56:25
57:6,24
58:14,16
59:3,12
60:9,10
147:16,19,
20,25

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017   Index: biomechanics..cameras

148:20
149:3,19
150:22
151:3,19,
25 152:12
154:19
155:3
156:8
157:3,7,8

**biomechanics**
19:6,17
20:3,6,11
57:15 58:5
60:1
156:9,12

**biomedical**
19:4,8,9,
12 20:2,4
56:25 57:5
58:12,14,
16 59:3,13
147:16,18,
21,24
148:20
149:3
151:4,19,
25 152:12
154:19
155:3

**bit**  9:23
29:24
42:10
67:9,10
69:4
101:20
169:22
172:15

174:14
186:4,6
187:6

**blades**
109:16
110:16

**blading**
130:13
171:22

**bleeds**  40:5

**blocks**
104:13,19

**body**  20:14
21:13,17
55:12,18,
20 56:11,
16 57:1,6,
14 58:17,
21,23
59:4,11,21
60:3,11
84:2,8
157:15

**body's**  20:15

**bold**  72:15
73:2,9
113:6

**bolded**
105:20

**bolden**  107:7

**boot**  109:16
110:16
114:10
156:23

157:13

**boots**  155:16

**bottom**  27:7,
16,21
74:15 80:7

**box**  34:23

**boy**  65:24

**brain**  54:7,
17 55:2

**break**  42:5,
6,11 46:6
105:4
124:22,23
125:1
161:21,24

**breakdown**
41:3

**briefly**
74:12,20
120:5

**bring**  5:18,
22

**brings**  11:8
68:5
105:18

**broad**  58:7,
22 59:6

**broader**
22:18

**broadly**
18:10 21:5
62:25
114:2

**broke**  9:23
14:10

**broken**  39:16
111:7,12
116:1

**brought**  6:11

**building**
104:13,19

**bullet**
29:20,21
115:20,24,
25 116:3,5
169:16
174:20
185:23

**bulleted**
188:13

**buttocks**
84:8

---

C

**call**  8:18
87:4
127:10

**called**  8:5
14:16
48:11
113:6,18

**calls**  63:14
115:1
129:19

**camera**  166:5

**cameras**
166:14

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017 Index: capabilities..characterizing

**capabilities**
 21:7
 55:19,21
 58:24

**capacity**
 170:18

**car** 22:23

**care** 175:6

**career** 32:23
 54:24

**Caribbean**
 7:25
 37:19,22
 38:1,8
 41:16
 42:17,19
 47:3 53:1
 102:13
 107:8,25
 109:4
 111:6,11
 117:25
 120:10
 127:23
 128:12
 142:11
 167:24
 172:6

**Caribbean's**
 108:17,18
 111:13
 142:15

**case** 10:11
 12:1 14:3,
 6,14 15:4
 16:3 23:3,

4,7 25:11
30:1,6,11
32:10,13,
23 33:18
34:11,15,
19,25
35:5,9,10,
20,22
41:21
42:1,17,24
43:10,17,
18 44:20,
22 45:8
46:16,18,
22 47:13,
24 48:4,6,
15,19,22
49:3,7,8,
11,14,17,
19,23
50:11,13,
20,23
51:11 52:8
62:2 64:4,
7,16 68:14
69:23
70:9,15,
17,19,20,
24 71:24
73:12,23
75:18
77:12
78:13
99:25
100:1
101:9
103:25
104:6

107:16
112:11
116:18
119:1
146:24
148:13,21
149:4,10,
20,21
151:5,20
152:13
157:16
164:4,5,6
165:9,14
167:6,7,
15,22
168:19
169:7
170:3
177:3
179:18
180:5,17
186:1,10
187:9
189:3,8,21

**cases** 33:1,9
 40:23,25
 41:9,15
 42:9 44:7,
 18,19
 164:8,14,
 16,19

**cast** 109:9

**causation**
 144:2

**caused** 85:6,
 8 174:11
 176:23

186:22

**causing** 85:9

**CCPD** 10:5

**CCTV**
 120:12,20
 121:14
 166:10,15
 176:3
 182:17,18
 188:2

**center**
 176:10

**certainty**
 114:6
 169:18
 170:22
 173:13
 177:12
 188:18,21

**certification**
 4:3

**change** 68:2,
 3 119:7

**changed**
 68:13
 180:16

**characteristic
s** 21:12

**characterize**
 52:21
 54:20
 103:12

**characterizing**
 57:20

characters
46:2

charges
32:16

check  10:21
76:17
110:11

checklist
145:6,8,
11,13
146:3,17,
21

chief  179:21

choices
136:8

choose
154:22

chooses  34:5

chose  136:7

choses
127:10

citation
80:12
83:1,20,22
121:24

citations
100:22

cite  75:21
88:24
112:24
123:3

cited  88:23

citing  98:4

108:22
109:6
122:2

claim  8:24
9:7 18:24
45:9 48:2
86:14

claimed
16:20
76:10

claims
148:17

clarify
52:12
122:23

clarity  87:2
186:6

clear  27:18
31:11
48:21 51:7
60:14 72:5
80:5,17
81:22
82:8,14
85:17,21
86:18
88:1,3,24
90:23
94:21,25
95:22
96:18
99:12
100:7,13
108:16
109:25
112:25

115:7
156:4,24
162:14
164:2
167:5
168:4
178:22
189:6

client  7:22
8:5 9:17,
24 33:21,
22 34:4
39:8

clients
15:23
33:23

climbing
51:6

close  124:20

closed-circuit
101:25
174:7

closer
183:12

clothes  86:6

clothing
86:23

coding
143:22

cognition
21:15 58:4
60:8

cognitions
56:8

cognitive
21:8 54:7
55:3

colleagues
58:11

collect
146:16

collects
30:23 31:4

combination
85:10

comfort
138:20
142:7

comfortable
140:14

comment
77:16
86:23
103:12
113:25
146:8,17
148:12
158:14

commented
77:4

commenting
44:1
148:7,22
149:8
151:24
152:4,5
157:6,18
173:1

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017    Index: comments..consistent

comments
 172:24
 187:21

common
 154:14,18
 155:3,19,
 23 156:4,
 6,9,17
 157:4,9
 158:11,12,
 18,22
 159:2,9,
 11,18,19,
 20,22
 161:5,9,
 12,13

communicated
 117:25
 127:24
 172:6

communication
 9:6,10
 28:16

communications
 8:24 63:6

company   30:2
 31:19
 34:20,22
 39:25 40:1

comparison
 70:23
 170:2,15
 172:1

compensated
 30:1,3

31:22
32:10,12

compensation
 30:20
 32:4,17

competitive
 31:19

compile   6:25

compiled
 27:11,14,
 19 28:24
 29:1

complete
 150:19

completed
 163:8

completely
 68:17 84:7
 146:9

component
 119:15

composer
 110:8

computer   6:9
 164:22
 190:22

concept
 160:9

concerned
 52:13 61:4

conclude
 133:24

conclusion

63:14 95:9
115:2,14
118:6
129:20
170:8
176:20

conclusions
 100:6
 116:17
 118:16
 128:10,19

condition
 44:23
 61:22
 108:3,20
 109:15
 110:4,13,
 16 135:4
 140:16
 141:7,10
 168:2
 170:12
 171:5,8,16
 172:1,8

conditions
 55:23
 85:10
 145:22

conferences
 40:4 63:5

confidential
 31:18

confirm
 12:21

confused

37:17 74:1

confusing
 37:10 49:6
 138:1

confusion
 112:23
 127:6

conjecturing
 145:21

connection
 54:16

consideration
 147:14

considered
 31:18 33:5
 150:12
 159:2
 160:1
 161:5
 172:20

considers
 148:8

consistent
 68:17 76:7
 85:14 87:5
 99:17
 102:24
 111:8
 123:25
 135:23
 137:6
 141:7
 142:9,10
 153:1
 159:18

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017    Index: consistently..correct

161:11
167:2
168:2
171:5,13,
19 184:1

**consistently**
82:14
87:17
135:19

**constantly**
123:10

**construction**
16:23 17:2

**consumer**
28:11

**contact**
176:4

**contained**
18:1 25:4,
11 185:10,
17 188:6,
13

**contaminant**
45:10
48:2,6
49:3

**contemporaneou**
s 67:2
181:15

**contend** 15:4

**contending**
15:13
128:25

**content**

128:14
168:1

**contentions**
117:6,17

**context**
14:3,19
16:3 65:9,
22 66:19
68:6 77:11
89:19 92:5
154:22
155:6
156:10
158:15
170:7
171:22
172:22

**contingent**
61:11

**continue**
47:22
66:20,22
84:3 89:20
91:6 93:21
134:21
135:3
136:23
142:16

**continued**
25:25
171:18
173:8

**continues**
183:4

**Continuing**

66:17

**contradicted**
182:10

**contradicting**
16:8

**contradiction**
102:21
173:8

**contrary**
117:13,19
126:9
136:21
137:10
139:3
141:12
142:12
158:3
171:10
173:10

**contributed**
33:3 146:6

**control**
56:9,10
131:21
156:1,2

**conversation**
9:3

**conversations**
180:11

**convey**
170:3,10

**conveyed**
90:21

**copied** 7:2

**copies**
191:15

**copy** 5:4,7
6:12
190:18,19
191:16

**core** 54:10,
15

**correct**
5:19,20,
23,24 7:15
8:7,12,21
10:1,18
11:10,11,
13,18 12:5
13:9,10,
18,19,21,
22 15:18
17:6,19
18:6
19:18,20
20:19,22
21:22 22:2
23:25
24:14,15,
18 26:15,
20,21
27:11
29:2,18,19
30:6,10,
24,25 31:5
35:15,16
37:20
39:3,11,20
40:9,10,16
41:15,19,
22 48:7,15

49:4,24
50:14
51:11
53:3,11,22
55:13,16
56:1,18
57:7 58:17
59:14
60:22
61:18
62:11
63:7,9,11
64:8 65:1,
5 68:10
69:5 71:13
72:12,20,
23 73:10,
13 76:4,15
77:1,12,22
78:7,14,
19,23
80:3,4,19
81:24
82:16
84:12
85:19,20,
23 86:11,
19 87:8
89:9
91:16,17
92:24
93:7,16,25
94:5,8
95:14,24,
25 96:4,5,
7 98:12,
17,19
99:14,22

100:7,18
101:3
102:10
103:5,25
104:15,25
105:12,13,
15,22,23
106:23,24
107:9,12,
16 108:6,
20 109:5,
11,16
110:17
111:2,7,13
112:4,11,
19 113:7,
11,14
114:5
115:11,22,
23 116:3,
8,15,18
118:6
122:5,15
124:10
125:10,14,
18 126:4,
6,11,22
127:3
128:3,7,22
129:11,12,
18 130:13
131:14
132:12,14
133:7,11
134:7,23
135:8,25
136:19
137:4,15,

24 138:13,
21 139:9
140:17,23
141:13,14,
17,22,24,
25 142:2,
22 143:4,
16,17
144:6,19
145:10,17
147:11,12,
16,21
149:4,5
152:15,25
153:6,14
154:20
155:8,10
156:12
157:25
158:6
160:8,13
161:6
162:16,17,
23 163:12
164:9,10,
17 165:17,
18 166:2,
6,18,19
167:7
168:20
169:1,8
172:12
173:2
178:1,2,9
182:11,12
184:10,11,
18 185:11,
12 187:10,

11 189:23
190:10
191:5,6

**corrective**
183:9

**correctly**
148:21

**correspondence**
7:24 8:6,
14

**counsel   4:2**
6:15,18
7:4,9,25
8:15,23
9:7 27:20
28:24 29:1
90:10
191:14

**couple**
166:11
190:2

**court   5:7**
34:16
35:10
77:12
91:22
158:16
162:6

**courteous**
90:14
124:23

**cover   26:14**

**covered**
147:23

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017        Index: covers..defendant

covers  187:5

crashes
  22:25

create
  100:11

critique
  150:1

cross  71:23
  162:11
  190:12

cross-
examination
  189:4

cross-talk
  90:9

cruise
  34:19,20,
  22 38:4,8,
  9,10,13
  41:9,14,
  16,17,21
  42:1,20
  43:21
  46:17 47:3
  61:15

culmination
  116:20
  176:18

current  41:2

cut  31:10

─────────
         D
─────────

danger  20:22
  28:12

63:11,12,
21 65:1
67:3 68:9

dangerous
  44:23
  114:24

dangers
  24:20
  118:12

data  143:23
  145:14
  146:9,16
  147:6,10
  174:7
  175:9

database
  29:20
  143:8
  145:2
  146:10,12

databases
  144:24
  145:1

date  8:18
  14:1
  25:12,16
  165:10
  166:23,24
  178:1,9
  179:23
  180:19
  184:1,9
  189:23

dated  12:11
  162:20

dates  12:16
  163:5

daughter
  74:16
  75:9,14
  76:3,12,20
  84:21,25
  175:1
  176:16
  179:13
  181:11
  183:16

daughter's
  176:6
  183:21

daughters
  182:21,25
  183:2,7,14

Dave  120:10

David  102:14
  160:20,24
  179:22
  184:15

day  162:25
  163:2,8,9
  181:12

deadline
  13:24
  14:2,3

deal  21:16,
  20 47:11
  60:10

dealing
  147:2

decide
  158:17

decided
  35:10
  135:21
  136:22
  138:25

decision
  33:25
  35:21

decisions
  28:16
  131:23

declares
  119:10

deep  85:7
  87:5,7,24
  88:14,24
  89:8,14,25
  93:23
  94:4,8,15,
  22 95:3,5
  97:3
  153:5,13,
  23

defect  85:7
  86:3 87:18
  137:14
  184:8

defective
  82:8

defendant
  6:15 8:15
  27:20
  28:25 29:2

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017          Index: defense..desired

