EDGARDO LEBRON,

     **Plaintiff,**

v.

ROYAL CARIBBEAN CRUISES,
LTD.,

     **Defendant.**
_____/

## ORDER GRANTING, IN PART AND DENYING, IN PART, DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERT TERRY MACLAUGHLIN AND DENYING MOTION TO EXCLUDE THE PROPOSED TESTIMONY OF DR. YING LU, PURSUANT TO FEDERAL RULES OF EVIDENCE 403, 702, DAUBERT

This matter came before the Court upon Defendant's Motion to Strike/Daubert Motion Regarding Plaintiff's Expert Terry MacLaughlin, ECF No. [127]. The Motion is fully briefed, ECF Nos. [160] [162]. Also pending before the Court is Defendant's Motion to Exclude the Proposed Testimony of Dr. Ying Lu, Pursuant to Federal Rules of Evidence 403, 702, Daubert, ECF No. [126]. That Motion has also been fully briefed, ECF Nos. [161] [163]. The Honorable Kathleen M. Williams, United States District Judge, has referred the Motions to the undersigned Magistrate Judge, ECF No. [154]. For the following reasons, the Motion to Strike Terry MacLaughlin is granted in part, and denied in part, and the Motion to Exclude Dr. Lu's testimony is denied.

## I.    BACKGROUND

This personal injury action was initiated when Plaintiff Edgardo Lebron ("Lebron") filed a Complaint against Defendant Royal Caribbean Cruises, Ltd., ("RCL") alleging various causes of action sounding in negligence related to injuries sustained by Plaintiff

when he fell and broke his ankle while ice skating aboard the Adventure of the Seas, a cruise ship operated by Defendant RCL, ECF No. [1].

In its Answer, the Defendant has generally denied the substantive allegations in the Complaint and has raised several affirmative defenses including, comparative negligence and waiver of liability by the Plaintiff, ECF No. [67].

The Defendant has filed the instant Motions seeking to exclude the Plaintiff's two experts in this action, Terry MacLaughlin and Dr. Ying Lu, generally contending that the experts are unqualified to offer their opinions on certain subjects, did not utilize reliable methodology in forming their opinions, and have offered opinions that are not helpful to the trier of fact. In addition, as to Terry MacLaughlin, the Defendant contends that several of his opinions were belatedly disclosed and should be stricken on that basis. Defendant further argues that Dr. Ying Lu's testimony would be unfairly prejudicial pursuant to Federal Rule of Civil Procedure 403 because it will likely mislead the jury.

For the following reasons, the Defendant's Motion to Strike Terry MacLaughlin is granted in part, as set forth below, and denied as to his remaining opinions; and the Defendant's Motion to Exclude Dr. Lu's testimony is denied in its entirety.[1]

II.     LEGAL FRAMEWORK

        A.     *Admissibility of Expert Testimony*

Federal Evidence Rule 702 governs the admission of expert testimony in federal court, and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the

---

[1] The undersigned did not believe that holding a *Daubert* hearing on the Defendant's Motions would be helpful in this case. The Eleventh Circuit has stated, "*Daubert* hearings are not required, but may be helpful in 'complicated cases involving multiple expert witnesses.'" *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) (quotation omitted).

> testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

District courts have a duty under Rule 702 to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 714 (11th Cir. 2008) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)). Thus, a Court performs a "gatekeeping role" regarding admissibility of expert testimony, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

The Eleventh Circuit has set out three requirements that an expert must meet before his opinions may be admitted. *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014). First, the expert must be qualified on the matter about which he intends to testify. *Id.,* citing *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Second, the expert must employ reliable methodology. *Id.*[2] Third, the expert's testimony must be able to assist the trier of fact through the application of expertise to understand the evidence or fact in issue. *Id.*

The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n. 10, (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76, (1987)).

B. *Qualifications*

As to the first of the these requirements, determining an expert's qualifications is

---

[2] In *Daubert*, the Supreme Court set out four non-exclusive criteria for reliability determinations: "(1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the technique has been subjected to peer review and publication; (3) the known and potential error rate of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community." *Wilson v. Taser Int'l, Inc.*, 303 Fed. Appx. 708, 714 (11th Cir. 2008) (citing *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 595). These factors may guide a district court's reliability inquiry, but the district court ultimately has "broad latitude" as to how it determines reliability. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

not a stringent inquiry "and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted); *see also Johnson v. Big Lots Stores, Inc.*, 2008 WL 1930681, *14 (E. D. La. Apr. 29, 2008) (summarizing *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 n.10 (5th Cir. 1999), and "explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination"); *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing*, 185 F.3d at 507, "As long as some reasonable indication of qualifications is adduced ... qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity"). After a review of the relevant issues and an expert's qualifications, "the determination regarding qualification to testify rests within the district court's discretion." *Clena Investments, Inc.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976).

### C.   *Methodology*

Proposed expert testimony must be supported by appropriate validation, what the Supreme Court has characterized as "good grounds based on what is known." *United States v. Frazier*, 387 F. 3d 1244, 1261 (11th Cir. 2004) (quoting *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, (1993)). A court cannot admit an expert who simply states that he used the "scientific method" to reach his conclusions; more is required. *See Hughes v. Kia Motors Corp.*, 766 F.3d 1317 (11th Cir. 2014) (affirming district court's exclusion of expert testimony).

To determine the reliability of an expert's testimony, the Supreme Court identified four factors that district courts should consider: 1) whether the expert's methodology has been tested or is capable of being tested; 2) whether the theory or technique used by

the expert has been subjected to peer review and publication; 3) whether there is a known or potential error rate of the methodology; and 4) whether the technique has been generally accepted in the relevant scientific community. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 593–94,(1993). Such factors, however, are not exhaustive and are intended to be applied in a "flexible" manner. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Courts within the Eleventh Circuit have recognized that in cases with non-scientific expert opinions, the *Daubert* factors may not be helpful in determining the reliability of an expert's methodology. *See Regions Bank v. Kaplan*, 8:12–cv–1837–T–17MAP, 2017 WL 1148322, at * 3 (M.D. Fla. Mar. 24, 2017) ("The opinions at issue are not scientific opinions and do not apply scientific techniques or theories; the *Daubert* factors as to reliability are not helpful in determining the reliability of the methodology."); *Clena Invs., Inc.*, 280 F.R.D. at 663 ("Turning to the area of non-scientific, experience-based testimony, while these same criteria may be used to evaluate its reliability, sometimes other factors may prove more useful."). Thus, a "district court has considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (internal quotations and citations omitted).

Further, the proponent of expert testimony need not show that the opinion proffered is scientifically correct, but only, based upon a preponderance of the evidence, that the opinion is reliable. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). Although, an expert must know "facts which enable him to express a reasonably accurate conclusion instead of mere conjecture or speculation," absolute certainty is not required. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). Whether this logical basis has been established is within the discretion of the trial judge and the weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility. *Id. Daubert* requires that the proposed expert testimony be relevant

and advance a material aspect of the case. *McDowell v. Brown*, 392 F.3d 1283, 1289-1290 (11th Cir. 2004).

Finally, in assessing the validity of the expert's methodology, the district court may not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "The gatekeeper role ... is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999) (alteration added). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (alteration added). The court's role is limited to analyzing if the evidence is unreliable and irrelevant "because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison*, 184 F.3d at 1311–12.

### D. *Helpfulness to the Trier of Fact*

The helpfulness prong of the inquiry requires that an expert's testimony involve matters beyond the understanding of the average lay person. *Frazier*, 387 F.3d at 1262. The opinion must also have a "valid scientific connection to the disputed facts in the case." *Daubert*, 509 U.S. at 591. The party offering the expert bears the burden of establishing reliability and helpfulness. *Frazier*, 387 F.3d at 1260. The expert may be qualified and the basis for his opinion may be reliable, but if his opinion is not necessary for resolving the issues in the case, then the opinion is not relevant and should not be admitted. *See id.* The Eleventh Circuit has stated that this prong "goes primarily to relevance." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 987 (11th Cir. 2016) (citing *Daubert*, 509 U.S., at 591). The basic standard of relevance . . . is a liberal one, but if an expert opinion does not have a valid scientific connection to the pertinent inquiry it should be excluded because there is no fit. *Id.* Stated another way, expert testimony is

considered relevant when "it logically advances a material aspect of the proposing party's case." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quotations and citation omitted).

### III.    MOTIONS TO STRIKE/EXCLUDE

#### A.    *Defendant's Motion to Strike/Daubert Motion Regarding Plaintiff's Expert Terry MacLaughlin*

In its Motion, Defendant requests that the Court strike Plaintiff's expert, Terry MacLaughlin, and exclude his opinions at trial pursuant to *Daubert*, Federal Rule of Evidence 702, Federal Rule of Civil Procedure 26, and Federal Rule of Civil Procedure 37(c).[3]

First, Defendant contends that MacLaughlin's opinions should be stricken pursuant to the Supreme Court's ruling in *Daubert v. Merrell Dow Pharms., Inc.*, 509, U.S. 579, (1993) because, according to Defendant, MacLaughlin offers opinions regarding the cause of other skaters falling which requires an analysis of human factors/biomechanics that MacLaughlin is unqualified to give, ECF No. [127] at 3. Defendant next challenges the methodology utilized by MacLaughlin as unreliable regarding MacLaughlin's opinions related to: 1) the condition of the skates; 2) the instructions provided to the Plaintiff; 3) the condition of the ice; 4) the presence of a "skate guard"; and, 5) the cause of other skaters falling, ECF No. [127] at 4-16. Defendant further contends that MacLaughlin's opinions are irrelevant to the facts of this case and are unhelpful to the trier of fact, and thus should be stricken, ECF No. [127] at 16-17. Finally, Defendant argues that some of MacLaughlin's opinions are untimely and therefore should be stricken.