34:19
40:24

**defense**  8:23
41:4,24

**defer**  14:17
15:23 16:3
87:11
110:7

**deficiency**
119:14

**definable**
87:16

**defined**  21:6

**defining**
103:10

**definitively**
28:1

**deformities**
153:18

**degree**  51:18
58:5 60:1
169:17
170:21
173:13
177:11
188:17,21

**degrees**
53:24

**delayed**
181:21

**demonstrate**
115:5
136:21
139:5

**demonstrates**
129:4,6
133:7
143:10
175:19

**demonstration**
114:18
115:4
120:8

**demonstrative**
24:7

**depend**  103:7

**dependent**
60:4
111:17

**depending**
35:6

**depends**
67:25

**depicting**
114:9

**depiction**
170:15

**depo**  10:5
177:17

**deposed**  77:4
78:1

**deposition**
5:19 6:7,
19,23
8:11,18
9:17 10:8,
9,16,21
11:6 13:7

16:18,19
25:20,21,
22,24
26:4,8,13
30:9,11
46:22 49:7
52:5 64:4,
15 75:22
76:7,16,18
77:1,15,25
78:13,21,
23 79:5,13
83:1
84:12,15
85:13,15
88:23,25
89:16
90:19 93:4
100:14,18,
23 101:3
108:24
138:7
141:8
151:13
158:8
163:8,10,
21 164:8,
11 165:20,
23 168:3,
18 171:6
172:9
177:19
180:4,10,
17 181:10
184:15
186:20
187:2
191:20

**depositions**
10:14 26:6

**derivations**
160:16

**describe**
38:21
70:11 75:7
90:6 92:13
95:23
152:9
173:4

**describes**
83:13,15
87:14
154:13

**describing**
105:8
170:13

**description**
25:23 69:1
103:8

**descriptions**
168:12,23

**design**  17:2
28:9
155:16
156:14,23
187:3

**designs**
157:13

**desire**  136:2

**desired**
137:9
141:13

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017  Index: destabilizations..distinct

142:8,15
171:11
172:3,5
173:9

destabilizatio
ns   102:22

destabilizing
176:12

detail   52:19
79:18
113:2
169:3

detailed
119:22

details
42:21

detect   93:13

detecting
94:21

determination
111:21

determine
109:19
110:3
133:21

determined
35:2
111:25

developmental
21:8 55:21

difference
22:4 33:17
59:10 61:4
154:3,10

differences
22:6,8
172:24

differentials
57:4

differently
61:17

difficulty
102:15

digital   6:19
7:9 9:16
13:3
27:11,13,
19 190:18,
19,24
191:2

direct   31:10
46:14,21
71:23
97:15
138:1
167:15,19
173:8
180:24
181:17,25
182:14
184:5,13,
21

directly
25:19

dirt   86:13
89:23

dirty   86:6,
10,19,24
89:22

disagree
76:22
106:21
116:25
117:5,9
118:5
126:10,17,
19 127:9,
19

disagreeing
103:4

disagreements
117:16

disagrees
127:1,12

disc   10:20

discipline
56:25
59:22

disciplines
54:6,10

disclosed
34:12

disclosure
11:13
163:5

discomfort
139:18,22,
24 140:5
142:7

discontinue
135:5

discrepancy
7:14

discuss   25:7
69:2 79:20
150:8

discussed
123:4
136:8
147:15
185:7,10,
17 189:3

discussing
6:22 65:4
99:8
122:18

discussion
46:9 64:6
69:4 105:5
125:3
152:16
169:24
191:12,19

disposed
109:2

dispute
117:5

disputed
107:3

disregard
130:22

disregarded
142:13

distance
182:24

distinct
18:14,24

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017Index: distinction..encountering

23:15  59:4

**distinction**
  14:19
  22:11
  69:21
  70:25

**distracting**
  36:14

**disturbances**
  103:9

**divided**
  30:12

**doctor**  4:16
  21:22  22:3
  25:21
  29:25
  35:22
  37:20
  45:17  61:6
  68:22
  69:15
  118:15
  153:22
  175:6

**document**
  45:12,19
  178:17,19
  190:24
  191:2

**documentation**
  174:5,20

**documented**
  77:6
  174:23

**documents**

5:18  6:6
7:1,4  9:22
10:1  25:22
26:22
27:11,15
28:24  29:8
110:24
125:8
177:1

**Dorris**  28:7

**doubt**  81:19
  95:11

**draw**  23:23
  24:5  64:2,
  13

**drinking**
  134:3

**drive**  6:2,6
  7:2,5,20
  44:5

**driver**  65:5
  67:23

**driver's**
  23:2

**Dropbox**
  6:16,19
  7:6

**duces**  5:1,21

**due**  76:20
  85:5
  119:22
  151:12
  175:14
  188:3

**duly**  4:9

**duplicates**
  7:21

**duplicative**
  187:6

**duties**  32:14

―――――――――――

**E**

**e-mail**  8:14

**e.g**  118:2

**e.g.**  128:1

**earlier**
  22:10
  77:11
  143:8

**easily**
  140:22

**Edgardo**
  100:17

**educated**
  60:18

**education**
  17:11
  18:12,22
  20:9  29:24
  53:21
  54:19,20,
  23  55:7
  60:15
  118:22
  159:16
  169:13

**effect**

120:16
186:16

**effective**
  63:10
  64:25
  67:1,21,24
  68:9

**effectiveness**
  67:13
  68:13

**efforts**
  22:19
  41:5,6

**elevated**
  65:17

**elucidate**
  122:9

**emphasis**
  57:23
  58:15,16
  59:21

**employee**
  30:18
  32:14
  135:6

**employees**
  31:5  111:6

**encompassed**
  52:23

**encounter**
  114:5

**encountering**
  145:10

end  67:15,
16,22,23
75:4 80:11
83:22 84:3
85:1
127:16
141:23
152:17,18

ended  191:20

ending  72:8
83:21
89:17

ends  58:9
74:3 81:7

engaged  41:3

engaging
131:23
136:1

engineer
19:5,10,14
60:19
147:25
154:19

engineering
19:8,13
20:2,4
22:5 57:1,
6,24 59:3,
13 60:15,
22 148:20
149:3,19
151:4,20

engineers
58:12,15

entailed

51:18

enter  182:24

entered
171:18
173:7
182:21

entertainment
107:25

entire  5:23,
25 6:2
8:21 72:10
73:8 74:6
92:6
161:14
165:16
166:5,6

entirety
26:12
48:22
51:15 52:4
158:1
165:19

entitled
26:19 28:8
29:5
115:18
116:14

entrance
182:22

environment
21:10
23:20
44:14

environments
54:15

118:21

equipment
107:24
108:2
109:7
113:10,11
118:2
127:25
130:21
179:3
184:17

equipped
58:7

errors  181:3
182:7

essence
156:16

essentially
78:20
168:16

evaluate
119:5

evaluation
119:1
149:20
170:1

event  43:4
103:18
111:23
112:22
133:16
176:12
181:1

events
112:10

175:13

eventually
103:19
119:13
183:1

evidence
35:3 53:10
61:21 62:2
73:17,23
74:7 100:1
101:8
107:19
112:1
144:23
153:17
157:16
158:24
165:9
175:12
187:9
189:8,21,
22

exact  7:19
106:15
164:6

EXAMINATION
4:13
162:11
190:4

examine
53:14,17

examined
4:10

exceed  46:2

excessively

86:6,24

**exchange**
135:5

**exchanged**
8:14

**exclusively**
19:22 20:4

**excuse** 26:24
27:24 42:4
43:1 62:4
65:13
70:18
75:24 78:4
84:20
160:22

**exemplar**
53:14,17
150:12

**exhaustive**
22:12
164:15

**exhibit**
5:11,12
11:1,2
12:20
64:5,9
108:24
191:13

**Exhibit-1**
5:11

**exhibits**
10:13
53:13 77:7
108:23

**exist** 10:7
79:17 90:5
92:20
109:14

**existence**
95:5

**expect** 118:8
136:4
173:10

**expected**
134:20
135:3
150:15

**expecting**
37:8

**experience**
17:10,12
18:11,22
19:11
20:10
29:25 58:4
63:2
105:20
113:17,23
118:23
120:2
129:7,15,
18 130:3,
4,8,13
131:4,10
132:7,13,
25 133:8
134:9,16,
20 135:2,
13 136:1,
18,23

138:1,23
142:9,14
147:17
148:14
159:16
169:14
170:16
171:21,23
172:19
177:2,3

**experienced**
130:20
131:21
137:1
173:3

**experiences**
56:8 103:4
119:23
135:23
172:19

**experiencing**
135:15
136:6

**experiments**
160:7,12,
14

**expert** 10:5
11:9,25
12:3
13:16,24
14:14
16:13 17:1
18:4,17
19:8 21:3
25:11
27:22

41:25
60:21
68:21
102:13
106:16
120:10
127:2
133:23
147:16,21
155:4

**expert's**
117:19

**expertise**
16:5,12,16
17:4,8,15,
17,19,21,
23,24,25
18:5,9,13,
14,18,24
19:2,5
22:14,17,
22 23:13
57:19
86:14
116:21
133:14
147:19
148:3
152:12
157:3
187:18,20

**experts**
14:8,22,25
15:5,8,12
16:10
70:16,17
71:4,8

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017          Index: experts'..factual

106:1,9,21
107:4
116:24
117:5,9,14
118:5
126:10,25
146:13
158:4,11,
15 167:7

experts'
126:8

explain
23:24
24:16
172:15

explicit
67:3 90:24
95:1 98:6
110:9
127:11
129:1
143:5

explicitly
26:2 66:18
79:2
125:21,25
129:3
149:11
164:11
186:7

Exponent
13:3,17
29:5 30:2,
5,13,19,
21,23
31:2,14

32:3,5,15,
18 33:6
40:2,15

expressed
15:10

extend   73:1

extends   40:5
72:22

extent   16:1
44:1 51:4,
17

external
56:17
122:12

eye   93:2,
15,16

eye-level
92:17

───────────

F

───────────

fact   35:19
61:8,11
75:21
92:19
100:6
124:9
133:6
135:20
137:11
138:4
158:12
166:22
172:8
178:6,25
181:7

182:9
184:15
186:20
191:4

factor   43:24

factors
17:9,15,
17,18,20
18:2,10,17
19:17
20:2,7,10,
16,17,20,
25 21:3,5
22:5,19,22
23:17 35:5
40:3 42:23
43:5 44:12
48:5,10
50:8 52:13
54:3,11
55:17 56:7
57:2,4,15,
18,22
58:3,17,22
59:5,12
60:1,6,12
61:4 63:5
67:6,13
99:22
100:3
104:5,14
113:16,17,
22 116:15,
20 117:11
118:18,23
128:21,24
133:14

148:7,10,
14 158:25
169:14
170:7
177:2
187:18

facts   69:23
70:8,15,
19,20
71:2,10,
16,17,24
73:12,23
74:7 75:17
78:24
99:20,25
101:8
103:24
106:22,23
107:2,15,
19 116:20
119:1
148:21
149:4,20,
21 151:4,
20 152:13
158:23
159:15
170:4
174:15
177:3
186:1,10
187:9

factual
69:24
70:3,14,16
73:16
79:18

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017          Index: Fagenson..fairly

106:17
168:8,10
171:14

**Fagenson**
7:15 9:1
12:6,13
15:19 17:7
18:7,20
19:21
20:23
21:18,23
23:8 24:2,
23 26:17
28:4 30:16
31:7,16,24
32:11,24
33:10,19
36:2,7,14,
18,23 37:2
38:6 40:17
42:6 43:12
44:10,25
45:11
46:7,25
47:9 48:8,
16 49:5,
10,25
50:15
51:1,12,25
52:10,16
53:23
54:4,22
55:14 56:2
57:10,25
58:18
59:15,23
60:17,23
61:9,19