---

[3] Terry MacLaughlin submitted his initial opinion on September 5, 2017, ECF No. [127-5], a Supplement to Expert Witness Affidavit on September 25, 2017, ECF No. [127-2], an Amended Supplement to Expert Witness Affidavit on September 26, 2017, ECF No. [127-3], and a Rebuttal to Wescott Expert Witness on October 25, 2017, ECF No. [128-6].

In Response, the Plaintiff contends that that MacLaughlin has extensive experience in ice rink management, design, operation and safety, and is thereby qualified to make an observation of another skater's skate catching the ice and falling in the same area where the Plaintiff fell. Plaintiff contends that such an observation supports MacLaughlin's opinions about the defective condition of the ice. Plaintiff argues that if the Court determines that MacLaughlin is unqualified to render an opinion about another skater's fall, that the Defendant's expert, David Wescott, is also unqualified to offer his rebuttal opinion that the Plaintiff would have fallen forward rather than backwards if he encountered a groove in the ice, ECF No. [160] at 6.

Plaintiff further contends that MacLaughlin explained the methodology that he employed in arriving at his other opinions, which included speaking to Plaintiff Lebron about the defective conditions of the ice and skates, and inspecting the ship for deficiencies in the ice and determining whether those conditions failed to meet industry standards. According to Plaintiff, MacLaughlin then determined whether those deficiencies were causative factors in Lebron's fall. Plaintiff further suggests that even if MacLaughlin's opinions about the cause of the Plaintiff's fall are not reliable, those opinions are severable from MacLaughlin's opinions regarding Defendant's failures to meet applicable industry standards. Plaintiff thus suggests that if the Court determines that MacLaughlin's causation opinions should be excluded, MacLaughlin's other opinions should still be admitted.

Plaintiff further asserts that MacLaughlin's specific opinions on the various subjects challenged by the Defendant are reliable and thus admissible because, although MacLaughlin did not inspect the ice rink at the time of the Plaintiff's fall, Defendant represented to him that when he did inspect the ice rink, it was in the same condition as when the Plaintiff's accident occurred. Plaintiff also argues that MacLaughlin has inspected over a hundred ice rinks in his career and thus he is capable of rendering

opinions on the presence of debris and defects in the ice, as well as, the temperature of the ice as falling below ice rink industry standards.  Plaintiff further asserts that although on direct examination by Defendant's Counsel MacLaughlin was not able to state whether Defendant's maintenance of the rink fell below recognized industry standards, on cross-examination, MacLaughlin clarified that there were industry standards or industry best practices that he relied on in arriving at his opinions.  Plaintiff further contends that, to the extent that Defendant challenges the credibility of MacLaughlin's opinions, those challenges go to the weight rather than the admissibility of those opinions.

### 1.    *Expert MacLaughlin's Qualifications*

Plaintiff's expert Terry MacLaughlin is the president of MacLaughlin Management & Design, ("MMD"), an ice skating and sports facility consulting company founded in 1993, that provides consulting services to assist in the design, construction management and renovation of ice rinks, ECF No. [127-1] at 8.  The company bills itself as a firm that consults with owners to insure that their facilities are managed and operated effectively in order to provide skaters with a safe environment and a high quality skating experience. The company states that its services include safety engineering, staffing, training ice rink personnel in ice making and ice maintenance, and developing realistic operational budgets with ice schedules.  The company has consulted on several municipal ice skating rink projects in Massachusetts.  Prior to becoming the President of MMD, MacLaughlin graduated from Colgate University and served for 7 years as the Vice President of Ice Pro, an ice rink construction company, and 6 years as President of US Arena Supply, an ice rink design and material supplier, ECF No. [127-1] at 10.  In addition, at his deposition, MacLaughlin estimated that he has conducted between sixty and eighty inspections of ice arenas throughout the course of his career, ECF No. [127-5] at 158. MacLaughlin also testified that he has been employed by various insurance carriers

at various time to inspect ice arenas for renewal policies to ensure that the arenas are well managed, there are safety procedures in place, and the operation of the equipment is proper, ECF No. [127-5] at 158. MacLaughlin testified that he is often engaged to evaluate existing ice rink conditions, including the conditions of the ice floor, ECF No. [127-5] at 158.

The Eleventh Circuit has made clear, "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Frazier*, 387 F.3d at 1260. Rule 702 provides that an expert's opinion may be based on their knowledge, skill, experience, training, or education. Fed. R. Evid. 702. Indeed, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. The 2000 Advisory Committee Notes to Rule 702, provide,

> Nothing in this amendment is intended to suggest that experience alone--or experience in conjunction with other knowledge, skill, training or education--may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g.*, *United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *Tassin v. Sears Roebuck*, 946 F.Supp. 1241, 1248 (M.D.La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"). *See also Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Fed. R. Evid. 702, Advisory Committee Notes (2000). Thus, pursuant to Rule 702, MacLaughlin is clearly qualified to render opinions about the maintenance of ice skating rinks, particularly as to those items which involve the skater's experience on the ice, *i.e.*,

requisite skating equipment, temperature of the ice rink, obstruction-free maintenance of the ice, etc.

Although the Defendant does not challenge MacLaughlin's general qualifications, Defendant contends that MacLaughlin should not be allowed to offer opinions about the cause of the fall of other ice skaters. Specifically, the Defendant argues that because MacLaughlin is not a human factors or biomechanics expert that he should not be allowed to opine about the cause of the fall of another skater in the area near where Lebron fell that was captured on CCTV. The Defendant contends that MacLaughlin testified that he is unable to state what caused the other person on the CCTV video to fall and cannot confirm that the skater caught his skate on something prior to his fall.

In his September 25, 2017 Amended Supplement to Expert Witness Affidavit, MacLaughlin states that he reviewed the CCTV video and noticed an individual who skated over to Lebron after Lebron's fall and the individual caught the edge of his skate on the ice, which further supports MacLaughlin's belief that, more likely than not, there were hazardous ice conditions in the area of Lebron's fall, ECF No. [127-3] at 3. At his deposition, MacLaughlin testified that he considered himself to be a good judge of how people are skating and what causes people to fall, and stated the following when asked about the cause of the unidentified skater's fall,

> It's my observation that he caught an edge on something and almost fell. It wasn't –I didn't—it was my interpretation that he didn't lose his balance, that he actually caught an edge— an edge of his skate and stopped awkwardly as a result of that. That's what I observed, and that's why I put it in my report.

ECF No. [127-5] at 147. Given this testimony and MacLaughlin's qualifications and experience, the undersigned concludes that the Defendant has the better of this argument. It is undisputed that MacLaughlin is not a human factors or biomechanics expert, and there is no evidence that MacLaughlin has any additional experience that

would give him expertise in this area.[4]  Thus, without more information, he is unable to provide an expert opinion as to the cause of the fall solely based upon the body movement of the unidentified skater.  Moreover, the jury will be able to view the other skater's fall and make the same observations as MacLaughlin.

It is for this reason that MacLaughlin's opinion regarding the unknown skater differs from the opinion MacLaughlin offers regarding Lebron's fall.  MacLaughlin's opinion regarding the cause of Lebron's fall was based, in part, upon Lebron's testimony and MacLaughlin's meeting with Lebron and his family regarding the details of his fall, including Lebron's level of experience as an ice skater, the condition of his skates, the condition of the ice, and Lebron's personal observations just prior to his fall, ECF No. [117-8].  On this point, it is worth noting that in his rebuttal report the Defendant's expert, David Wescott, only opined that without knowing the skating experience of the unknown skater, it would be hard to conclude that the ice caused the skater to stumble, ECF No. [128-7] at 11-12.   Further, there is no methodology provided by MacLaughlin regarding how he was able to determine what caused the skater on the CCTV video to fall.

Thus, the undersigned concludes that MacLaughlin is not qualified to render an opinion on the causation of the skater's fall.  Accordingly, MacLaughlin's opinion on the cause of the fall of the unknown skater shown on the CCTV video is excluded.[5] MacLaughlin is however qualified to render the other opinions he has offered in this action.

---

[4] MacLaughlin testified that he played professional hockey, ECF No. [127-5] at 146. However, that experience alone does not provide the requisite expertise to allow him to render causative opinions regarding falls without additional information in this case.

[5] This conclusion does not prohibit the introduction of such testimony for other purposes such as impeachment or any other permissible purpose under the Federal Rules of Evidence.

## 2.     *Expert MacLaughlin's Methodology*

Defendant next challenges the methodology employed by MacLaughlin as to the opinions he offered regarding the conditions of the ice rink, the ice skating equipment and safety instructions related to that equipment, and the cause of Lebron's fall. Defendant argues that MacLaughlin's opinions are not grounded in any facts regarding the actual circumstances of the Plaintiff's accident and further contends that MacLaughlin failed to identify a reliable methodology to arrive at his opinions, ECF No. [127] at 5.

An expert cannot rely on "experience" without explaining in detail how the experience and other materials consulted support the opinion rendered. *Frazier*, 387 F.3d at 1265. "An expert's unexplained assurance that [their] opinions rest on accepted principles is not enough." *Clena Invs., Inc. v. XL Specialty Ins. Co.,* 280 F.R.D. 653, 663 (S.D. Fla. 2012) (citations omitted).  Rather, because the Court's "gatekeeping function requires more than simply taking the expert's word for it," the burden is on the party offering the expert testifying based on experience "to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case." *Id*. at 1261, 1265. *Accord Umana-Fowler v. NCL (Bahamas) Ltd.*, 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014) (citing *Frazier*, 387 F.3d at 1265) (stating "an expert cannot rely on 'experience' without explaining in detail how the experience and other materials consulted support the opinion rendered."). Courts may not admit speculation, conjecture, or inference and a court  should exclude an expert opinion when a "leap from data to opinion [is] too great." *Hughes*, 766 F.3d at 1331; *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).  Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis added). Rather than merely asserting that he has a great deal of experience, MacLaughlin is obligated to "connect the dots" between that experience and his conclusions regarding

the condition of the ice skating rink and equipment, and how those conditions are relevant to Lebron's accident.  Based upon a thorough review of the entire record, the undersigned concludes that, under the facts of this case, all but one of MacLaughlin's opinions and conclusions are grounded in reliable methodology based upon his experience and are adequately explained in his expert reports and deposition testimony.