62:6,15
63:13
64:19 65:6
67:4 68:15
69:7,12,17
70:5 71:6,
18 72:14,
24 73:14
74:24
75:15
76:5,13
77:2,13,23
78:9,15
79:10
80:20
82:9,17
83:4 84:13
85:24
86:20 87:9
88:2,7
89:2
91:19,21,
24 92:9,25
93:8
94:10,24
95:15
96:1,8,21
97:14
98:2,13,
18,23
99:10,15,
23 100:8,
16,19
101:4,15
102:16
103:6
104:1,7,16
106:4,25

107:17
108:14
110:6,18
111:14
112:5,12,
20 114:15
115:1,12
116:9
117:2
118:7
120:14
121:7
122:6,16
123:21
124:5,11
126:12
127:5
128:8
129:19
130:14
131:15
132:15
137:17,23
139:10
140:1,18,
24 142:3
144:9,20
145:18
147:5,22
149:7
150:4
151:22
153:7,15
154:5
159:4,12
160:3
161:7,16,
18,19

162:1,9,13
164:1,21
165:6
166:21
167:4,12,
18 169:21
172:14
173:16,22
176:24
177:6,9,15
178:5,12
180:1,4,8,
14 181:8
182:3,8,15
183:24
184:6,14,
22 185:3,
14,20
187:13
188:10
189:1,18,
24 190:11
191:9,16

**fail** 181:2

**failings**
119:13,21

**fails** 152:19
186:23

**Failure**
28:15

**fair** 52:7
54:19
56:24
177:22

**fairly**
160:14

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017                    Index: fall..find

fall  42:20
 43:15
 61:6,7
 62:3,24
 75:5 76:2,
 19 78:2
 84:22
 85:9,18
 87:20,24
 90:6 96:19
 97:1,23
 98:7 102:6
 103:8,10,
 11,18
 105:9,15
 138:12
 143:13
 152:21
 156:12
 157:19
 174:10,11
 176:9,13,
 15,22
 179:1,13,
 14 183:21
 186:22
 187:23
 189:15

falling
 75:9,10,14
 76:12,21
 84:25
 105:11
 137:22
 156:3
 175:1,20,
 21 183:10

falls  43:5
 50:4 145:4
 175:11,13
 183:22
 188:2

familiar
 129:5,7
 130:20
 131:21
 133:4,8
 140:6
 160:20,23,
 25

familiarities
 119:24

familiarity
 131:4
 171:21

faster
 101:20
 190:23

fault  129:15
 130:11,16,
 17 132:23
 133:20,22

faulty  28:16

feature  46:1

federal
 34:16

feel  27:2
 35:4 42:8
 85:18 93:6
 94:3,7
 96:19
 97:23,24

98:8,17
130:20
131:25
148:2
165:23
173:5

feeling
 83:15
 88:11
 94:12,18
 95:1,4
 136:9

feels  96:23

fees  31:3

fell  37:19
 46:20 47:6
 52:9,15
 84:2,7,8
 85:4,22
 86:19,22
 89:22
 98:11,21
 99:2,4
 103:19
 154:3
 157:14
 174:24
 179:15
 181:11

fellowship
 55:5

felt  83:21,
 24 84:2
 86:5 87:4,
 6,14 89:11
 135:24

138:7
139:23
140:8,15

Ferrie
 179:22
 184:16

Ferrie's
 180:4,10

fidgety
 65:14

field  53:22
 169:14

fields  22:12
 54:7,9

figure
 190:21

file  5:23
 6:2,20
 7:9,13,16,
 17,18,19
 8:1,4,21
 9:16,17
 11:12,14
 13:11,15
 25:25
 28:18 43:7
 46:2

filed  180:21

files  6:10
 46:1

filing  4:4

find  8:18
 121:21
 130:19

131:3
135:21
191:1

**finding**
126:1

**findings**
126:11

**fine** 7:7,8
42:13
97:21
162:3
163:19

**finish** 42:14
90:14

**finishing**
42:8

**fit** 81:11,
18,21,23
82:2,6
83:8 109:1
141:11
171:9
172:4
173:10

**fits** 154:21
155:5

**flashdrive**
190:20

**floor** 44:24
45:10
48:3,7
49:3

**Florida**
35:11,12

**focus** 20:16
21:3 55:11
56:14,19
57:1 58:23
60:4

**focuses** 56:6
59:4 60:2

**focusing**
55:3 58:21

**folder** 8:5,
6,8 9:16,
19 10:17,
19 13:1,2,
3 26:19

**follow** 28:15
90:23
131:5

**follow-up**
161:16,18,
19 190:2,7

**foot** 37:25
81:11,18
83:8 84:1,
6,7 87:14
88:12,13
89:11,13
172:25

**footage**
101:25
104:3
105:9,17
120:12,21
174:8
175:16
176:4

**footnote**
74:14,17,
22,23
75:10
80:7,12
83:20,23
121:23
154:15

**forces** 152:3

**Foreman** 8:10

**form** 4:5
12:6,13
15:19 17:7
18:7,20
19:21
20:23
21:18 23:8
24:2,23
26:17 28:4
30:17
31:7,16,24
32:11,24
33:10,19
38:6 40:17
43:12
44:10,25
45:11
46:25
47:10
48:8,16
49:5,25
50:15
51:1,12,25
52:10
53:23
54:4,22
55:14 56:2

57:10,25
58:18
59:15,23
60:17,23
61:9,19
62:6,15
63:13
64:19 65:6
67:4 68:15
69:17 70:5
71:6,18
72:24
73:14
74:24
75:15
76:5,13
77:2,13,23
78:9,15
79:11
80:20
82:9,17
83:4 84:13
85:24
86:20 87:9
88:2,7
89:2 92:25
93:8
94:10,24
95:15
96:1,8,21
97:14
98:2,13,
18,23
99:10,15,
23 100:8,
19 101:4
102:16
103:6

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017        Index: formal..generally

104:1,7,16
106:4,25
107:17
108:14
110:6,18
111:14
112:5,12,
20 114:15
115:1,12
116:9
117:2
118:7
120:14
121:7
122:6,16
123:21
124:5,11
126:12
127:5
128:8
129:19
130:14
131:15
132:15
137:17,23
140:1,18,
24 142:3
144:20
145:18
147:5,22
149:7
151:22
153:7,15
154:5
159:4,12
160:3
161:7
166:8,20

167:1,11
169:20
172:13
173:15,21
174:18
177:5,8,14
178:4,11
179:25
180:3,7,
13,23
181:24
182:13,19
184:4,12,
20 185:2,
13,19
187:12
188:9,24
190:11,24

**formal**  169:7
**formalized**
116:22
**format**  67:17
128:14
145:13
167:25
**formated**
66:4
**forming**
10:10
158:19
160:1
**formulate**
184:23
**formulated**
185:15

188:12
**formulates**
185:5
**formulating**
159:3,10
161:5
169:23
187:8
**forward**
105:10
**forwarded**
7:11
**found**  8:16
119:20
178:14
**fourth**
185:21,23
188:12,16
**frankly**
139:13
**free**  165:23
**frequency**
38:24
**frequent**
38:22
**frequently**
167:8
**Friedman**
8:10
**front**  5:14,
16 24:4
27:9 28:17
71:21

146:21
164:8
183:18,20
**frozen**  133:1
**full**  4:20
10:5 136:9
**fully**  136:2
189:17
**fun**  39:2
**function**
110:11,22
**future**
159:24

_____
G
_____

**gait**  20:8
43:5 44:1,
7,13 48:14
50:23
51:11
**garbled**
14:11
**gave**  130:3
150:6
**general**
114:3
119:4
142:24
152:5
**generalization**
58:8
**generally**
159:25

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017       Index: gentleman..Hayashi

**gentleman**
 43:20
 46:19

**give**  8:17
 22:11 43:7
 45:13
 151:14
 155:22
 178:18

**giving**  154:7

**gleaned**
 169:4,6

**globe**  65:25

**good**  4:16
 108:3,19
 109:20
 110:3,13
 161:21
 162:7

**governmental**
 146:14

**grab**  84:23

**graduate**
 54:9

**grasping**
 102:8

**greater**
 57:23
 58:16
 59:21

**groove**  87:4,
 7 88:15,25
 90:6
 92:13,18,

 22 93:6,13
 95:23
 96:24,25
 97:3
 153:6,13,
 22,24
 154:1,8,9

**grooves**
 90:5,7,25
 92:15
 93:10
 95:13,19,
 20 96:4
 153:18

**guess**  12:25
 19:25
 39:15
 56:23
 65:12
 66:19
 68:25 80:9
 97:6
 118:14
 187:5

**guest**  108:1
 109:11
 178:20,23,
 24 179:4,7

**guests**  108:6
 109:22
 110:1,5
 117:24
 118:4,12
 127:22
 128:2

**Guevara**

 41:17
 43:17,19
 46:16
 49:8,14,
 18,23
 50:10,11,
 20,23,24
 51:3,11,16
 52:2,8,9,
 15 64:4,16
 68:14
 164:5

**Guevara's**
 51:5

**guidance**
 118:3
 128:1

———————————

———————————
        **H**
———————————

**half**  142:25
 149:15

**hand**  176:5,
 10,16
 183:14,22
 186:1

**handing**
 109:11,22
 110:1,4

**handler**
 111:22

**handling**
 109:9,10

**hands**  176:5,
 6 183:6

**handwrite**
 36:18

**happened**
 23:15
 43:18 47:4
 62:3 152:2
 180:18

**happening**
 47:9
 131:20

**happy**  88:17

**hard**  6:12
 36:15
 161:3

**Hayashi**  4:15
 5:15 7:19,
 23 9:4
 11:7 12:9,
 19,23,24
 16:11
 17:13
 18:15
 19:1,23
 21:1,19
 22:1 23:21
 24:11 25:1
 26:18
 28:22
 30:22
 31:8,20
 32:6,19
 33:7,15
 34:6 36:5,
 10,16,21,
 24 37:5,14
 38:7 40:21

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017          Index: hazard..hearing

42:7,15
43:13
44:17
45:4,15
46:10
47:15
48:12
49:1,9,12,
21 50:9,21
51:9,22
52:6,11,24
54:1,18
55:10,24
56:13
57:21
58:10
59:8,19
60:13,20
61:1,13
62:1,9,20
64:1,7,11,
12,22
65:11
68:19
69:9,13,18
70:12
71:11
72:4,18
73:6,24
75:3,16
76:9,23
77:9,18
78:3,10,18
80:1,22,25
81:4
82:12,24
83:9 84:16
86:9 87:1,

21 88:4,19
89:5 90:11
91:20,24
92:3,11
93:1,14
94:19
95:10,21
96:2,10
97:5,18
98:10,15,
20 99:1,
11,18
100:4,12
101:1,12,
17 103:1,
14 104:4,
12,23
105:6
106:7
107:5,22
108:15
110:14,23
112:3,8,16
113:4
114:21
115:9,16
116:13
117:7
118:9
120:18
121:17
122:10,24
124:2,8,14
125:4
126:13
127:20
128:15
129:24

131:8,16
132:2,16
137:18,24
138:9
139:17
140:11,21
141:4
142:4
144:15
145:5
146:1
147:8
148:1
149:22
151:1
152:10
153:10,20
154:12
159:8,23
160:6,19
161:15
162:3,18
163:23
164:3,24
165:7,24
166:8,9,20
167:1,11,
16 169:20,
25 172:13
173:15,21
174:18
177:5,8,
10,14,16,
23 178:4,
11 179:25
180:3,7,
13,23
181:16,19,

24 182:13,
19 184:4,
12,20
185:2,13,
19 186:4
187:12
188:9,24
189:13
190:1,6,17
191:7,18

**hazard**
144:25

**hazards**   66:6
106:14
118:13,20
129:9
133:10

**head**   34:18
35:13

**heading**
72:15
73:2,9
107:20
113:14

**headphones**
164:25
165:4

**hear**   36:3,
6,12,15,
19,21
37:2,3

**heard**   6:22
108:9

**hearing**   36:9
165:3

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Index: heed..ice

heed  129:16
  130:6
  131:11,12

heeded
  129:10
  133:11

heeding
  130:11

held  46:9
  64:6 105:5
  117:14
  125:3
  158:4
  188:20
  191:12,19

helpful
  89:20

helps  133:15

high  157:5

history
  156:19
  187:3

hold  16:25
  19:7,15
  21:4 48:19
  53:24
  60:24
  68:20
  75:9,13
  76:3,12,20
  117:16
  131:18
  147:24
  179:14
  183:14

holding
  15:12
  125:24
  158:3
  176:15
  183:6,16,
  21

holds  98:3

honestly
  160:25

hope  27:2
  33:23

hoping
  164:25

Hopkins  55:4

hour  30:6,
  12,24

hourly  31:10

hours  40:6

human  17:9,
  15,17,18,
  20 18:2,
  10,17
  19:17
  20:2,7,10,
  14,15,16,
  17,19,25
  21:3,5,17
  22:5,19,22
  23:17 28:8
  35:5 40:3
  42:23
  43:4,23
  44:1,5,7,
  12,15