### a)  Inspection of Ice Skates and Rink

At the outset, the undersigned notes that many of the Defendant's attacks on the reliability of MacLaughlin's opinions are predicated on MacLaughlin's failure to inspect the skates that the Plaintiff was wearing at the time of the incident, See ECF No. [127] at 6, ECF No. [162] at 5.  However, this failure is entirely due to the Defendant's decision to place the ice skates back into circulation rather than segregating the skates for the expert's inspection. In fact, the failure of the Defendant to preserve the skates is the subject of Plaintiff's Motion for Sanctions for Spoliation of Evidence, ECF No. [58].  It would be patently unfair to permit the Defendant to exclude the Plaintiff's expert's opinion on this basis, when MacLaughlin's inability to inspect the skates was due to the Defendant's own actions.

Moreover, MacLaughlin's opinions regarding the condition of the skates are not unreliable because he examined the photos of the ice skates that were taken immediately after the Plaintiff's fall, and reviewed the Plaintiff's testimony regarding the condition of the ice skates prior to rendering those opinions, and thus had a basis for evaluating the condition of the skates without actually inspecting the skates themselves.  Further, Defendant's own expert similarly failed to inspect the skates worn by Lebron at the time of the accident because of the Defendant's actions, yet still rendered opinions regarding the condition of the skates.  *See* ECF No. [128-7] at 8. The Defendant's argument on this point is therefore without merit.

Defendant makes a related argument regarding MacLaughlin's inspection of other skates that occurred nearly a year after Lebron's accident, to the extent that those skates were not in the same condition as those skates were on the date of the Plaintiff's accident, ECF No. [127] at 6. However, again, if the Defendant had properly preserved the skates used by Lebron at the time of his accident, MacLaughlin could have opined about the condition of the exact skates that were involved in the accident instead of merely providing his opinions about other skates that were made available for inspection subsequent to the incident. In addition, MacLaughlin's testimony and opinions based on his inspection of the other rental skates are reliable to establish the overall maintenance and condition of the rental skates aboard the ship, which could assist in establishing whether the Defendant had notice of defective skates.

Similarly, to the extent that the Defendant complains that MacLaughlin's opinions related to the condition of the ice rink are not reliable because the inspection of the rink occurred a year after the incident and the conditions of the rink therefore likely were not the same at that time, MacLaughlin indicated in his written report that it had been represented to him by RCL and their counsel that the ice rink made available to him during the August 19, 2017, ship inspection was in the same condition as at the time of Lebron's fall, ECF No. [127-1] at 2. Moreover, Courts have held that an expert's later occurring inspection of an accident site does not render that inspection unreliable because it did not occur at the time of the accident. *See Sorrels v. NCL (Bahamas) Ltd.*, 796 F. 3d 1275, 1284 (11th Cir. 2015) (reversing district court's exclusion of witness based, in part, upon 560 day delay in testing ship's deck following passenger's fall and stating "We have long held, moreover, that a delay in viewing or inspecting the place where an accident took place normally goes to weight and not to admissibility.").

### b) Industry Standards

Defendant contends that MacLaughlin's opinions are unreliable because he failed to point to specific industry standards in concluding that the Defendant failed to adhere to industry standards in operating and maintaining the skating rink. In his September 5, 2017 Report, MacLaughlin stated that he inspected the ice rink aboard the Royal Caribbean ship, Adventure of the Seas to gather information about the condition of the ice surface, the rental skates, the ice skating rink and the overall ice skating rink operational procedures, ECF No. [127-1] at 1. He then identified areas or practices that he observed onboard the cruise ship that he concluded fell below minimum industry standards for ice skating safety, ECF No. [127-1] at 1. Specifically, as to the condition and fit of the rental skates, the report states, "The industry standard is for employees to make sure the ice skate laces are not warn (sic) or frayed, can be tightened properly, and that the skate boot fits securely before allowing a skater on the ice. This should be communicated clearly to anyone renting skates. Many of the skates I observed on the ship had warn (sic) or frayed laces and Lebron stated that the laces were short on one of his skates and he could not tighten that skate securely", ECF No. [127-1] at 5. [6]

---

[6] Among other things, that Report concluded the following:

> The accident Mr. Lebron had was most likely caused by a combination of improperly fitted rental skates, unsafe ice conditions such as wet, soft ice, dirt or sand on top of the ice surface and gouges in the ice caused by poor operation of the ice resurfacer or the ice covering.

ECF No. [127-1] at 4. The Report further states:

> I believe that the injury sustained by Mr. Lebron can be directly connected to the lack of training and improper procedures of the employees responsible for fitting the rental skates that Mr. Lebron was issued prior to his fall.

ECF No. [127-1] at 5. Further, the Report concluded:

MacLaughlin made similar observations regarding the Defendant's failure to maintain and operate the ice rink to industry standards including permitting unacceptably wet conditions of the ice, and failing to keep the surface of the ice free from dirt when people were skating.

However, throughout his deposition testimony upon questioning by Defendant's Counsel, MacLaughlin confirmed that many of his opinions regarding the Defendant's failure to adhere to industry standards were not based on any written industry standards but rather were based on MacLaughlin's belief that it would be the better practice to follow certain procedures, ECF No. [127-5] at 86-90. One such exchange provided,

> Q:     What is the industry standard about whether and operator of an ice rink is supposed to ask about the experience of an ice skater before allowing them to ice skate?
>
> A:      . . .there's nothing written as an industry standard, but from a standpoint of customary, we—when we consult, we always tell operators of ice rink when renting skates that, A, they should maintain the skates, and that they should be --- that they should have people ask question as to the ability of people to skate, and if their boots—if their skates feel comfortable and are—and they know—and they understand how to tie skates.

ECF No. [127-5] at 85. MacLaughlin then agreed that there was no requirement that RCL ask the experience of an ice skater, but instead said that it is the best practice to do so, ECF No. [127-5] at 86. MacLaughlin then testified that there is probably a difference between industry standards and best practice, although he was not sure, ECF No. [127-5] at 86. MacLaughlin stated that although it would have been the better practice for RCL to

---

> The combination of improperly fitted ice skates, wet, soft and dirty ice conditions created by improper use of the resurfacer and excess heat in Studio B created a hazard for skaters that is below ice skating industry standards.

ECF No. [127-1] at 5. Most significantly for the instant Motion, the Report discussed how certain things fell below the minimum standard of safety for public ice skating for the ice skating industry including frayed or split laces on the rental ice skates, ECF No. [127-1] at 2.

have asked Lebron about his ice skating experience, there was no violation of an industry standard in failing to do so, ECF No. [127-5] at 88.

Thus, as correctly noted by the Defendant, the problem with MacLaughlin's original report and initial deposition testimony related to that report and the opinions expressed therein is that without an objective measure and or source for evaluating the industry standards for an ice skating rink, it is nearly impossible to challenge Mr. MacLaughlin's opinions on whether a certain condition feel below an industry standard or to assess whether the Defendant's conduct and/or policies fell within industry standards.

However, upon further questioning from Defendant's Counsel, MacLaughlin testified that he had relied on written industry standards related to the temperature in the ice rink and the condition of the ice skates in forming his opinions, ECF No. [127-5] at 324.[7] Specifically, although not cited in his report, MacLaughlin testified that he relied on the American Society of Heating Refrigeration and Air Conditioning Engineers ("ASHRAE") code and U.S. Ice Rink Association guidelines as industry standards, ECF No. [127-5] at 325, 326. MacLaughlin testified that the remainder of his opinions were based on his personal experience, his inspection of the equipment and the conditions on the ice rink, ECF No. [127-5] at 327. As to the requirement that a skate guard needed to be present on the ice while people are skating, MacLaughlin testified that although there

_____

[7] The undersigned notes that throughout MacLaughlin's deposition, Defendant's counsel objected to the form of the questions from Plaintiff's counsel as being leading. In addition, Defendant's Counsel objected to Plaintiff's counsel's examination as being beyond the scope of her direct examination, ECF No. [127-5] at 154. However, it appears that many of the questions were not leading and/or were foundational questions, and for purposes of this Report, the undersigned considered the testimony notwithstanding the objections. By way of example, the witness was asked, "Could you tell us, Mr. MacLaughlin, have you ever consulted with ice arenas regarding their duty to preserve evidence in litigation?" ECF No. [127-5] at 165, and "Okay, have you ever dealt with a case involving—have you ever dealt with the issue of preserving skates when somebody falls in an ice arena?" ECF No. [127-5] at 166. Both questions were answered in the negative, and both questions were objected to as to form. However, there were many questions from Plaintiff's Counsel which were, in fact, leading.

is no industry standard in writing, there are more rinks that have skate guards than don't, and that having a skate guard would have been prudent, ECF No. [127-5] at 134.

MacLaughlin further testified that he reviewed a number of articles and periodicals prior to authoring his September 5th and 25th reports although those articles were not referenced in his Report, ECF No. [127-5] at 19-21. MacLaughlin stated that those articles included the ASHRAE code related to ice temperature, and documents and reports from the Ice Skating Institute that talked about rental skate conditions and how to maintain ice rentals, and material from the U.S. Ice Rink Association, formerly known as STAR, which specifically discusses maintaining ice skate rentals and maintaining ice, and testified that those articles confirmed his opinions about this case, ECF No. [127-5] at 20-21, 23-24.