48:5,10
  50:3,7
  51:10
  52:12
  54:3,10,
  12,13,21
  55:8,12,
  17,18
  56:1,7,15
  57:1,2,4,
  5,6,14,18,
  22,23
  58:3,17,
  21,22,23
  59:4,5,11,
  21 60:1,3,
  6,8,11,12
  61:4
  62:11,14,
  18 63:5
  99:22
  100:3
  104:5,14
  113:16,17,
  22 116:15,
  20 117:11
  118:17,23
  119:1
  128:21,24
  130:18,19
  133:14,18
  148:7,10,
  14 158:24
  169:14
  170:5,7,18
  177:2
  187:18

humans  21:7

Hume
  160:20,24

hurt  139:9,
  18

hurting
  139:15

hypotheses
  119:5

hypothetical
  65:3,4
  154:7,11

hypothetically
  18:17
  130:5
  132:6

                    I

ice  16:22
  17:1
  38:12,15,
  22,23,24
  61:15,17,
  24 62:4
  84:7 85:7,
  11,19,22
  86:7,10,
  11,13,15,
  19,25
  87:4,8,16
  90:7,8
  91:1
  92:14,15,
  23 93:13
  95:13,19,

20,24
96:4,20
97:3,24
98:8,9,12,
17 99:3
107:24
108:1,2
109:1,8,9
111:21
113:9,10
114:10
118:1,2,3,
13 120:9
121:6
127:25
128:1,2
130:4
132:8
134:15,16
136:18
137:3
138:13
140:16
141:7,11
142:21,24,
25 143:10,
12,15
145:7,8
147:1
153:5,6,
13,18,23,
24 154:1
155:16,24
156:19,20,
23 157:12
166:12
168:2
171:4,9,

17,19
172:21
173:7
174:7,12
176:11
182:21
184:8

**idea** 41:9

**ideas** 181:5

**identifiable**
145:1

**identification**
5:13 11:3
191:13

**identified**
119:16

**identify**
119:10,11
121:16

**immediately**
66:15 78:2
109:2
111:1,23
120:2
174:8
175:16
176:8
177:25
182:22

**impact**
150:9,16
185:24

**implicate**
143:15

**implication**
179:2

**implications**
22:17 28:9
170:14

**implies** 26:3

**imply** 163:13

**important**
148:9
150:17,18

**imposed**
141:10
171:8
172:4

**imposes**
58:25

**improper**
140:8
144:24
158:10,14

**in-line**
171:22

**inability**
93:13
137:20
174:11
176:22
186:21

**inadequacy**
52:14

**inadequate**
148:4

**inappropriate**
142:1

**inaudible**
181:16

**incident**
23:4 53:3
66:6 69:2,
3,5,10
71:13
72:7,11,16
73:5,10
74:13
75:7,12
76:11 77:7
86:23
113:1
120:13
122:22
124:17
137:2
165:11
166:18,23,
25 174:5,
6,9,21
175:4
176:1
178:1,9
179:22,23
180:19
181:13
183:13,15
184:2,9
185:25
186:18

**include**
21:12
25:23
44:14
50:4,22

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017     Index: included..inspected

62:22
78:17
79:6,22
109:9
121:23
177:23

included
25:17 28:6
45:2 50:3
62:11 63:6
116:11
117:10
124:12
178:21,23
179:4

includes
175:22

including
21:13 22:9
23:10
55:20 56:7
62:14,17
120:8
146:17
175:18

inconsistencies
148:16,22
151:8

inconsistent
106:2,10

incorporate
57:16 60:7
62:23
69:24 70:8

incorporates
58:3

169:13

incorporating
171:25
187:3

incorrect
139:7

indecipherable
90:9

index   26:3,7

indicating
145:14

indices   13:7
25:20,21,
22 26:7,9

individual
117:16

influence
21:9 63:19

influences
33:24
67:16

inform
133:18

informal
169:7

information
25:14
31:18,19
43:8 45:23
66:5 68:2,
4 69:22,25
73:4,16
79:18
94:17 95:8

100:10
106:14,17
113:6
114:1,2
116:6,8,12
117:22,23,
25 118:10,
12 119:7,
8,9,12,15,
18,21,25
120:7
121:3,4,
10,19
127:22,23
128:6,11
129:10,17
130:6,7,12
131:3,12,
25 133:11
139:4
142:10,14,
15 143:23,
24 144:10
145:20
150:16,18,
21 167:23
168:10,14
170:1,3,9,
10 171:14
174:4
175:3
176:19
181:6

informed
33:13
118:12

inherently

19:16
104:20

initiated
76:19

injured
149:24

injuries
24:17
143:12,14
144:18
147:1

injuring
179:15

injury   63:21
143:9
145:24
146:6
152:2,14
157:20
174:6
175:9
178:20,23,
24 179:4,7
189:11,16

insert   181:5

inside   8:5,6
9:21 10:1
13:6

inspect
37:18,22
52:25
53:1,8
109:21

inspected
150:11

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017          Index: inspection..issue

186:12,13

**inspection**
  37:24 53:7
  108:25
  109:10,13,
  19 110:2
  111:19

**instability**
  176:7

**instance**
  149:18
  150:7
  176:11
  188:4

**instances**
  102:6,9

**instinct**
  84:5

**instruct**
  114:11,12

**instructed**
  168:7

**instruction**
  168:15

**instructions**
  28:15
  114:2
  128:11
  165:15
  167:23

**instructs**
  115:21,22

**insufficient**
  82:21

**integration**
  21:14

**intend**  14:17

**intended**
  14:24
  15:15,22
  70:15
  73:11
  105:25
  114:4,19
  123:24
  135:18
  137:9
  138:4
  139:2
  140:9
  168:15
  172:3
  173:2
  182:1

**intending**
  76:1

**intent**  50:17
  79:21
  110:10
  156:20,23
  157:12
  187:2

**intention**
  78:16 79:3
  135:13

**interact**
  21:9 58:25
  119:17

**interacting**
  62:24

120:3

**interaction**
  54:14 56:7
  61:23

**interactions**
  23:18
  118:1,20
  127:24

**interference**
  188:19

**interpret**
  118:25

**interpretation**
  104:21

**interview**
  179:8

**intricacies**
  58:20

**introduced**
  182:6

**inventory**
  111:1

**investigate**
  57:16

**investigated**
  179:22

**investigating**
  118:23
  144:23
  146:14

**investigation**
  170:6
  178:16

**investigations**
  60:9,10

**invoicing**
  30:25

**involve**
  22:15,21
  57:22
  104:20

**involved**
  22:18 33:1
  35:20
  42:20
  43:19
  44:7,12
  48:20
  63:18
  110:8
  123:15
  175:6

**involvement**
  32:16
  49:19

**involving**
  43:10
  49:10
  54:20
  164:4

**issue**  15:14,
  17 36:13
  42:24
  45:7,9
  47:12,23
  48:1,5,10
  49:2 71:9
  111:6,11
  144:5,12,

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017            Index: issued..large

14,18
145:9,16
184:17

issued
  111:18
  163:6

issues  15:11
  19:16 20:9
  43:3 44:3,
  12 49:16
  50:8,20
  175:15,18
  184:8

---
J
---

Joe  37:3
  161:20
  162:9

Johns  55:3

Joseph  4:8,
  21

judge  16:4
  35:2

jury  23:23
  24:5,13
  70:3
  71:16,21
  133:17,21
  159:22
  172:15
  174:14
  186:8

---
K
---

kick  176:8

kind  53:14
  159:11
  167:20
  174:13
  181:20
  187:5

knew  14:1
  138:10,17

knowing
  133:17

knowledge
  14:4 38:2
  40:4 53:6
  72:9
  105:20
  106:14
  131:13
  134:20
  135:2
  136:23
  141:9
  156:8
  159:20
  164:20
  169:13
  171:7,21
  172:18

---
L
---

label  28:11

lace  82:21
  85:5

114:13,18
115:7
120:9
135:16
137:7,13,
  20 138:1,
  11,18
139:2
140:7
142:16
168:5
171:16

laced  114:25
  135:17,18,
  19 136:2
  137:2
  138:2
  142:17,25
  149:13,14,
  15,16,25
  189:9,17

laces  111:7,
  12,17
  114:10,23,
  25 116:1
  135:14,17
  136:13
  137:1,10
  141:6,10
  145:3
  149:13
  157:5
  168:1
  170:15
  171:4,8
  172:8
  175:3

186:12

lacing
  82:16,20
  83:2
  114:19
  115:5
  128:13
  139:6
  141:12
  143:15,18
  144:6,14,
  17,18,24
  145:8,15
  146:4,5,
  20,25
  167:24
  168:6,15
  171:10,17
  172:4,24
  173:3
  174:12
  175:14
  176:23
  185:25
  186:15,21
  187:3,22

lack  141:16
  175:2

laid  106:22
  119:19
  174:19

land  61:17
  62:4

land-based
  62:4

large  55:7

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017          Index: largely..Likewise

**largely** 16:7
  73:22

**larger** 14:3
  18:1

**lay** 174:13

**laying** 71:24
  73:16
  78:22

**lead** 181:2

**leads** 25:9
  33:18

**learned**
  35:19

**leave** 103:11

**leaving**
  183:1

**Lebron** 23:24
  37:19 53:2
  69:4 70:17
  71:4,9
  75:7,12
  76:1,2,10
  77:10
  78:6,12,22
  81:7,8,12
  82:5,14
  84:11,21
  85:13,17
  87:3,5
  89:7 90:25
  92:22
  96:16,18
  97:22
  100:18
  101:22

102:3,15
103:3,17,
19 105:21
106:2
111:11
112:9,18
113:7
116:25
117:9
130:1,2
134:21
136:4,11
141:8,9,16
142:8,20
143:2
146:19
153:3,11,
25 157:14
165:15
168:3,13,
24 170:13
171:6,16
172:3,9
174:24
175:18
176:2,4,9
177:24
178:8,25
179:9
180:11,15
181:9
182:20
184:1,7,17
187:25
188:3
189:9

**Lebron's**
  24:13,19

53:5,18
61:5,7,16
62:21 69:1
70:17
73:12
78:21 79:5
80:18
89:16
96:17
97:12
99:13,21
105:9,15
106:21
107:15
118:11
119:22
120:13
124:17
130:10
134:20
135:13
141:7
152:20
156:12
165:11
166:18
168:2,17
169:6
171:4
174:10
176:13,22
177:17
179:1,22
183:19
185:25

**led** 95:8

**left** 81:9

84:18
172:25

**leg** 81:9
  176:8
  179:15
  183:19,22

**legal** 14:19
  16:2 63:14
  115:2
  129:20
  158:15

**legs** 105:10
  183:17

**length** 116:2

**letter** 8:9

**level** 86:12
  93:2,15,16
  136:1
  171:23

**levels** 47:11
  132:13

**light** 25:14

**lighting**
  44:3,8
  47:7,11
  48:24
  49:15,23
  50:4,5,12,
  13,19,20
  52:9,14

**likelihood**
  137:21

**Likewise**
  4:19 109:3

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017       Index: limitations..made

limitations
  21:7 55:19
  58:25

limited
  14:13 26:6
  34:10
  49:23
  164:19
  176:14

lines  38:10
  47:3 65:21
  91:13
  95:12
  96:11,14
  117:16

Ling  19:3

link  6:16,
  19

list  22:12
  29:16,17,
  21 34:11
  37:9,13
  41:11 63:2
  115:20,25
  164:4

listed  10:22
  12:14,16
  26:14 27:6
  34:11

lists  80:8

literature
  13:8 26:20
  27:14
  67:15
  118:22

119:16
133:12
156:16
170:5,24
186:25

litigation
  39:6,9,11,
  18,19
  40:12,15,
  20 41:5,6
  158:15
  180:21

lived  38:20

locally
  38:19

located
  123:23
  166:12

location
  128:14
  168:1

locked  98:12
  99:3

locomotion
  44:16

log  8:22

long  42:12
  108:7

longer  79:1,
  13

looked  86:16
  111:24
  135:20
  146:12

148:17

loose  135:24
  138:8
  173:6

lose  33:2
  84:19
  85:6,11
  152:22

losing  84:22

loss  75:8
  83:25
  179:1

lost  129:21
  153:4,5,12
  154:2
  174:25

lot  39:24
  53:21

louder  37:2

Lu  53:11
  125:17,21
  126:4
  147:14,15
  148:19
  149:2
  150:7
  151:2,18
  152:18
  154:13
  156:21
  157:11
  167:8
  186:12