Thus, although not specifically cited in his Report, MacLaughlin's testimony makes clear that he relied on various industry sources to confirm his opinions regarding whether the Defendant's conduct fell below industry standards.[8]

### c) Industry Methodology

Defendant contends that MacLaughlin failed to identify or apply a reliable methodology to arrive at his opinions, and further argues that MacLaughlin failed to assert any methodology that is recognized as valid in the *scientific* community, ECF No. [127] at 5, [162] at 4. However, courts have acknowledged that the scientific reliability methodology factors set forth in *Daubert*, may not apply with equal force to experts whose opinions are predicated upon their experience, rather than scientific tests or methods. See *Padgett v. Kmart Corp.*, No. CIV 315-048, 2016 WL 3746671, *5 (S.D. Ga. July 8, 2016) (observing that nature of expert's testimony rendered Daubert's reliability factors largely unhelpful, but finding that expert's experience used reliably to reach his

---

[8] To the extent that the Defendant challenges the timeliness of MacLaughlin's disclosures of materials he used that confirm his opinions, that argument is discussed below in this Report.

conclusions, where expert was critical of defendant's failure to have certain security plans based on expert's thirty-six years of experience, which was supported by published security related materials).  *See also Cornerstone Missionary Baptist Church v. Southern Mut. Church Ins., Co.*, No. 5:12-CV-149 (HL), 2013 WL 67129028 (M.D. Ga. Dec. 18, 2013) (concluding that expert's methodology was not unreliable merely because it did not involve testing and concluding that methodology-observation and deduction calculations based on knowledge and experience sufficient to deem expert's opinions reliable).

Here, MacLaughlin reached his opinions by visually inspecting the ice rink, examining photographs of the ice skates, reading the testimony of the Plaintiff, inspecting the ice skates that were made available to him, reviewing some, if not all, of the Defendant's responses to requests for production, conducting an interview with Lebron and his family, reviewing RCL operating manuals, and reviewing CCTV footage of the incident, ECF No. [127-5] at 42, 45-46, 62, 108, 111.  Based upon that information, MacLaughlin applied his experience from working in the ice skating arena area, and formulated his opinions about the conditions of the ice skating rink and equipment related to this action.[9]  *Cf. Farley v. Oceania Cruises, Inc.*, 2015 WL 1131015, at *8 (S.D. Fla. Mar. 12, 2015) (concluding that safety expert Randall W. Jacques' methodology was unsound where: (1) the expert failed to inspect the vessel where the accident took place or interview any crew members, (2) failed to cite to any publications or experiments to support his opinions with respect to lounge chair safety, and (3) did not provide a detailed explanation of how his experience supports his opinions or what materials he

---

[9]  MacLaughlin further testified that he used his finger to determine the sharpness of the skates, ECF No. [127-5] at 331-32.  He placed his hand on the surface of the ice to determine how soft it was, although he admitted that another way to test for the softness of the ice was by using a gauge, ECF No. [127-5] at 105, 106. He further testified that it was industry standard and best practices to keep a log of when the ice is resurfaced, ECF No. [127-5] at 340.  He also testified that it is industry standard and best practices to have a sign to explain how to lace up skates, ECF No. [127-5] at 345.

consulted (other than the policies and procedures of competitor cruise line operators) to reach his conclusions)); *O'Malley v. Royal Caribbean Cruises, Ltd.*, Case No. 17-21225-CIV-SCOLA/TORRES, 2018 WL 2970728, (S.D. Fla. June 13, 2018) (same).

Courts have denied requests to exclude expert testimony where experts have similarly conducted visual inspections and applied their industry knowledge and experience to develop opinions regarding the conditions under which an incident likely occurred. *See* e.g., *Kirksey v. Schindler Elevator Corp.*, 2016 WL 5213928, *11 (S.D. Ala. Sept. 21, 2016) (finding *Daubert* satisfied where industrial engineer's methodology in visually inspecting escalator guardrail without performing testing or analysis of its structural strength); *Nicholson v. Pickett*, 2016 WL 854370, *9-11 (M.D. Ala. Mar. 4, 2016) (finding expert's methodology sufficiently reliable, despite lack of testing, where expert visually inspected vehicle, reviewed depositions, films and reports, and relied on his experience in the industry); *Holman v. State Farm Fire and Cas. Co.*, 2015 WL 12803770, *7 (N.D. Ala. Jan. 12, 2015) (where defendant argued that structural engineer failed reliability prong because he did not take measurements or make calculations, ruling that expert's "methodology is sufficiently reliable" where it is based on "first-hand inspection" of the house and applied "knowledge and experience of structural engineering to reach his conclusion" as to cause of cracks in basement wall); *Sparger v. Newmar Corp.*, 2014 WL 3928556, *5 (S.D. Fla. Aug. 12, 2014) ("visual inspection of an engine may be an acceptable way of identifying an engine defect for purposes of evaluating admissibility of expert testimony," even where expert did not perform any "intrusive diagnostic procedure"); *Altieri v. State Farm Fire and Cas. Co.*, 2011 WL 1883054, *3-4 (E.D. Pa. May 17, 2011) (finding structural engineer's methodology sufficiently reliable where, in forming opinion about cause of wall collapse, he "made first-hand observations of the collapse and applied his knowledge and experience of structural design and engineering to reach conclusions regarding the cause of the

collapse," even though his "report lacks engineering jargon"); *Banta Properties, Inc. v. Arch Specialty Ins. Co.*, 2011 WL 13096149, *5 (S.D. Fla. Dec. 20, 2011) (where architect assessed cause of damage to windows, "[t]he application of his experience during a visual inspection was an appropriate methodology," even though there were other steps he could have taken but did not); *Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, 2009 WL 1046354, *3 (M.D. Fla. Apr. 20, 2009) (rejecting reliability challenge to architect's opinions that were "[b]ased on his visual inspections, with no measurement or other testing").

In addition, several courts have also found expert opinions from a particular industry to be reliable where the expert of the party seeking to strike the expert has itself retained an expert who relied on a similar methodology in arriving at that expert's own opinions. *See Hanna v. Ward Mfg.*, 723 F. App'x 647, 651 (11th Cir. 2018) (noting that although plaintiff questioned reliability of defendant's expert's methodology, plaintiffs' own expert relied on the same indicia and used same criteria in making his own assessments). In such cases, courts have typically concluded that because experts from the same industry both relied on the same or similar methodology, that the particular methodology enjoys at least some level of acceptance in that industry. In *Portis v. State Farm Fire*, No. 1:15-CV-3949-MHC, 2017 WL 3499873, *8 (N.D. Ga. April 11, 2017), for example, the court stated,

> The Court concludes that [the plaintiff's expert's] testimony is sufficiently reliable to meet *Daubert's* standard. Indeed, although [the defendant] protests that [the expert's] testimony is unreliable and speculative, many (if not all) of [the defendant's] criticisms could be applicable to the report prepared by its own expert: both documents are based not on any kind of systematic testing or measurement, but instead on visual observation and, ultimately, what is evidently the same uncontroversial deductive methodology. . .Neither expert used any kind of sophisticated equipment, nor does either report contain information that is inherently misleading or unreliable, given both [experts'] qualifications. . . Instead, both inspectors ultimately did no more than visually examine

> [the] property, and [the defendant] has pointed to no
> meaningful distinction in the methods used by the two.

*Portis v. State Farm Fire*, No. 1:15-CV-3949-MHC, 2017 WL 3499873, *8 (N.D. Ga. April 11,

2017).  The Court in *Clena Invs., Inc. v. XL Specialty Ins. Co.,* 280 F.R.D. 653, 663 (S.D. Fla.

2012) reached a similar conclusion and noted that the defendant's expert, like the

plaintiff's expert, who defendant sought to strike, engaged in a similar evaluative process

which consisted of visually inspecting the property and relying on information from

public websites and certain industry information, but did not include performing

destructive testing, conducting a mold investigation, reviewing construction drawings of

the property, or conducting any mathematical calculations.

   The undersigned finds the logic of those courts persuasive and observes in this

case, the methodology utilized by Defendant's expert David Wescott mirrors that of

MacLaughlin's methodology.  Specifically, many of Wescott's opinions are also

predicated on his visual observations made during the ship inspection and the

documents he reviewed related to this ligation. By way of example, the examination of

ice skates performed by Mr. Wescott did not include any additional methodology or other

scientific measurements than that utilized by MacLaughlin but consisted of a visual

inspection which was summarized with "[T]he skates on the rack were of excellent

quality and the ones that I looked at had adequate laces, were sharp and no noticeable

defects." ECF No. [128-7] at 1.  That visual inspection resulted in Mr. Wescott concluding

that the skates he inspected and used were in good shape and sharp, ECF No. [128-7] at

9. In addition, Mr. Wescott turned on and off the sharpening machines to see if they were

working properly, observed that the "ice came out very nice" from the resurfacing

machine, and skated on the ice to confirm that the quality of the ice "was good" and that

the "skating on the rink in Studio B was enjoyable," ECF No. [128-7] at 3.  Thus, there

appears to be little difference between the methodology used by Defendant's expert and that used by MacLaughlin.[10]

Finally, to the extent that the Defendant asserts that MacLaughlin should have engaged in more sophisticated testing or analysis, that argument ultimately goes to the weight and credibility of MacLaughlin's proffered testimony (and in particular his method, or lack thereof), rather than its admissibility. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) ("Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.").

d)      Facts for Basis of Opinions

Defendant also contends that MacLaughlin's opinions are not grounded in any facts regarding the actual circumstances of the Plaintiff's accident, ECF No. [127] at 5. However, the "facts" relied on by MacLaughlin included the testimony of Plaintiff Lebron who, among other things, testified under oath as to the conditions of the ice, the condition and fit of the ice skates, and the instructions he was given by the RCL employees. MacLaughlin testified that he based his conclusion that Lebron's shirt was black when he got off the ice after his fall, on Lebron's testimony, although he could not see from the videos whether the shirt was dirty, ECF No. [127-5] at 128, 129. To the extent that the Defendant argues that Lebron's testimony is contradicted by the testimony of Defendant's witnesses, it is not for MacLaughlin to assess the credibility of each of the witnesses. Further, MacLaughlin testified that he also reviewed RCL's operating manual for the ice resurfacer machine, the deposition testimony of the

---

[10] Mr. Wescott did use his infrared thermometer to check the temperature of the surface of the ice and used his temperature, humidity and dew point sensor to evaluate the air conditions of the arena, ECF No. [128-7] at 2. However, these readings, in and of themselves, do not provide a basis for determining that Mr. Wescott employed a reliable methodology and MacLaughlin did not because he did not use the same testing instruments. Interestingly, Mr. MacLaughlin's opinion that the temperature reading in the arena exceeded fifty degrees was confirmed by the temperature readings taken by the Defendant's expert, David Wescott.

manager for the studio where the ice rink is located, and visually inspected and touched the covering that goes over the ice, ECF No. [127-5] at 108, 109, 112, 113.  The fact that MacLaughlin gave greater weight to certain pieces of evidence than others does not demonstrate that his methods are unreliable. *See Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (while an expert's testimony must be supported by facts, "absolute certainty is not required").