Lu's  125:13
  127:15

148:3
157:23
185:24
186:9

—————————
         M
—————————

Maclaughlin
  10:17
  11:13,16,
  20,24
  12:4,8,11,
  16 16:16
  17:14
  18:3,6,16
  125:7,23
  126:3,22
  162:19
  167:9

Maclaughlin's
  11:5 17:5,
  10 18:11,
  19 163:7,
  10

Madame  162:6

made  35:21
  37:9 58:2
  77:20 78:1
  86:22
  90:24 99:7
  100:23
  104:3
  105:16
  125:21
  138:6
  168:19
  174:23

175:7
177:24
178:7,8
179:9
187:21

main  20:16

maintain
102:23
175:23

maintenance
89:24 90:4
107:24
109:7
113:11

major  54:25

majority
39:22 40:8

make  7:3
14:19 24:1
58:7 70:25
92:1 95:6
115:25
120:22
121:15
127:2
138:12
142:23
143:5
153:23
157:2,5

makes  33:16
89:13
93:10
94:13 98:5
123:16

152:24
186:19,20
187:1

making  33:25
131:23
183:9

manage
130:24
131:6
136:9

management
16:22 17:1

maneuvering
175:23

maneuvers
152:23

manipulating
183:10

manner  61:24

manners
175:19

manual  108:1

manufacturer
38:10

mark  5:10
12:20 64:3

marked  5:12
10:25 11:2
64:3,8
191:13

master
172:22

master's

55:1

material
43:7 150:9
186:14

materials
6:4 9:18,
25 10:22
12:17 26:1
29:17,21
53:13
73:23
127:12
173:17

matter  14:15
31:1 32:5,
14 34:9,14
43:19 44:2
51:3,16
52:2,18,23
73:17
77:15
112:2
158:16

matters  77:4
118:20

Matthias
36:2 45:12
164:21

Mckinney
41:16
42:17,19
44:20 45:8
47:2 48:15
49:9,12,16
164:4

Meaning
96:11

means  170:14
187:25

meant  56:14
109:11
155:2

mechanical
58:12

mechanics
157:14,19

mechanisms
176:14

medical
178:16

members
109:9

memories
112:22
181:5

memory  16:21
34:21 35:2
112:10
113:1
181:2

mention
154:13

mentioned
173:6

mere  138:4

meta  119:4

method  119:5
169:25

methodologies
  118:19

methodology
  118:15
  150:23
  152:6
  187:15

methods
  188:2

metric   33:5

middle   4:22
  83:12

mind   54:17,
  21 55:9,12
  56:1,5,15,
  16,17
  57:2,5,23
  59:11,21
  60:8 86:24
  164:22

mine   163:6

minimal
  150:16

minimize
  163:17

minor
  139:18,22
  140:5

minutes
  124:21
  183:5

mischaracteriz
ed   90:21

misconceptions

132:13

misrepresent
  52:21

missed
  112:25
  177:9
  182:3

misstates
  87:10
  112:13

mistaken
  112:4,10,
  19,23

misunderstood
  75:25

modify   63:20

moment   10:23
  22:13
  26:25
  135:15
  155:13
  176:7
  178:18

moments
  84:22

money   30:20

monitors
  120:24

morning   4:16
  7:18

motion   21:15
  101:15

motions

21:14

mounted
  65:25

move   9:15
  12:25 67:7
  91:8
  101:19
  142:19
  161:23
  162:2,3
  183:12

moved   157:19

movement
  20:15
  61:17
  62:11,14,
  18,21
  155:25

movements
  22:24
  24:16
  61:22

moving   62:23
  102:9

multi-faceted
  115:6

multiple
  102:3
  135:24

muscle   156:1

muting
  164:22

N

N-e-i-s-s
  13:8 29:6
  143:7

named   9:20

narrative
  144:3

narratives
  143:22

nature
  157:7,8

navigation
  44:2,12
  50:3 51:5,
  19

near-fall
  103:3,18

necessarily
  15:15
  22:15 24:4
  71:22 95:6
  102:20
  127:18
  133:20
  149:18
  155:18
  166:16

needed   118:4
  128:3
  170:2

NEISS   29:20
  175:10

neuroscience

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017          Index: night..objection

54:7 55:3

**night**  43:22

**Noel**  108:23
111:5,22,
24 112:4
123:3,4,9,
12 124:15
165:20,25
166:22
175:5

**Noel's**
122:19
165:23

**noises**  165:4

**non-fully**
138:2

**non-project**
39:23 40:7

**non-responsive**
142:19

**non-similarity**
134:14

**Norwegian**
41:17
46:16

**notably**
175:2

**note**  37:9
109:15
110:16
138:6
144:13
156:7
176:1

**notes**  36:17,
19 78:5
163:15
189:25

**notice**  8:4,
10 10:16
11:12
25:19 29:4
53:21
110:12

**noticed**
85:22
86:18
134:22
140:7

**Nuaverz**
179:11,12

**number**  6:11
40:6 41:12
67:6,13
73:3 80:8
120:24
123:3
138:7
145:4
173:6
175:17
177:18
180:10
185:6

**numbers**
122:25

**numerous**
152:21

**nurses**

143:22
144:2
145:14,19

─────────

O

─────────

**oath**  77:12

**Object**  26:17
80:20 89:2
145:18

**objection**
9:1 12:6,
13 15:19
17:7 18:7,
20 19:21
20:23
21:18,23
23:8 24:2,
23 28:4
30:15,16
31:7,16,24
32:11,24
33:10,19
38:6 40:17
43:12
44:10,25
45:11
46:25 47:9
48:8,16
49:5,25
50:15
51:1,12,25
52:10,16
53:23
54:4,22
55:14 56:2
57:10,25

58:18
59:15,23
60:17,23
61:9,19
62:6,15
63:13
64:19 65:6
67:4 68:15
69:17 70:5
71:6,18
72:14,24
73:14
74:24
75:15
76:5,13
77:2,13,23
78:9,15
79:9 82:9,
17 83:4
84:13
85:24
86:20 87:9
88:2,7
92:25 93:8
94:10,24
95:15
96:1,8,21
97:14
98:2,13,
18,23
99:10,15,
23 100:8,
19 101:4
102:16
103:6
104:1,7,16
106:4,25
107:17

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017        Index: objections..open

108:14
110:6,18
111:14
112:5,12,
20 114:15
115:1,12
116:9
117:2
118:7
120:14
121:7
122:6,16
123:21
124:5,11
126:12
127:5
128:8
129:19
130:14
131:15
132:15
137:17,23
139:10
140:1,18,
24 142:3
144:8,20
147:5,22
149:7
151:22
153:7,15
159:4,12
160:3
161:7
177:7
189:13
190:11

**objections**
4:4 181:21

**observable**
168:4
170:17

**observation**
99:7
105:16
109:24

**observations**
23:14
104:2,8,
17,20
168:11
187:24

**observed**
88:13
89:12
101:22
102:3,9
103:13,17,
18 104:10
105:11
169:3
183:13

**observing**
104:22

**occasion**
153:12

**occasions**
102:4,7
153:14

**occupied**
176:6

**occur**   110:2
119:14
175:11,13

**occurred**
24:8 75:7,
12 76:2,11
132:24
152:2,14
157:20
189:11,16

**occurring**
101:11
186:22

**occurs**   58:8

**October**
12:5,11
13:21
162:16,20
163:9

**offer**   14:12
15:7 25:10
32:22
42:25
51:10
124:23
148:2
156:22
158:14
186:13

**offered**
14:8,23
15:21 16:9
42:25 45:5
68:14
76:25
102:14
112:18
125:17
129:2

134:17
147:14
162:25

**offering**
15:2 16:7
23:4 50:13
99:22
117:13
123:5
132:3,9,
11,20,22
148:18

**offers**
122:21

**officer**
77:21
179:21

**official**
178:18

**oftentimes**
131:19
159:17

**one's**   44:13
102:23
114:18
115:8
139:14
144:25
159:19
170:16
175:23
181:1

**online**   55:21

**open**   166:2
190:21,24

opine 24:15
  25:6 45:22

opining
  15:25 50:2
  150:10

opinion
  14:24 15:8
  66:3 73:21
  80:18
  99:21
  102:14,19
  104:5,14,
  15,21,25
  112:7
  122:14
  128:25
  132:9
  133:23
  135:10
  149:1
  151:5,14,
  15,17
  156:21
  161:14
  167:22
  168:9
  169:11,15,
  23 170:19,
  21 171:2,
  12 172:7
  173:12,18,
  24 174:3,
  16 176:25
  177:11
  180:9
  182:11
  184:24

185:6,16,
22,23
186:4,9
187:8,16
188:12,13,
16,20
189:7,20,
21

opinions
  10:11
  14:9,13,
  22,23
  15:2,6,10,
  11,21
  16:6,9
  25:5,8,10,
  15 33:22,
  24 34:4
  43:24
  49:22
  50:7,13,23
  51:3,16,
  18,23
  52:18,22,
  23 61:11
  68:12
  70:16,23
  74:2 100:3
  104:25
  106:1,9,
  12,18
  116:22
  117:12,13,
  18,20
  125:17,22,
  23 126:8,
  9,11 127:7
  128:10,18

132:4,21,
23 134:14,
18 147:14
148:3,6,7,
18,24
150:1
152:8
156:22
157:17,23
158:2,3,20
159:3,10,
21 160:2
161:6
164:6,14,
16,18
165:14
167:6,14,
20 168:25
185:24
188:6
189:2

opportunities
  135:25
  136:3

opportunity
  45:13
  182:6

opposing
  6:18 7:4
  9:6 15:12
  107:4
  117:4
  158:4

opposition
  16:9
  125:25

order 25:24
  26:1,10
  41:12 43:7
  64:24 67:1
  68:8
  109:20
  118:24,25
  150:19
  175:23
  191:17