However, there are no facts in the record to support MacLaughlin's opinion that the ice rink's mechanical covering may have caused a gouge in the ice, ECF No. [117-8] at 4.  In fact, in his Report, MacLaughlin stated the following: "I am not familiar with this product or the mechanical system for the covering.  Typically, ice coverings are made of 4' x 6' sections laid by hand on top of the ice surface.  My concern with this mechanical system is that since it is not hand laid, when operated mechanically it could gouge the ice creating skating hazards." ECF No. [117-8] at 4.  In his deposition, MacLaughlin stated that on the day of the ship inspection, he conducted a visual inspection of the flooring that covers the ice rink while that covering was not on the ice, ECF No. [127-5] at 112.  He had no information regarding what material the flooring was made of, but thought that it "looked like it had a metal edging, and it looked like it was some kind of hard laminate." ECF No. [127-5] at 113. He further testified that although he was told how the floor operates, he was not sure whether any part of the covering even came into contact with the ice, but rather reiterated that his concern related to the fact that the covering was a mechanical system and not hand laid, ECF No. [127-5] at 115.

MacLaughlin's opinion on this issue is therefore not based on any facts in the record or any prior experience that he had with this type of floor covering.  Rather, MacLaughlin's opinion is based purely on his speculation that a mechanical type of floor

covering *could* cause a gouge in an ice rink.[11] Accordingly, the opinion must be excluded because it is not based on sufficient facts or data as required by Fed. R. Civ. P. 702 (b).

Given his experience in the operation and maintenance of ice arenas, except for the testimony regarding the floor covering, the methodology utilized by MacLaughlin to reach his opinions, which included a visual and tactile inspection of the ice arena, coupled with a review of the testimony and other relevant documents, is based on sufficient facts and is sufficiently reliable. Thus, his opinions and testimony will not be excluded on this basis.

### 3. *Helpfulness to the Trier of Fact*

The helpfulness prong of the inquiry requires that an expert's testimony involve matters beyond the understanding of the average lay person. *Frazier*, 387 F.3d at 1262. The opinion must also have a "valid scientific connection to the disputed facts in the case." *Daubert*, 509 U.S. at 591. The expert may be qualified and the basis for his opinion may be reliable, but if his opinion is not necessary for resolving the issues in the case, then the opinion is not relevant and should not be admitted. *See id.* Defendant also argues that the opinions of the witnesses at issue should not be permitted because their

---

[11] It is for this reason that MacLaughlin's other opinions regarding the presence and possible causes for gouges in the ice are distinguishable from his opinion regarding the ice covering. MacLaughlin's opinion that the ice resurfacer may have caused gouges in the ice is based on his familiarity with the possible damage that a resurfacer may cause to the ice, as well as, his observation that a piece of the board was damaged near the area where Lebron fell, ECF No. [127-5] at 110-111, 240. MacLaughlin stated in his Report that he thought there may have been no formal training to operate the resurfacer, and that damage to the boards are more likely caused by resurfacers banging into the boards while cleaning the ice, ECF No. [127-5] at 240. Similarly, MacLaughlin's opinions regarding gouges possibly created by professional ice skaters is predicated upon his experience that professional skaters typically put gouges in ice, and the fact that the schedule for the day of Lebron's fall provided an open rink for the professional skaters to practice, ECF No. [127-5] at 120-122. Thus, MacLaughlin's opinions on these possible causes of gouges in the ice are based upon his experience and observations and/or facts supplied to him, as opposed to pure speculation. Such opinions are therefore sufficiently reliable to be presented to the jury.

testimony will not be helpful to the trier of fact. The Eleventh Circuit has stated that this prong —"goes primarily to relevance." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 987 (11th Cir. 2016) (citing *Daubert*, 509 U.S., at 591). The basic standard of relevance . . . is a liberal one, but if an expert opinion does not have a valid scientific connection to the pertinent inquiry it should be excluded because there is no fit. *Id.*

In this case, it is clear the MacLaughlin's opinions are helpful to the trier of fact because they provide far more than a layman's understanding of the conditions of the ice rink, ice skates, and RCL's procedures regarding the operation of the ice rink, all of which are critical to establishing the cause of Lebron's fall, including whether the Defendant's actions related to that fall.

### 4. *Timeliness of MacLaughlin's Opinions*

Finally, the Defendant seeks to exclude a number of MacLaughlin's opinions that Defendant claims were not timely disclosed in his expert reports. Defendant contends that MacLaughlin's new opinions were only provided to the Defendant during MacLaughlin's deposition on October 24, 2017, a day before the Parties' rebuttal witness disclosures were due, ECF No. [127] at 18.

An expert report must convey the substance of an expert's opinion so that the opponent will be able to prepare to rebut, cross-examine and offer competing reports if necessary. *Porto Venezia Condo. Assoc. Inc., v. WB Fort Lauderdale, LLC*, No. 11-60665-CIV, 2012 WL 7636003, *3 (S.D. Fla. Sept. 19, 2012) (citing M*etavante Corporation v. Emigrant Savings Bank*, 619 F.3d 748, 762 (7th Cir. 2010)). Those disclosures need not however, "replicate every word that the expert might say on the stand." *Id. See also*, *Harford Casualty Ins. Co. v. Lanzo Construction Co., Florida*, 12-61934-CIV-MARTINEZ-MCALILEY,2013 WL 11936361, *1 (S.D. Fla. June 28, 2013) (quoting *Herbst v. L.B.O. Holding, Inc.*, 783 F. Supp. 2d 262, 268-69 (D.N.H. 2011) and stating "Even though an opinion is not expressly disclosed in the plaintiff's expert's report, the court will allow the

opinion if 'that opinion can be reasonably inferred from the substance of the report, and [defendant] has received sufficient notice to 'be ready to rebut [it], to cross-examine, and to offer a competing expert, if necessary.'")

The undersigned has carefully reviewed the examples cited by Defendant wherein MacLaughlin purportedly testified to "new" or "additional" opinions that were not included in his expert reports, as well as MacLaughlin's deposition testimony related to those opinions, ECF at [127] at 18-19.[12] The undersigned first observes that several of those opinions were adequately disclosed in MacLaughlin's initial and supplemental reports and were merely further described in his deposition testimony. For example, MacLaughlin's opinion that, "It is an industry standard to keep logs of rental skate repair and sharpening" was touched upon in his initial report, under the "Findings/Opinions:" heading which provided a list of items that MacLaughlin found to be below the minimum standard of safety for public ice skating for the ice skating industry. ECF No. [127-1] at 2. In that bullet-pointed list of items that fell below the industry standard, MacLaughlin stated, "Royal Caribbean did not produce all of the documents which I wanted to review. . .including logs for the sharpening of specific skates." ECF No. [127-1] at 3. Similarly, MacLaughlin's "new" opinion that "RCL should have had signs showing how to lace the skates, and a video is inadequate" was also referenced in his initial report when he

---

[12] In its Motion, the Defendant cites the following new "opinions" that MacLaughlin offered for the first time at his deposition, "It is an industry standard to keep logs of rental skate repair and sharpening", "the plaintiff 'felt rushed' after he was given his skates and may not have felt he had time to ask for instruction on how to lace them,; "RCL should have had signs showing how to lace the skates, and a video is inadequate"; "A skating rink on a cruise ship would have more first-time or inexperienced skaters than a land-based rink"; "Accidents are more likely to happen on a smaller rink such as that on the ship"; "Ship movement creates potential for accidents"; "Plaintiff fell in a location where the STAR documents indicate is a 'traditional trouble area'"; "The ice skating rink should have a dew point of 35 to 40 degrees Fahrenheit"; "A cold, dry building is necessary to make quality ice"; "Laying excess water is not the correct way to make ice."; "The floor under the Liberty ice arena was a type that would require special consideration for regular ice removal according to STAR"; "Rust on skates is evidence of overall poor maintenance procedures on the ice rink"; "Inexperienced skaters should be offered equipment that helps them learn how to skate."

stated, "I did review the training video that RCCL provided and found that it did not adequately show how to lace skates properly. . ." ECF No. [127-1] at 5. It is not difficult to infer from those statements in his initial report that MacLaughlin's testimony might include more detailed opinions related to the industry standard for skate sharpeners and his opinion that RCL should have provided additional ways of teaching skaters to lace their skates. In addition, Defendant's Counsel cross-examined MacLaughlin about the industry standard requirements for skate sharpening logs at his deposition, ECF No. [127-5] at 330, as well as whether a sign rather than a video was needed to demonstrate how to lace ice skates, ECF No. [127-5] at 344-45. Therefore, Defendant's Counsel was made aware of MacLaughlin's opinions on these issues in a timely manner.