ordered
  109:3

organization
  132:11

original
  11:22

Otsubo 28:10

outcome
  33:4,18

outcomes
  33:13

outline 22:7
  73:3

outlined
  26:6
  107:20

outlines
  73:22 74:7

outlining
  78:20

overestimate
  131:22

overhead
  39:14

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017    Index: overlap..perception

```
overlap               116:23              122:1              145:13
 19:15,20,            117:1,23            136:14             146:2,24
 25 20:1              118:14,17           159:25             147:2
 22:9 57:3,           120:6                                  175:5,19
 13 58:8              125:19          path  23:24
 59:25               129:6,25          24:5              perceive
                      135:1                                 20:21
overview             141:20,23       patient               24:20
 69:11               142:5            103:17               47:8,13
 71:13               154:16           143:24               84:21
 72:7,11,16                                                 90:7,25
 73:5,10         part  7:12         patrons               92:14,17,
 74:14            37:3 47:13         117:25                19,22
                  70:9 79:4          127:24               93:10
                  81:5 100:2         128:6                95:13,20
_____           104:18            175:17               96:4
      P           109:21            182:24
                  180:9             188:1             perceived
p.m.  191:20                                             28:12
                 participate      pattern                89:23
pages  29:15      113:25           144:25               131:6
 73:2 98:5                                              135:17
 123:3           parties          pay  31:4
                  13:24                              perceiving
paid  31:13                       pedestal            47:23 49:2
                 parts  79:5       65:25
pair  110:25      88:21,22         66:2,13,16        percent
                  108:5,9                              41:5,6
pairs  108:9,                     pedestrian           143:11
 10              party  32:22      66:5
                  39:6                               percentage
papers  63:4                      people  20:9        40:23,25
                 passage           23:19
paragraph         181:3            55:22             perception
 80:9             182:5            58:25               19:19
 83:12,19,                         103:9              20:20
 22 84:4,17      passengers        114:4              21:15
 85:2,16          111:7            118:21             44:5,19
 92:6 93:7        115:22           119:17             45:7 48:24
 94:21                             129:5,6            50:3,19
 96:11           passes            130:19             54:13 55:8
 97:9,10          180:25           131:20             60:8 61:3,
 101:21,24                         133:4,7
 103:16          past  89:20
 109:25
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017       Index: perceptions..playing

16 173:5

perceptions
  56:8 94:17
  136:3

perceptive
  55:17

perceptual
  21:8 49:15
  142:14

perform  23:1
  30:21
  37:24
  151:11

performance
  119:2

performed
  146:12
  149:17
  170:7
  191:1

performing
  40:3

period
  143:11

person  20:20
  47:12
  67:25 68:1
  114:9
  126:17,18
  127:8
  132:5,10,
  12 136:4
  145:21,23

personal

134:15
170:16

personally
  33:12

personnel
  177:25
  178:9

perspective
  23:2,17
  63:17
  148:8

pertain
  66:11

pertaining
  66:12

pertains
  66:14

ph  179:11

Ph.d.  4:8
  55:2

Philadelphia
  35:15,17,
  18 38:17,
  18

philosopher
  160:24

phone  176:3

photographs
  53:4

phrase  6:17
  8:22 61:6

phrased  59:7

phrases  89:4

phrasing
  106:15

physical
  20:15
  21:8,12
  55:19

physicist
  21:21,24

physics
  20:13,14
  21:16

pictographs
  28:13

picture
  23:23

pictures
  24:5

pieces  73:16
  79:15
  106:17
  119:9

place  9:10
  84:1
  178:20

plaintiff
  14:8,23
  15:8 16:13
  31:21
  32:7,9
  41:1,7,21
  42:1
  44:19,22
  48:5,14

126:10

plaintiff's
  5:11,12
  10:25
  12:20
  14:14,25
  15:4,12
  16:10
  64:5,9
  106:9
  117:19
  118:5
  167:7

plaintiffs
  15:3

plan  15:7
  25:10,16
  70:9

planned
  71:20
  91:16

planning
  14:12,16
  42:24
  69:14 70:2
  71:15
  91:2,4,13,
  14,15

play  123:24

played  124:1
  165:10
  166:15,17

playing
  120:12,20,
  23 121:1,

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017    Index: pleasure..primarily

12 122:20
123:11,12,
18,19
124:10,17
166:1,5,24

pleasure
 4:24

point  16:7
 40:6 42:22
 43:6,16
 75:20
 88:8,15
 89:7,20
 90:22 98:4
 115:24
 116:3,5
 127:13
 134:24
 138:22
 141:18
 148:15
 153:19
 157:1
 169:16
 174:20
 185:23

pointed
 165:24

pointing
 148:5
 151:7
 161:13

points  86:8
 87:15
 115:21,25

policies

107:8
110:9

policy
 108:17,18
 109:4,7
 110:15
 111:13,16

portion
 30:14
 55:6,7
 81:2 88:16
 90:23
 94:11
 179:17

portions
 23:16
 26:2,10
 82:19
 86:1,2
 112:24
 122:8
 138:23
 183:8

posed  32:2

position
 138:2
 153:22

positive
 38:9 57:11
 102:17

possession
 28:21

possibility
 149:24

possibly

16:8
164:22

postdoctoral
 55:4

potential
 22:8 49:15
 66:6
 106:14
 114:4
 137:16

potentially
 22:24

precisely
 72:2

prepared
 13:3

preparing
 165:13

present
 14:18
 116:19
 159:15

presentation
 67:17
 79:14
 107:19
 121:9

presented
 25:5 35:5
 63:3,4,12
 65:1 66:4
 68:4,10
 70:23 72:1
 120:7
 121:4,5,

10,11,20
142:10
147:19

presenting
 117:22,23
 127:21
 133:12

presents
 69:22
 116:21
 144:25

pressed
 156:15

presumed
 132:24

pretty  97:20

prevent
 37:17
 75:9,13
 76:12
 175:20,21
 176:15
 179:14

prevented
 186:22

previous
 45:17
 49:19
 142:9
 153:4,12
 172:19

previously
 45:6

primarily

44:18
52:8,13

**primary**
17:19

**principle**
159:24

**principles**
151:3,19
156:8

**printed**  6:4,
13

**prior**  6:22
10:10
34:12
85:17
87:19
96:19
97:23
109:21
110:1,4
129:14
137:2,12,
14 152:20
174:8
175:17
176:9

**privilege**
8:25 9:7
31:17

**privileged**
8:22

**privileges**
9:10

**problem**  27:3
37:4

86:11,15
98:22 99:4
110:25
136:12
146:4
165:5

**problems**
85:18,22
96:20
97:24
98:7,8,17
114:4

**procedures**
107:8
109:8

**process**  33:6

**produced**
179:18

**producing**
114:7

**product**
13:4,17
28:9 29:5

**production**
113:18,21,
25 115:3

**products**
21:10
28:12
54:14
56:10
129:7
130:21
133:8

**project**  30:4

39:21
40:9,11

**project-
related**
39:13,18
40:19

**prompt**
146:18

**prompted**
145:16
146:4

**proper**  38:19
83:2 115:5
118:2
127:25
128:12
138:20
158:14
167:24

**properest**
138:17

**properly**
81:21,23
82:2,7
114:18
115:7
120:9
135:18
149:16

**protect**
156:1

**protection**
155:23

**provide**  7:9
25:7 32:15

33:20,21
34:3 65:9
95:7
118:24
131:6

**provided**
7:16 51:14
53:5 71:4
77:6 118:3
128:12
139:4
145:20
167:24
168:11
171:15
172:23

**providing**
110:11
128:1
145:14
158:23
174:25

**psychological**
55:2

**psychology**
53:22,25
54:2,3,5,
6,16,25
55:8

**publically**
174:6
175:9

**publish**  63:3

**published**
20:12 63:4

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017          Index: Pueblo..quotes

Pueblo  50:23

pull  155:21

pulling
  37:15

purported
  120:11,20
  124:16

purports
  150:8

purpose
  156:22
  157:12
  168:15

purposes
  31:22 66:7
  74:5
  156:20
  166:13
  178:14

Purswell
  28:7

purview  34:3

put  13:2
  28:18
  56:23
  80:15 81:8
  82:5 87:22
  102:2
  111:25
  114:13
  130:8
  141:6,15
  146:23
  164:25

puts  150:14

putting
  56:20

———————

Q

———————

qualification
  97:13

qualifications
  96:6 97:8,
  25

qualified
  148:2
  156:22
  157:11

qualifier
  56:20
  97:17

qualify  57:8

qualitative
  56:4

quality
  120:25

quantify
  39:23

queried
  145:2

query  143:9

question  4:5
  6:14 11:9
  23:11 24:9
  25:9 28:23
  31:25 32:2
  47:3,6,14,

23 51:20
58:21
64:16,24
65:7 66:2,
14,25
67:1,22
68:8 73:7
74:5
81:17,25
82:4,10,22
90:6,15,
18,24
92:10,13
103:23
111:10
122:11
123:14
124:6,13
126:14,15
129:22
132:20
136:25
139:20
143:25
151:13
159:7,11
163:1
166:14
182:4
187:6
190:7

questioning
  42:14
  48:18
  152:11
  160:18
  164:23

questions
  25:13
  36:3,6,9
  45:18,24
  48:23
  49:14,17
  50:12,18
  59:18
  79:16
  90:20 91:7
  118:4
  128:2
  154:22
  155:6
  158:8
  161:17,18,
  20 162:18,
  21 164:3
  165:7,11
  177:17,18,
  20,23
  190:2

quick  105:4
  109:13
  155:7
  161:20
  190:2

quickly
  83:14

quote  75:8
  86:15
  110:19,20
  144:1
  172:22

quotes
  159:19

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017     Index: Rachael..recitation

**R**

**Rachael**   36:6
  150:3

**rack**   109:15

**range**   50:7
  150:14,15

**rate**   30:10,
  19  31:10
  32:15

**reach**   118:16

**reached**   25:8
  176:20

**reaching**
  148:24
  152:8
  175:24

**read**   46:23
  47:19,20
  64:14,15
  65:8,22
  66:9,24
  68:6  74:21
  75:1  80:6
  81:6
  83:14,19
  84:17
  89:21
  91:2,4,6,
  13,14,16
  92:5,9
  97:19
  100:17
  101:19
  102:2

  117:24
  127:22
  130:10
  155:10,17
  167:21
  171:3
  174:2
  190:16

**readily**
  168:4
  170:17

**reading**   4:3
  49:7
  65:20,23
  66:8,20,22
  85:1  91:23
  92:2  99:13
  100:14
  141:19
  142:5

**reads**   100:16
  110:20

**ready**   46:12

**realize**
  146:5

**realized**
  145:15

**realm**   18:10

**reason**   28:20
  61:15
  76:19
  81:19
  95:11
  139:25
  162:24

  163:9
  174:10
  176:21
  178:25

**reasonable**
  128:13
  131:9
  167:25
  169:17
  170:10,21
  173:12
  177:11
  188:17,21

**reasons**
  114:6
  136:7
  145:4
  156:19

**rebut**   14:24
  15:15
  70:15
  191:4

**rebuttal**
  11:19,25
  12:8  13:25
  14:6  16:2
  126:21
  127:9
  162:19
  163:11
  190:9
  191:3

**rebutting**
  14:13
  148:6
  157:22

**recall**   8:16
  9:2,16
  13:4  29:6
  34:24
  43:9,23
  46:16
  84:24
  161:1
  162:20
  177:20,21
  181:10
  190:14

**recalls**   81:8

**recanting**
  161:9

**receive**
  30:13,14,
  20  31:9
  60:15  90:4

**received**   5:1
  8:9,11
  10:20  11:5
  12:2,3,7,
  10,15  31:2
  32:4  55:1

**receiver**
  67:15,16,
  22,23
  119:12

**receiving**
  67:25

**recitation**
  73:12
  79:21
  80:23

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017          Index: reciting..reflect

97:11
99:20
101:8
103:24
107:14
114:1
179:8

**reciting**
70:20

**recognized**
146:21

**recollection**
8:7 10:6
13:14
27:5,25
43:2,16
45:9,17,21
48:1,22
50:2 51:7
87:13
164:13
167:3
180:18
181:1

**reconcile**
136:5

**reconstruct**
22:21
23:6,11

**reconstruction**
22:15,19
23:1,5

**record** 4:20
7:16 46:9
64:6 91:21

105:5
108:11
125:3
144:2
145:2
162:15
164:2
178:14,22
186:6
189:7
191:12,19

**recorded**
92:1 175:8

**recording**
143:23
145:20,23
146:9

**records**
75:2,6,20
143:14
144:13,16

**recounting**
104:10
161:9

**recover**
83:25 84:5
85:8
174:11
175:20,21
176:22

**recovered**
187:23
188:1

**recovery**
20:8

175:22

**recreate**
181:4

**recreationally**
38:23 39:4

**rectified**
139:14

**rectify**
136:5

**REDIRECT**
190:4

**refer** 16:23
87:6

**reference**
29:14
66:15 81:3
83:6 107:2
125:9,11,
13,22
126:24
143:15
144:13,17
154:15
156:6
163:10
165:22
167:8
179:2
186:23,24

**referenced**
22:10
26:22
27:15
29:9,10,
11,13

66:18
123:6,9
155:13
162:24
163:3
168:12,24
169:10,25
170:25
173:19,24
174:24

**references**
100:22
101:7
127:11
178:25

**referencing**
79:2
121:22
122:5,18
156:13
158:21
174:22
175:10

**referred**
87:7
102:18
179:10

**referring**
45:12 89:8
122:25
123:8
156:5

**refers** 88:25

**reflect**
30:20
108:11

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017                    Index: refresh..report

refresh   10:6
 27:5 45:16

refreshed
 27:24

regain   90:2
 93:24 94:5
 152:24
 153:25

regaining
 102:5

reinforce
 161:11

relate   21:11
 56:1 63:22
 139:16
 143:6

related
 39:11,23,
 24 40:12,
 15,20
 43:3,5
 44:3,13
 45:9 48:1
 54:6 55:5
 56:5 60:7
 146:20
 148:18

relatedly
 54:16

relates
 24:16
 39:18
 54:12 55:7
 56:10,11
 73:21

relating
 48:14 63:5
 65:4
 107:20
 118:13

relation
 54:3 60:2

relay   159:22

relevant
 26:2 48:10
 71:25
 79:2,6,16
 100:2
 106:19
 144:1

reliable
 180:20
 181:13

relied
 169:10
 173:18,23

rely   150:20
 158:11,16,
 18,19
 159:14,15,
 16

relying
 157:4,9
 161:9
 170:24

remark
 179:16

remarks
 179:6,11,
 21

remember
 34:15
 35:9,13
 42:21
 121:18
 165:11

remembrance
 113:1

remitted
 32:17

removed
 111:1

render
 189:19,20

rendered
 164:6,15,
 16 169:15,
 17

rendering
 165:14
 169:11
 173:18,24
 187:16

repeat   24:10
 27:17
 53:16
 62:12 94:6
 106:6
 109:23
 113:20
 129:23
 134:2

repeatable
 160:10

repeated

160:8,12,
 15,17

rephrase
 24:10
 106:6
 129:23
 133:3

replaced
 108:4,20

replacements
 109:3

replicable
 160:10

report
 10:21,25
 11:5,16,
 17,19,22,
 23,25
 12:4,8,10,
 19 13:16,
 20 15:9
 16:17,18,
 20,24
 23:14
 25:5,7,11,
 17,19
 26:23
 27:3,4,7,
 16,22,25
 29:9 41:25
 50:6,22
 51:3,15
 52:19
 62:22
 68:24
 69:1,19

72:6,8,20,
21,23 73:9
78:12
80:3,6
83:6,11,18
99:7
100:17
101:18,21
102:3
103:15,21
105:8,19,
22 106:11
107:21
113:2
122:4,12,
13 123:2,9
125:7,10,
17 126:3,
4,8,21,24
127:2,10,
16,17
130:9
134:7,12,
18 135:7
141:6
146:18
148:25
152:17
158:1,6,20
159:3,10
161:6
162:15,19,
24 163:4,
11 165:13
167:9
168:24
169:4,10,
16 170:25

173:19,25
174:22
178:16
179:18
185:10,17
186:12
188:7,14
190:9,14,
16,18
191:5

**reported**
143:20
144:5
179:21
184:1,7

**reporter**   5:8
12:22
64:10
91:22,23
162:6,7
181:18,22
182:2
191:14

**reports**   10:6
11:9,21
12:15
13:25
106:16
123:25
163:2,4
164:7

**represent**
49:20

**represented**
53:5

**representing**

7:10 77:24

**request**   8:23
9:3

**requested**
8:20

**requesting**
9:12

**requests**
5:22

**require**
150:24

**requiring**
117:24
127:22

**reread**   74:5

**research**
40:3
129:4,6
133:7
160:7
170:6
186:2,24

**research-based**
40:2

**researching**
133:13

**reserve**
25:15

**reserved**   4:6
35:6

**respect**
53:13
82:23

119:17,20
140:10
151:12
171:2
182:9

**respective**
59:22

**respond**
56:16,17
126:19

**responded**
152:3

**responding**
70:22
139:20

**response**
15:3 16:8
22:24 39:9
41:6 90:19
123:14
167:6
183:23

**responses**
52:5

**responsibiliti
es**   133:22

**responsibility**
132:5,10,
11,21

**rest**   24:9
47:25
96:11

**restate**
132:17,18

rests
  149:10,11

result   75:8,
  13 119:14

results
  143:9
  152:23

retail   34:23

retained
  8:19 14:8
  16:13
  70:18
  71:5,8
  116:24
  117:9

retelling
  181:6

retention
  8:9 20:8

return   135:5

reveals
  109:1

review   8:24
  11:15,19
  16:17
  25:25
  26:5,11
  33:6 43:7
  45:14,22
  69:3 78:21
  88:10,18
  89:16
  91:14
  101:24
  104:3

105:17
115:10
121:21
122:8,21
127:12
163:5
164:10
165:19
168:13,16,
17 177:1
180:2
182:16,18
190:13

reviewed
  10:10
  11:22 12:2
  26:8,13
  29:17
  51:2,15
  52:1,18
  53:4,12
  70:20
  73:17
  79:19 97:7
  115:13
  125:9,10
  126:21
  143:14
  165:16
  169:5
  178:8

reviewing
  123:15,17
  148:15
  158:5

rigidity
  186:17

rink   16:22
  61:15,17,
  24 62:4
  63:1 83:17
  90:3
  92:16,23
  102:5,15
  118:3
  120:4,8
  121:6,20
  123:20
  124:3,7
  128:2
  142:21
  166:12
  183:3,11

risk   63:6
  131:6
  136:9

riskier
  131:23

risks   130:24
  131:21

risky   28:16

role   133:21

roles   39:25

roller
  130:3,8,12
  136:14
  137:3
  138:13,19
  155:24
  171:22

rollerbladed
  133:25

134:4,8

rollerblader
  172:23

rollerblading
  134:10,16
  136:19

rollerskating
  134:15

Royal   7:25
  37:19,22,
  25 38:8
  41:16
  42:17,19
  47:2 52:25
  102:12,13
  107:8,25
  108:17,18
  109:4
  111:5,11,
  13 117:25
  120:10
  127:23
  128:12
  142:11,15
  167:24
  172:6

rude   91:10

rules   117:24
  118:1
  127:23,24
  129:9
  133:10

run   117:18

rushed   83:16

**S**

safe  108:3,
 19 110:3
 118:1
 127:24
 142:25

safety  21:11
 28:15
 107:7
 113:6,13
 114:2,3,8
 117:22
 119:17,20
 120:6,11,
 20 121:2,
 4,19
 122:18,20
 123:4
 124:16
 127:22
 128:6,11
 129:9,17
 130:6
 131:2,7,
 12,24
 133:10
 139:3
 143:6
 165:8,10,
 15,16
 167:23
 168:17
 169:5
 170:1
 179:21

sake  87:2
 130:5

Sala  4:8,
 21,25 6:19
 7:7,16
 9:16 14:21
 36:11
 45:13
 46:11
 64:4,18
 78:4 90:12
 92:5 125:5
 134:1
 151:12
 160:21
 163:23
 190:8
 191:10

Sala's  7:2
 12:19
 182:4

salaried
 30:18
 32:13

salaries
 31:4

salary  31:14

Sam  4:21

sample  53:17

scenes
 121:15

scheduled
 163:21

scholastic

54:24

school  54:9

schooling
 55:1

science
 118:24
 133:18
 148:11

sciences
 54:8 55:2

scientific
 21:6 63:16
 67:14
 119:5,16
 133:12
 152:5
 158:24
 159:17
 160:7
 169:17,25
 170:5,22
 173:13
 174:9
 176:21
 177:12
 186:2,24
 188:17,21

scope  14:7
 180:23
 181:17,25
 182:13
 184:4,12,
 20 190:12

screen  66:17
 166:6

screens
 166:11

scroll  47:24
 67:18

sea  61:8,16

sealing  4:3

search
 190:25

Seas  37:20,
 23 38:1,3
 53:1

secondary
 17:23

section  5:21
 27:3 29:17
 69:3,10
 71:12
 72:6,9,11,
 20,21,22,
 25 73:2,8,
 11,15,22
 74:2,6,9,
 13,21
 78:5,20
 90:13
 103:15
 105:19,21,
 25 106:3,
 10 107:6,7
 108:1,2
 113:5,6
 115:17
 116:14
 117:11,17,
 21 121:25

125:9,16
126:2,4
128:16,21
157:24
179:11,17

**security**
77:21

**seek** 135:6

**segment**
90:19

**sense** 104:21
154:14,18
155:3,19,
23 156:4,
7,9,17
157:4,5,9
158:11,12,
18,19,22
159:2,9,
11,19,22
161:5,10,
12,13

**sentence**
75:1,22
81:6 83:13
95:18
97:10,16,
25 101:24
108:21
130:9
141:23

**separate**
57:18 86:8

**separation**
182:23

**September**
12:17,18

**series** 90:20
154:21

**serve** 26:9
39:25
70:20
100:2
101:9

**serves** 34:21
110:10,21

**service**
112:1

**session**
123:11,13,
17 124:10

**sessions**
166:2

**set** 37:25
66:1

**setting**
77:12

**ship** 37:18
38:4,8,13
41:9,15,21
42:1 61:8,
15 177:24

**ships** 38:9

**shoe** 82:15

**shoelace**
82:1

**shoelaces**
81:20,24

82:7

**shoes** 82:6

**short** 42:5
97:20
125:1
135:17

**show** 166:15
175:11,17

**showed** 137:8
182:17,20

**showing**
114:22

**shown** 114:24

**shows** 65:24
127:1
166:10

**sic** 32:10
69:3

**side** 57:5,7
59:12,13
66:13
102:8
171:25

**sign** 66:3,
11

**signed**
118:11

**significant**
6:11

**signing** 4:3
118:11

**similar**
43:25

53:12
118:19
127:16
172:20

**similarity**
134:14

**simple**
101:13
153:24

**simply** 14:13
56:24
65:20
94:13

**simultaneous**
163:4

**single**
166:5,6

**sir** 85:3

**sit** 45:20
51:8,14,20
52:3,20
59:5 71:7
72:1 107:1
117:3
124:18

**siting** 81:1

**sitting**
127:18

**situation**
101:10
136:5
147:2,9

**size** 81:19
82:23

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017          Index: sizes..speak