In this regard, the case at bar is like *Vigneulle for Estate of Vigneulle v. Tahsin Industrial Corporation USA*, 2018 WL 1509435, *1 (N.D. Ala. March 27, 2018), wherein after a review of the "new opinions", the court concluded that the issues identified by the defendant, by and large, were elaborations of the matters presented in the experts' written reports. *Id.* at *12. The court in *Vigneulle* further concluded that the other area of objection concerned matters that were discussed at length at the experts' depositions. The court therefore declined to exclude the affidavit testimony from the summary judgment record as the expert fully disclosed his opinion to the defendant during the deposition. *See also*, *In re Stand 'N Seal Prods. Liability Litig.*, 623 F. Supp. 2d 1355, 1363-64 (N.D. Ga. 2009) (declining to exclude an expert's testimony about how many seconds a patient needed to be exposed to a product to cause injury where he disclosed that information during a deposition).

As to those "new" opinions that arguably were not disclosed in MacLaughlin's initial and supplemental written reports, Federal Rule of Civil Procedure 37(c) provides, in relevant part, that if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not to use that information or witness to supply

evidence on a motion, at a hearing or at a trial, unless the failure was substantially justified or is harmless. Thus, the rule makes clear that exclusion of a witness is not automatic when a party fails to comply with the applicable disclosure rules. Rather, the court must first assess whether there was substantial justification for the failure to disclose or whether the failure to disclose was harmless.[13] The burden of establishing that a failure to disclose was substantially justified or harmless rests on the non-disclosing party. *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (citation omitted).

Assuming *arguendo* that some of MacLaughlin's opinions were untimely disclosed, the Plaintiff's failure to do so was substantially justified. In arriving at this conclusion, the undersigned notes the timing of when the parties were required to disclose their expert and rebuttal experts and written reports in this case, in relation to when the depositions of the expert witnesses were taken. In particular, pursuant to the Court's Scheduling Order, MacLaughlin's expert report was provided to the Defendant on or around September 5, 2017, and his supplemental report was timely produced on or about September 25, 2017. Defendant's expert, David Wescott's report was provided to the Plaintiff on or around October 6, 2017 and Wescott was deposed on October 17, 2017. Plaintiff's expert MacLaughlin was then deposed on October 24, 2017, and on the

---

[13] In making this determination, some courts have considered: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *U.S. ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, No. 8:06–cv–40–T–33MAP, 2009 WL 92826, at *3 (M.D. Fla. Jan. 14, 2009) (internal quotation omitted). Similarly, in evaluating whether the exclusion of a late witness was an abuse of discretion, the Eleventh Circuit has considered: (1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice. *Lips v. City of Hollywood*, 350 F. App'x 328, 340 (11th Cir. 2009) (citing R*omero v. Drummond Co.*, 552 F.3d 1303, 1321 (11th Cir. 2008)). The balance of these factors, under the facts of this case, weigh in favor of not excluding MacLaughlin's testimony.

following day, October 25, 2017, Plaintiff's expert MacLaughlin was disclosed by the Plaintiff as a rebuttal witness and provided a rebuttal report as to Wescott's opinions on that same date. Thus, it appears likely that by the time that MacLaughlin was deposed on October 24, 2017, he had already been retained by Plaintiff to rebut Wescott's opinions and thus had reviewed additional relevant materials, and developed additional opinions, which were disclosed in his deposition.[14] This conclusion is borne out by comparing MacLaughlin's "new" opinions disclosed at his deposition to MacLaughlin's rebuttal report disclosed by Plaintiff the day after MacLaughlin's deposition. Specifically, five of the thirteen "new" opinions cited by Defendant are clearly included in MacLaughlin's rebuttal report including, testimony about industry standards related to sharpening logs, MacLaughlin's belief that RCL should have signs to show how to lace skates, and what the dew point of the ice skating rink should have been. *See* ECF No. [128-6].

Accordingly, to the extent that any portion of those opinions can be considered "new", any delay in disclosure is likely due to MacLaughlin's status as a rebuttal witness and not due to any improper conduct by the Plaintiff. Although a party's opportunity to submit a rebuttal expert report is not license to expand its case-in-chief or to introduce new legal theories, here much of MacLaughlin's challenged testimony pertains to rebutting the Defendant's expert's opinions on issues that were relevant to MacLaughlin's initial reports. Thus, in this case it appears that MacLaughlin may have testified prematurely to his rebuttal opinions, as opposed to belatedly disclosing his opinions related to Plaintiff's case in chief. This is not surprising given that it would be unrealistic to expect MacLaughlin to limit his deposition testimony only to those opinions that he had reached in his initial report and supplemental report, as opposed to

---

[14] The undersigned is aware that MacLaughlin testified that all of his opinions at the time of his deposition were contained in his written reports, ECF No. [127-5] at 60. However, a careful review of MacLaughlin's deposition testimony reflects that several of his opinions were based upon his review of the materials identified in Defendant's expert's Report.

testifying as to all of his opinions, including those more fully developed during his preparation as a rebuttal witness.  In such a scenario, the testimony should not be excluded merely because it arguably could have been presented in party's case in chief rather than the expert's rebuttal testimony. See e.g. *Donell v. Fidelity Nat. Title Agency of Nev.*, No. 2:07-cv-00001, 2012 WL 170990, at *5 (D. Nev. Jan. 20, 2012) (quoting *United States v. Lunschen*, 614 F.2d 1164, 1170 (8th Cir. 1980)) (stating "the fact that testimony would have been more proper for the case-in-chief does not preclude the testimony if it is proper both in the case-in-chief and in rebuttal.").  In any event, it is clear that the "untimely" disclosure of MacLaughlin's "new" rebuttal opinions at his deposition was substantially justified.

As to whether the late disclosure of MacLaughlin's opinions was harmless, as discussed above, many of the "new" opinions did not significantly expand or depart from the opinions initially provided by MacLaughlin, and thus the Defendant did not experience any great surprise by the deposition testimony given by MacLaughlin related to those opinions. Nor do the opinions introduce new causative theories or introduce new materials that would be unknown or unexpected by the Defendant or its already retained experts.[15]

It is for this reason that the Defendant's reliance on *Brown v. NCL*, 190 F. Supp. 3d 1136 (S.D. Fla. June 6, 2016) is misplaced.  In *Brown*, the plaintiff's expert, a licensed neurologist, provided an initial diagnosis that the plaintiff suffered from postconcussive syndrome. More than three months later, and for the first time at his deposition, that expert disclosed that he had changed his diagnosis to traumatic brain injury.  At the time of the court's opinion four months after that deposition, the plaintiff had still failed to

---

[15] In addition to David Wescott, who, like MacLaughlin, opined on the conditions of the ice rink operation and maintenance after conducting a vessel inspection, the Defendant also retained Dr. Joseph Sala, Ph.D. who performed a human factors analysis of Lebron's accident, ECF No. [128-1].

provide a supplemental written report to the defendant related to the witness' new diagnosis. Thus, the opinion belatedly disclosed by the expert was truly a "new" and substantively different opinion than his initial opinion, that the court concluded deprived the defendant of the ability to prepare for effective cross-examination and rebuttal with respect to the traumatic brain injury. *Id.* at 1143.

Further, there is no evidence that the Defendant suffered any prejudice due to the disclosures in MacLaughlin's deposition. "Prejudice generally occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question." *Bowe v. Pub. Storage*, 106 F. Supp. 3d 1252, 1260 (S.D. Fla. 2015) (quoting *Berryman–Dages v. City of Gainesville Fla.*, No. 1:10cv177–MP–GRJ, 2012 WL 1130074, at *2 (N.D. Fla. Apr. 4, 2012)).

The Defendant in this case contends that it was "blind-sided" by the new sources and opinions provided at MacLaughlin's deposition but fails to explain how it was unable to cross-examine MacLaughlin on those opinions at the deposition, or to adequately prepare a rebuttal to those opinions. Notably, the Defendant did not seek leave of court to obtain a rebuttal witness to MacLaughlin's "new" opinions. *See e.g. In Romero v. Drummond Co.*, 552 F.3d 1303, 1323 (11th Cir. 2008) (concluding that two of the expert's disclosures failed to state the expert's anticipated opinion "with sufficient specificity to allow [the defendant] to prepare for rebuttal or cross-examination."); See also *Mitchell v. Ford Motor Co.*, 318 Fed. Appx. 821, 824 (11th Cir. 2009) (affirming exclusion of the plaintiff's expert for failure to timely disclose the scientific bases for his opinions which left the defendant unable to fully depose the expert "or question what he relied on to form his opinions").

Finally, MacLaughlin's deposition was taken in the form of a discovery deposition and Plaintiff has listed MacLaughlin as a witness who is expected to be called live at trial. The undersigned thus concludes, under the facts of this case, that the failure of the

Plaintiff to provide all of MacLaughlin's opinions in his initial and supplemental report was harmless. See Fed. R. Civ. P. 37 (c). However, to the extent that the Defendant's experts dispute any of the "new" opinions offered by Mr. MacLaughlin, those experts may dispute those opinions at trial, without regard to whether the Defendant's experts have previously disclosed their opposition to such opinions.[16]

Accordingly, Defendant's request that MacLaughlin's "new" opinions and testimony be stricken and that he not be allowed to testify for violation of Federal Rules of Civil Procedure 26 is denied.