```
108:5

sizes   21:13

sizing   81:10
 82:11 83:7

skate   16:22
 81:7,9,24
 82:11,15,
 20 83:24
 84:1 85:10
 89:7,25
 90:1 93:6,
 20,22,24
 94:3,14,
 16,22
 95:2,4
 96:23
 98:12 99:3
 110:2,25
 111:22
 114:10,20,
 25 135:4,
 5,6,20
 136:2,23
 137:1,7,21
 139:16
 140:7
 141:11
 143:15,19
 149:17
 150:9
 155:16,24
 166:2
 168:5
 171:9,17,
 19 172:4
 173:5,11
 174:12
```

```
176:23
185:25
186:15,16,
 17 189:9,
 17

skated   38:23

skater   38:22

skates   53:2,
 6,8,10,13,
 15,18
 80:14,15
 81:10,11,
 18 82:6
 83:7,8
 108:3,5,19
 109:1,9,
 10,14,20,
 22 110:1,
 3,25
 111:6,11,
 23 114:13,
 19,23
 115:8
 118:2
 120:3,9
 128:1
 132:12
 134:21
 136:12,14,
 22 137:3,
 13,20
 138:11,18
 140:13
 141:7,16
 142:16,17,
 21,25
 144:25
```

```
146:6
149:25
156:14
168:2
171:5
175:15
183:6
184:9
186:13,14
187:3

skating   17:1
 38:12,15,
 25 61:24
 62:4,25
 102:4,15
 107:24
 108:1
 113:9,10
 118:14
 120:3,8
 121:6,20
 130:3,4,8
 132:8
 134:15,16
 136:18
 138:6,13
 143:10,13
 147:1
 152:20,22
 156:19,20,
 23 157:12
 171:22
 172:5,21
 173:6
 174:7
 175:11
 179:10,12
 181:11
```