### B. Defendant's Motion to Exclude the Proposed Testimony of Dr. Ying Lu, Pursuant to Federal Rules of Evidence 403, 702, Daubert

The Defendant contends that the proposed testimony of Dr. Ying Lu, Ph.D., should be excluded because it is unreliable, fails to help the jury, and its probative value is significantly outweighed by its tendency to mislead and confuse, ECF No. [126] at 1. The Defendant further contends that Dr. Lu is unqualified to render her opinions and contends that her written opinions are unreliable because their factual bases are

---

[16] In the alternative, and if the District Judge deems it more appropriate to exclude the belatedly disclosed "opinions", the undersigned recommends that only those opinions identified by Defendant in its Motion be excluded, and MacLaughlin be permitted to testify as to all other opinions contained in his initial, supplemental and rebuttal reports. Specifically, in its Motion the Defendant cites the following new "opinions" that MacLaughlin offered for the first time at his deposition, "It is an industry standard to keep logs of rental skate repair and sharpening", "the plaintiff 'felt rushed' after he was given his skates and may not have felt he had time to ask for instruction on how to lace them,; "RCL should have had signs showing how to lace the skates, and a video is inadequate"; "A skating rink on a cruise ship would have more first-time or inexperienced skaters than a land-based rink"; "Accidents are more likely to happen on a smaller rink such as that on the ship"; "Ship movement creates potential for accidents"; "Plaintiff fell in a location where the STAR documents indicate is a 'traditional trouble area'"; "The ice skating rink should have a dew point of 35 to 40 degrees Fahrenheit"; "A cold, dry building is necessary to make quality ice"; "Laying excess water is not the correct way to make ice."; "The floor under the Liberty ice arena was a type that would require special consideration for regular ice removal according to STAR"; "Rust on skate is evidence of overall poor maintenance procedures on the ice rink"; "Inexperienced skaters should be offered equipment that helps them learn how to skate."

inadequate, do not consider relevant record evidence, and merely mimic the unfounded allegations of Plaintiff, ECF No. [126] at 2.

The Defendant asserts that Dr. Lu's training as a biomedical engineer does not qualify her as an expert to render opinions regarding the ankle fracture sustained by Plaintiff while he was ice skating, ECF No. [126] at 7. Specifically, Defendant states that Dr. Lu's experience has been primarily in motor vehicle incidents and premises-related accident and thus does not bear an adequate relationship to the opinions she provides related to Lebron's ankle injury because she has no experience in designing ice skates, rendering opinions in ice-skating injury cases or authoring ankle fracture articles.

The Defendant next contends that Dr. Lu's opinions should be excluded because they are based on fictitious facts and unreliable methodology. On this issue, Defendant states that Dr. Lu failed to consider the testimony of the Defendant's witnesses, and instead improperly relied only on the Plaintiff's deposition testimony in opining that the skates the Plaintiff wore at the time of the incident were defective.

Defendant further argues that even if the skates were unlaced or laced improperly, Dr. Lu has no basis to support her opinion that the lacing of the Plaintiff's skates exacerbated Plaintiff's ankle fracture. Defendant contends that without the technical specifications of the ice skates worn by the Plaintiff at the time of the incident that Dr. Lu is unable to formulate a reliable opinion as to whether the failure to have the laces fully laced inhibited Lebron's ability to regain his balance. Further, Defendant contends that Dr. Lu is unable to point to any peer reviewed literature or material to support her opinions regarding the effect of the failure to lace the skates to the top of the ice skating boot.

The Defendant next argues that Dr. Lu's opinions are not helpful to the trier of fact because her opinions regarding the inability of Lebron to regain his balance because of improper lacing, and her conclusion that the improper lacing exacerbated the lateral

rolling and twisting motion of his ankle are based solely on Plaintiff's assertions and not on the facts of the case. Defendant further argues that even if Dr. Lu's opinions are accepted as true, they are not helpful because she does not allege that any act or omission of RCL caused Plaintiff to fall. Defendant similarly contends that Dr. Lu's opinions are unfairly prejudicial and will mislead the jury because they rely on the assumption that the skates worn at the time of the incident were unlaced or improperly laced, which is based solely upon the Plaintiff's allegation and are contradictory to the "necessary facts," ECF No. [126] at 12, 13.

In response, the Plaintiff contends that the Plaintiff has retained two separate experts to investigate two separate issues with Terry MacLaughlin investigating the conditions, management, operation and design of the ice arena and ice skates, and Dr. Lu investigating the mechanics of the Plaintiff's fall, ECF No. [161] at 7. In addition, the Plaintiff has filed the Affidavit of Dr. Lu, which among other things, reiterates her qualifications, and directly dispute Defendant's contention that her failure to have experience in designing ice skates disqualifies her from rendering opinions regarding the biomechanics of how Mr. Lebron's body movement may have been altered by a loose upper shaft of one his ice skates, ECF No. [161-1] at 2.

### 1.    *Dr. Lu's Qualifications*

The undisputed record reflects that Dr. Lu received her Ph.D. in biomedical engineering in 2006, earned her master's degree in biology in 2000, and obtained her bachelor's degree in biology in 1998. She has extensive experience in biomedical and biomechanical engineering and has investigated incidents and testified in numerous cases involving body kinematics and injury mechanisms over the past thirteen years. Dr. Lu has extensive knowledge of ankle fractures. In its Reply, the Defendant concedes that Dr. Lu is well educated but contends that "[n]othing in her training, education or experience qualifies her to render opinions regarding the design feature of the skate

Plaintiff wore and how, if at all, its features impacted his alleged injury." ECF No. [163] at 4.

At her deposition, Dr. Lu testified that ankle factures are the second most common type of fall injury that she deals with, and that about ten to twenty percent of her cases involve ankle injuries, ECF No. [128-8] at 3. She further testified that she has never issued an opinion regarding ice skating but has issued opinions related to roller skating injuries. Further, when asked about the difference between roller skating boots and ice skating boots, Dr. Lu testified that the design and shaft of the boot are similar as is the purpose for the boots. She also noted that although roller skating deals with different types of impact of energy or energy of movement than ice skating, the ankle fractures related to those activities follow the same guidelines or same injury mechanisms, ECF No. [128-8] at 4. She then testified as follows,

> It doesn't matter whether ice skating or roller skating or any type of movement, if it's like, I said, a fall or a motor vehicle collision or machine operation, the ankles are ankles. They fracture the same way. They demand same—similar types of a mechanism. Of course, different kind of sports like roller skating or ice skating may have different focus on one specific direction, possibly for the ice skating so you may have a more lateral motion on the ankle as opposed to in roller skating where you have more of forward and backwards, essentially talking about flexion or extension type of motion to the ankle joint, so the focus is slightly different but injury mechanisms are the same.

ECF No. [128-8] at 4. The undersigned has thoroughly reviewed Dr. Lu's testimony, including those areas of testimony related to the design of the skate boot, and concludes that the Defendant's arguments for excluding her testimony are without merit. Specifically, although the Defendant cites brief excerpts of Dr. Lu's deposition where she testifies regarding the design of ice skates, when her testimony is read in context, it is clear that her testimony pertains almost entirely to the design of the boot as it relates to providing support for the ankle through lacing, and does not pertain to Dr. Lu's

assessment of the proper way to design an ice skate, or the technical specification of the design features of ice skates. In fact, the bulk of Dr. Lu's testimony regarding the design of the skates was in response to Defendant Counsel's questions about the ice skating manufacturer's written materials that Dr. Lu had reviewed related to the variation in ankle support provided by different types of skates available from that manufacturer, *i.e.* recreational v. professional, ECF No. [128-8] at 6. Thus, there is no indication that Dr. Lu is opining on how skates should be designed for a particular use but rather opines on how the manufacturer has recommended that the skates be laced depending on the type of skate being used, and whether certain skates provided more or less ankle support, ECF No. [128-8] at 6. Similarly, to the extent that Dr. Lu testified about the design purpose of the boot is to move forces up to the legs, this statement is in response to Defendant Counsel's question of whether Lebron would have sustained a trimall fracture with a properly laced boot, and Dr. Lu's explanation of why there would have been no excessive lateral rolling or twisting if the boot had been laced as designed to limit the force to the ankle joint, ECF No. [128-8] at 11.[17] Simply put, there is nothing in Dr. Lu's testimony or in her written report that suggests that she has provided opinions about the design of ice skates that exceeds her expertise in the body mechanics related to falling.

---

[17] This same analysis applies to Defendant's challenge to Dr. Lu's statements regarding the two components of the skates; the narrow blade of an ice skate and the soft leather design of ice skates, See ECF No. [163] at 3. Dr. Lu offered her analysis on those issues in response to Defendant's Counsel's questions regarding why the boot of an ice skate provides additional stability and protection to the ankle in comparison to when a person walks on a carpet and just slips and falls. This conclusion is not to suggest that merely because the questions were posed by Defendant's Counsel that Dr. Lu was free to exceed the scope of her expertise, but to provide context for Dr. Lu's testimony and to demonstrate that Dr. Lu offered opinions that were well within her knowledge of the mechanics of ankle fractures related to falls, given certain physical conditions, including the type of support provided to the ankle at the time of the fall. *See* ECF No. [128-8] at 12.

## 2.    *Dr. Lu's Methodology and Helpfulness to Trier of Fact*

In a Report dated September 5, 2017, Dr. Ying Lu, Ph.D., a biomedical engineer,

analyzed the body kinematics and fall mechanisms related to Mr. Lebron's fall, ECF No.

[119-4] at 5.[18]  Among the conclusions included in Dr. Lu's report are the following:

> 1.  Improperly laced ice skates such as Mr. Lebron's right skate as he described in his deposition would have hindered his ability to regain balance after his loss of balance was initiated by some other factors.
>
> 2.  The unlaced top portion of his right skate would have exacerbated the lateral rolling and twisting motion of his right angle, therefore worsening the severity of the injuries to his right ankle.
>
> 3.  The unlaced top portion of his right skate would have exacerbated the lateral rolling and twisting motion of his right ankle, therefore worsening the severity of the injuries to his right ankle.

ECF No. [117-4] at 8-9.  As set forth above, Defendant challenges these opinions and Dr.

Lu's testimony related to these opinions as being based upon flawed methodology and

as not being helpful to the trier of fact.  After a thorough review of Dr. Lu's Report and

her corresponding deposition testimony, the undersigned determines that the

methodology used by Dr. Lu in assessing whether improperly laced skates hindered

Lebron's ability to regain his balance, and whether the unlaced top portion of his right

skate would have exacerbated the lateral rolling and twisting motion of his right ankle,

therefore worsening the severity of the injuries to his right ankle, is well supported by Dr.