```
183:2,13
188:4

slide   105:10

slightly
 65:17

slip   42:20
 43:14

slip-and-fall
 43:4

slipped   47:5

slippery
 155:25

soft   150:15

softness
 145:7

solely   161:8

solve   165:5

someone's
 56:8 63:19
 130:17

sort   16:23
 21:14 33:1
 61:22
 187:8

sound   167:16

sounds   43:9
 45:2
 156:18
 160:25

space   20:15

spanned   50:7

speak   10:19
```

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017         Index: speaking..starting

15:2,11,14
17:10
18:12
22:23
50:16
57:15
106:13,18
118:3
128:2
148:12
157:16

**speaking**
15:16 20:3
88:21,22
91:25
132:6

**speaks**
110:20
138:8

**specialties**
149:2

**specialty**
55:25

**specific**
14:24 15:7
18:12
25:23
45:23
48:18,23
49:15,17
60:4
63:11,12
64:25
66:15 68:9
76:17
82:11 86:1

88:9,16
102:19
110:25
112:15
116:6,7,11
121:15
122:11
126:25
127:10
138:6,22
149:20
150:21
156:6
157:23
172:23
177:19
178:17
186:24

**specifically**
43:11
47:11 51:6
75:20
81:15 85:7
88:17
107:3
117:15
122:2
123:6
125:11,20
126:16
134:24
145:3
155:1
169:2
174:21
175:14
184:16
190:14

**specificity**
63:22

**specifics**
16:24 43:6
120:23
161:1
168:21

**speculate**
189:15

**speculating**
145:22

**speculative**
186:2

**spoke**  46:19
165:25

**sport**  136:1

**spot**  190:14

**spurs**  25:15

**stability**
186:17

**stabilize**
102:7,10

**staff**  118:3
128:2

**stairs**  43:20
46:20 51:7
66:1

**stairway**
43:21

**stand**  23:23
24:4 141:2
158:2

**standards**
68:21

**standby**
97:11 99:6

**standing**
92:15,17,
23 93:15,
16

**stands**  95:18
108:21

**Stanford**
55:5

**start**  6:17
20:18
25:18
46:12 61:3
65:13,14,
18 67:10
72:9 92:12
155:11
167:20
168:22

**started**
66:10
162:15

**starting**
46:23
64:16,20
65:15
66:25
68:25
69:10
74:21 78:6
80:6
83:11,19

89:17,21
93:19 98:6
105:7
155:19

**starts** 72:6
74:2 80:10
81:6 92:6
101:21
135:1

**state** 34:16
35:11
104:9
105:8,9
109:8
110:9,24
117:15
126:8,14,
16 127:21
128:10
129:4,13
134:6,11,
19 137:9
141:1,5,13
142:8,15,
20 143:2,9
145:3
152:19
155:1
171:11
173:9
186:8,11

**stated** 17:9
18:9 48:21
59:24
70:21
75:19
84:15

89:10 93:3
96:23
100:20
104:19
111:5
128:21
133:19
141:1
144:22
158:22
159:14
171:24
172:1,5
179:9,12
184:18
186:23
187:25

**statement**
58:2 59:6
67:5,12,21
76:8,15
90:24
93:11,17
94:1,13
95:12 97:8
98:6
103:20
121:24
123:16
124:4,13
135:7
137:6
142:24
143:5
178:20,23,
24 179:5,8
186:20

**statements**
56:4 75:6,
21 76:21
77:6,20
78:2 95:7
106:8
125:21
150:23
168:18
169:6
172:2
174:22
175:7
177:24
178:6,8,13
179:9,16
181:12
186:19
187:1

**states** 85:7
86:3 87:18
88:12 97:2
108:2
109:7
111:4
123:12
138:19
149:11
150:18
152:6

**stating**
125:25
129:2
130:17
133:6
142:6
148:23

157:6

**status**
141:10
171:8
175:3

**step** 66:15

**stepping**
51:19

**steps** 63:18

**stimuli**
56:16,18

**stop** 84:25
91:5

**store** 34:23

**story** 180:16

**straps**
109:16
110:17

**streamline**
42:9

**strengths**
21:13

**stricken**
34:7,25
164:18

**strictly**
20:6

**strike**
101:15
142:19
168:22

**strikingly**
172:20

strong
  139:19

structure
  150:8
  175:25

stuck  83:24
  84:2,7
  87:14
  88:12,13
  89:8,11,
  13,25
  93:20,22
  94:4,14
  95:2,4
  96:24

studied
  19:16
  20:5,11
  54:8

studies  22:8
  160:11

study  20:11
  21:6 28:11

stumbling
  102:4

subareas
  17:24

subfolder
  9:24,25
  10:8 11:9
  13:17
  25:20
  27:14 29:5

subfolders
  9:21,25

10:4 13:6

subheading
  107:24

subheadings
  73:3

subject
  158:16

subjection
  113:13

submission
  14:1

submit  13:24

submitted
  11:25

subpoena
  5:1,17,22

subsection
  113:9,10
  115:17

substance
  8:19

substantial
  33:4 40:14

successful
  33:9,18

successfully
  152:24
  188:1

suffice
  161:4

sufficed
  101:14

sufficient
  44:4 47:8
  119:8
  130:24
  141:9
  171:7

sufficiently
  63:19

suggest
  61:21
  138:16

suggesting
  37:15
  121:12

suggests
  83:1

sum  128:24

summarize
  169:3

summary
  70:13,14,
  16 71:2,3
  128:10,18,
  24 129:2
  167:19

supervising
  40:1

supplement
  11:23

supplemental
  11:17

Supplied
  9:17,24

support  85:5
  156:15
  159:18
  161:14
  174:25
  175:24
  186:25

supported
  186:1,10

supporting
  183:11

supports
  124:16

suppose
  75:24 90:3
  102:1
  130:2,4
  157:10,11

supposed
  6:16 31:21

surface
  47:5,6
  155:25

surprised
  36:24

surrounding
  182:22

sustained
  24:17

sweeping
  58:7

sworn  4:9

systems
  54:14

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017          Index: takes..testimony

**T**

**takes**  60:2

**taking**  42:11
  143:23

**talk**  29:24
  74:12,20
  94:12
  122:19

**talked**  143:8
  185:5
  186:3

**talking**
  18:13
  25:18
  36:8,11,12
  49:12
  74:17
  90:22
  101:23
  112:15
  122:1
  155:16
  156:11
  165:3

**tally**  38:24

**techniques**
  175:22

**tecum**  5:1,21

**telling**
  84:24
  100:15,16

**ten**  107:7,
  11

**ten-and-a-half**
  81:20

**tend**  130:22
  131:4
  181:4

**term**  18:1
  114:8

**termed**  16:1

**terms**  128:13
  167:25
  177:1
  187:15

**Terry**  10:17
  11:24 12:4
  16:16
  125:7

**testified**
  4:11 34:14
  41:9,14,20
  43:24 45:8
  50:1 68:17
  75:12 77:8
  78:13
  81:23
  82:15
  84:11
  85:17 89:7
  96:18
  120:16
  121:18,19
  136:11
  140:12,14
  153:3
  164:14
  171:16
  172:9

180:20
181:9
183:7
184:16

**testifies**
  76:16
  80:10,13
  81:17 85:9
  87:13
  88:11
  97:22 99:3

**testify**
  15:18,24,
  25 25:17
  28:1 35:8
  37:13
  40:22,24,
  25 48:13
  52:3 69:14
  70:2 76:2
  85:21
  86:18 87:3
  157:12
  164:5

**testifying**
  14:6,7
  82:4 87:6
  88:5
  148:19

**testimony**
  5:2,17
  8:13
  14:12,20
  23:5
  24:19,21
  25:23
  26:2,9,11,

12 30:11
32:21,22
33:3,16,
17,21
34:7,10,
12,24 35:7
36:19
37:8,13
41:3,11
42:25
44:6,21
45:6,17
48:4 49:20
51:10,24
52:2,19
59:9,17
64:14
68:14
70:1,7,10
71:21 72:3
75:11,22
76:7,17,
18,25
77:5,21
78:6,17,
22,25
79:6,13,
16,19,22
80:18,22,
24 81:2,14
82:19
84:19,20,
21 85:15
86:2
87:10,12,
17 88:9,
16,23
89:1,11

EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.
Joseph B. Sala, Ph.D. on 11/10/2017          Index: textbook..told

93:4
96:15,17,
22 97:2,4,
12 99:17,
21 100:1,
10,17,22
101:3,9
102:19
106:1,9
108:23
111:9
112:13,17
120:19
121:3,12
122:4,8,
14,19,21
123:8
124:15,19
126:25
127:15
135:16
136:16,20
138:14,16
139:7
140:4,20
141:2
142:12,18
148:15,25
151:8
153:9
157:13,15
163:11
164:4,8,12
165:20,23,
25 166:1,
4,23 167:3
168:18
170:13

171:15,20
174:5
175:4,5
177:18,19
180:5,10
182:10
185:24
186:9,14
187:2

textbook
155:22

thing   46:8
89:12 95:6
127:16
150:10

things   15:25
20:12,21
50:5 58:4
77:16 79:1

thinking
46:7 54:13
124:19
133:3

thinks   85:4

thought
108:9
145:17

thumb   6:2,6
7:2,5,20

tie   116:2
120:9

tied   136:13
141:17
142:21

tightening
114:9

time   4:6
23:20 24:8
30:3 32:3,
16 35:8,21
36:1 37:7
39:2,8
42:4 46:5
53:2 61:23
62:24
66:10
68:13 72:3
77:6 78:1
86:5 91:25
94:18
103:17
105:3
121:13
122:22
124:17
135:19
137:6,12
143:11
145:23
152:20
160:13
161:3
163:12,16
166:17
171:17
174:5,8,
20,23
176:1
180:18,25
181:4
182:5,23
183:12,15

186:7
190:8
191:10

timely   9:11

times   21:11
33:8 63:23
113:24
138:7
152:22
153:4
173:7

timing
163:13

title   105:20
178:19

titled   9:17
10:4 11:13
13:3,7,8
71:12
72:7,11
78:6
105:19

today   4:17,
25 5:2,17,
19 6:1,8
8:1,13
27:1 30:9
52:4 68:14
79:14
158:8,20
163:20,22
189:4
190:8
191:10

told   145:24

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017    Index: tool..understanding

tool  26:10
  146:11

top  34:17
  35:12
  69:9,10
  74:15
  105:7
  116:3
  129:6
  137:2,13
  138:12,18
  142:22
  186:16
  189:10

topic  52:20

topics  19:16
  20:5 25:6
  133:14

touched  51:4

track  33:8
  133:4

tracked  33:5

tracking
  33:1

trained
  60:18
  148:9

training
  17:11
  18:12,23
  19:5 20:9
  54:24 60:5
  116:21
  147:18
  159:16

169:13

transcript
  10:9 37:1,
  6 49:8
  64:8,15
  78:21 80:8
  83:1 89:16
  99:14
  100:15,18

transcripts
  10:5,10
  26:14

transition
  66:12

transmission
  7:12

treatment
  90:4

trial  4:6
  14:18 35:8
  37:8 72:3

trip  43:20

tripped
  46:19

trouble  36:8

truth  4:10

twist  24:14

twisted
  23:25
  24:14

two-thirds
  39:7,10,17
  40:11,19

tying  114:23

type  9:9
  14:20
  90:4,5,6
  92:13,18
  95:23
  146:24
  155:25

types  164:16

typical
  21:14
  60:12

typing  36:2,
  8,11
  164:23
  165:2

_____

_____

          U

ultimately
  68:3
  133:21
  138:25
  154:3

umbrella
  18:1

unable  85:8
  153:25

unaware
  148:13

uncomfortable
  142:2

uncommon
  158:19

undergraduate
  54:25

underlies
  118:24

underlying
  26:8,12
  87:12

underneath
  105:10
  109:6
  113:13
  183:17

understand
  20:17
  23:10 24:1
  39:15 47:8
  57:9 73:13
  90:17
  91:20
  99:20
  140:3
  153:21
  159:6
  160:5

understanding
  16:21 22:4
  35:3 37:21
  49:13
  62:19
  69:21,23
  70:14,24
  71:2,17
  75:17
  78:12
  79:23
  84:11

**EDGARDO LEBRON VS. ROYAL CARIBBEAN CRUISES, LTD.**
Joseph B. Sala, Ph.D. on 11/10/2017    Index: understood..warning

85:12
88:10
96:17
97:12
100:5
101:2,10
105:14
106:22,23
107:15
108:18
109:3,18
110:1
111:22
114:12
133:13,16
137:8
141:9
158:24
161:3
171:7
179:20
184:19

understood
78:23

unique
144:25

University
55:4,6

unquote
86:15
144:1
172:22

unsafe
140:16
141:17,21
142:20

143:1,3,4

upload 46:1,
4

user 135:3

utilize
118:16
175:20

utilizing
119:4

──────────

**V**

──────────

valid 150:1

variety 56:6
136:7

vehicles
22:24,25

venue 34:17
166:6,17,
24

veracity
95:3 175:7
177:17

verify
190:16

version 10:5

versus 46:16
59:11

video 24:6
101:25
103:13
104:3,11
113:13,19,
22 114:1,9

115:7,11,
14,15
119:9
120:1,11,
20,25
121:15
122:18,20
123:4,10,
11,12,15,
18 124:16
165:8,10,
16,17
166:1,10,
12,15,16
168:11,13,
17,21,23
169:5
170:16
174:8
175:16
182:11
183:8,25

videos 6:3,
13 114:3

view 166:11

violated
111:16

violation
111:12,19

visits
123:25

visual
109:9,13,
19 110:2,
11 111:19

visually
110:12
120:7
121:6,20

visually-
guided 44:15

voice 181:20

volunteered
144:11

──────────

**W**

──────────

wait 79:4
126:18

waived 4:4
9:8

waiver
115:18,21,
22 116:7,
11 120:1

waivers
119:10

walking 66:5

walks 44:13

wall 102:8
175:25
176:17
183:1,11,
16

wanted 90:23
91:3 92:1
97:17

warned 67:3

warning

28:11
63:10,18
64:25
65:3,24
66:3
67:14,17,
24,25 68:8
113:19,22

**warnings**
28:8,10
63:6,9
67:1 68:13
118:21
131:11

**wavering**
102:4
152:23

**ways** 118:2
127:25
146:16
175:19
181:2

**wear** 118:2
127:25
134:21
135:3

**wearing**
135:5
189:9

**weather** 27:1

**weight** 59:10
84:8

**Wescott**
102:14,18
103:2

120:11

**wet** 145:7

**whatsoever**
19:12

**wheel** 65:5

**white** 92:16,
23

**win** 33:2

**wins** 32:22

**withheld** 8:1

**woman** 47:4

**word** 75:4
83:21
124:3
139:19
141:20
155:15,18
156:4
190:8,25
191:2,4

**words** 76:1
81:12
84:19
100:11
129:2

**wore** 53:2

**work** 13:3,
17 29:5
30:1,2,6,
11,21 31:1
32:5,10,13
39:5,7,10,
12,13,16,
17,18,21,

22,23,24
40:7,8,9,
11,14,19
52:22 56:6
64:3 161:1

**working**
108:3,19
109:20
110:4,13
149:9

**world** 20:21
21:10 59:1

**write** 97:22

**writing**
126:18
127:8,9

**written**
69:15
78:11
110:20
127:2,17
153:2
185:10
188:7
190:15

**wrong** 8:13
19:18
20:19 22:2
24:18
41:15
78:20
134:22
138:5
151:6,18
155:11
178:17

**wrote** 98:1
127:7

---

**Y**

---

**year** 35:22

**yearly** 40:7

**years** 35:20,
24 146:12
164:13

**yesterday**
7:17

**Yu** 19:3

---

**Z**

---

**Z-e-i-t-l-i-n**
28:14

**Zeitlin**
28:14