Lu's application of reliable methodology to the facts presented by the Plaintiff to her.  In

her written report, Dr. Lu identified the material she reviewed in arriving at her opinions

including, the Complaint, the guest injury statements, photographs of the subject skates,

medical records, videos of the incident, the deposition of Mr. Lebron, various medical

---

[18] The Plaintiff also submitted the Affidavit of Dr. Ying Lu, Ph.D. on December 5, 2018 in response to Defendant's Motion to Exclude Dr. Lu's testimony.  That Affidavit generally provided additional information regarding Dr. Lu's qualifications.

references related to fractures and materials related to lacing ice skates, ECF No. [117-4] at 6.

In addition, at her deposition, Dr. Lu testified as to the step by step method that she applied in arriving at her conclusions regarding the impact the improperly laced skates had on the Plaintiff's fall. Dr. Lu testified that the starting point of her analysis was the description of the event, including the events leading up to the incident that was provided to her through the sworn testimony given by Lebron at his deposition, ECF No. [128-8] at 16. She then reviewed photos of the ice skates taken by the Defendant, since the original ice skates were not preserved, reviewed the injury pattern which was reflected in medical records and x-rays, and also reviewed the videos of Lebron's fall. Dr. Lu testified that she performed literature research to determine the actual injury mechanism that could result in the exact type of injury. Dr. Lu testified that from looking at the fracture pattern and the video, she was able to determine the mechanism for the type of fracture, and assessed how an unlaced ice skate would affect his body motion during the fall or immediately prior to him losing his balance and the resultant injury. She further opined that if Lebron had tied his skate all the way to the top that there likely would have been a sprain, and doubts that there would have been a trimalleolar facture, ECF No. [128-8] at 20. It is for this reason that Defendant's assertion that because Dr. Lu could not say within any degree of certainty or probability that Plaintiff would or would not have been able to regain his balance if the boots worn properly laced is also without merit, because it is clear that Dr. Lu's testimony relates to the extent of Lebron's injury, as well as his loss of balance, and thus is not unreliable simply because she doesn't know for a certainty if he would have fallen or not. The proponent of expert testimony need not show that the opinion proffered is scientifically correct, but only, based upon a preponderance of the evidence, that the opinion is reliable. *See Allison*, 184 F.3d at 1312. Defendant's arguments regarding Dr. Lu's methodology reflect a general

misapprehension of the nature of Dr. Lu's expertise as reflected in her written report and deposition testimony, as well as the Defendant's incorrect assumption that, in order to be helpful to the trier of fact, the Plaintiff's experts must opine on the ultimate factual issue involved in the case, rather than providing relevant testimony as part of the Plaintiff's overall case.

Similarly, Defendant's assertion that Dr. Lu failed to consider all of the facts of the case is also without merit. Dr. Lu's opinions were predicated on the Plaintiff's sworn testimony that he did not properly lace his skates to the top of the skate boot. The fact that the Defendant doubts the veracity of Lebron's testimony on this issue does not serve as a basis for concluding that Dr. Lu's opinions are unreliable and unhelpful.

Indeed, the 2000 Amendments to the Committee Advisory Notes to Federal Rule of Evidence 702 provide, "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Thus, Dr. Lu's opinions based upon the facts provided by Lebron's testimony may not be excluded merely because there is a different version of the facts in the record.

Further, to the extent that the Defendant contends that Dr. Lu's opinions should be excluded because she has not taken part in testing of the forces that are required to fracture an adult male ankle, at her deposition, Dr. Lu testified that studies have established an injury threshold or facture patterns that are well documented in biomechanical literature and in medical literature, ECF No. [128-8] at 4. Dr. Lu's reliance on other expert's data is wholly appropriate. *See In re Wright Med. Tech. Inc.*, 127 F. Supp. 3d 1306, 1320 (N.D. Ga. 2015) (in formulating his opinions, an expert may rely on facts and data of other experts).

Finally, Dr. Lu's testimony will be helpful to the trier of fact. Dr. Lu's testimony explains the loss of balance and the extent of the injury that Lebron suffered as a result of improperly laced skates based upon body kinematics and fall mechanisms. Such testimony is well beyond the knowledge of a lay person and is relevant to the ultimate issue in this case, and thus is helpful to the trier of fact. This conclusion is not altered by Plaintiff's argument that Dr. Lu's opinions are not helpful because she did not allege any act or omission on the part of RCL that caused the Plaintiff to fail to lace his skates properly, ECF No. [126] at 11.  The fact that Dr. Lu does not opine on any or all of the actions of the Defendant, including whether it was the Defendant's negligence or omissions that were the cause of Lebron not lacing his skates properly or his fall, does not render her opinion unhelpful and inadmissible.  An expert need not have an opinion on the ultimate question to be resolved by the trier of fact in order to satisfy the helpfulness requirement. *Smith v. Ford Motor Company*, 215 F.3d 713, 717 (7th Cir. 2000) (quoting *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000)); *See also Tilman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1323 (M.D. Fla. 2015) (citing *Dartey v. Ford Motor Co.*, 104 F. Supp. 2d 1017, 1024–25 (N.D. Ind. 2000) and stating "Relevant testimony is not excluded simply because the testimony does not relate to the ultimate issue in the case.")).  Further, while an expert may testify as to his opinions on an ultimate issue of fact he may not testify as to his opinion regarding ultimate legal conclusions. *Umana–Fowler v. NCL (Bahamas) Ltd.*, 49 F.Supp.3d 1120, 1122 (S.D. Fla. 2014) (quoting *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009)). Thus, Dr. Lu's opinions are helpful to the trier of fact.

### 3.   *Dr. Lu's Opinions Are Not Unduly Prejudicial*

Defendant contends that Dr. Lu's opinions will mislead the jury because they rely on the assumption that the skates worn at the time of the incident were unlaced or improperly laced, which is based solely upon the Plaintiff's allegation and are

contradictory to the "necessary facts," ECF No. [126] at 12, 13.  Defendant therefore contends that pursuant to Fed. R. Civ. P. 403, Dr. Lu's testimony should be excluded because the probative value of her testimony is substantially outweighed by the unfair prejudice to RCL.

As discussed above, the Defendant fails to acknowledge that Dr. Lu's opinions were predicated on the Plaintiff's sworn testimony that he did not properly lace his skates to the top of the skate boot.  The fact that the Defendant doubts the veracity of Lebron's testimony on this issue does not serve as a basis for concluding that Dr. Lu's opinions are will mislead the jury.  Indeed, the jury could well believe Lebron's contention that when he "put on [the] skate on [his] right foot, [the laces] were shorter, they were broken and [he] was only able to tie it on the front area of [his] ankle, not above [his] ankle." ECF No. [119-1] at 20.  If the jury chooses to believe Lebron's testimony that his laces were broken, then the assumption relied on by Dr. Lu in forming her opinions would be factually correct, and thus would not unfairly prejudice the jury.  Even if the jury does not believe Lebron's testimony on this issue, Dr. Lu's opinions, which are subject to cross examination, would still not unfairly prejudice the jury because the jury could disregard Dr. Lu's assumption and her opinions based on that assumption. In this regard, Dr. Lu's opinions are no different than many expert's opinions that are based upon hypothetical questions posed to them based upon a particular party's theory of a case.  Thus, Defendant's challenge again goes to the weight of Dr. Lu's testimony and opinions, not the admissibility.  Dr. Lu's opinions based upon the sworn upon testimony of the Plaintiff and the assumption that the laces on his skate were broken are not unduly prejudicial under Fed. R. Civ. P. 403.

IV.     SUMMARY

In summary, as set forth above, the undersigned concludes that in this case, Plaintiff's expert Terry MacLauhglin is qualified based upon his experience to offer the

opinions that he has in both his written reports and deposition testimony, except for his opinions regarding the cause of the fall of the unidentified skater captured on CCTV, and his opinion that the mechanical rink covering could cause gouges in the ice. Similarly, Dr. Lu is qualified to offer and testify to her opinions in her areas of expertise, as reflected in her written report and deposition testimony. In addition, the testimony and opinions of Mr. MacLaughlin and Dr. Lu are relevant to the resolution of this matter because they provide a scientific/technical explanation to the pertinent inquiry; the nature and cause of LeBron's injury, and are therefore helpful to the trier of fact. Finally, Dr. Lu's opinions are not unduly prejudicial and will not mislead the jury.

V.   **CONCLUSION**

Accordingly, it is

**ORDERED** Defendant's Motion to Strike/Daubert Motion Regarding Plaintiff's Expert Terry MacLaughlin, ECF No. [127] is **GRANTED, in part,** and **DENIED, in part.** Terry MacLaughlin is not qualified to render an opinion on what caused the unknown skater captured on CCTV to fall, and has not provided any reliable methodology regarding how he arrived at his opinion on the cause of the fall. In addition, there were no facts in the record to support his assumption that the rink covering could cause gouges in the ice. Accordingly, MacLaughlin's opinion as to the cause of the fall of the unknown skater shown on the CCTV video and the mechanical ice covering being the potential cause of any gouges in the ice are excluded, and thus Defendant's Motion to Strike is Granted, only on those issues. Terry MacLaughlin's remaining opinions and testimony are admissible, and therefore the remainder of Defendant's Motion to Strike is Denied. It is further

**ORDERED** that the Defendant's Motion to Exclude the Proposed Testimony of Dr.

Ying Lu, Pursuant to Federal Rules of Evidence 403, 702, Daubert, ECF No. [126] is

**DENIED.**

**DONE AND ORDERED** in Chambers in Miami-Dade County, Florida, this 26th

day of July, 2018.

_Andrea M. Simonton_
ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE


Copies via CM/ECF to:
The Honorable Kathleen M. Williams

All parties of record