UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO: 1:16-cv-24687-WILLIAMS/Simonton

EDGARDO LEBRON,

    Plaintiff,

vs.

ROYAL CARIBBEAN CRUISES, LTD.
a Liberian Corporation,

    Defendant.
_____/

## DEFENDANT ROYAL CARIBBEAN CRUISES, LTD.'S MEMORANDUM OF LAW ON THE ISSUE OF NOTICE

Defendant, Royal Caribbean Cruises, Ltd. ("RCCL"), pursuant to this Court's Order Requiring Briefing [DE 305], hereby files its Memorandum of Law on the Issue of Notice, and Plaintiff's failure to present evidence of such notice at trial.[1]

## BACKGROUND

Plaintiff failed to present any evidence at trial that the alleged problems with the ice surface of the skating rink or the laces on the subject skate, which allegedly combined to cause his injury, existed for a sufficient amount of time so that Defendant had the opportunity to discover this alleged condition. As there was no evidence of actual or constructive notice, Defendant moved for a directed verdict at the end of Plaintiff's case and at the close of all evidence. The Court reserved ruling on this issue, and subsequently ordered additional briefing to aid in resolving "the lack of notice issue." [DE 305].

---

[1] Defendant will separately file a Renewed Motion for Directed Verdict and Motion for New Trial within 28 days of the entry of judgment.

CASE NO: 1:16-cv-24687-WILLIAMS/Simonton

Page 1

**FOREMAN FRIEDMAN, PA, 2 South Biscayne Boulevard, Miami, FL 33131 Tel: 305-358-6555 / Fax: 305-374-9077**

# MEMORANDUM OF LAW[2]

## I. Plaintiff Failed to Prove that Defendant had Actual or Constructive Notice of a Dangerous Condition, a Prerequisite to Liability in Maritime Negligence Actions

Federal maritime law requires a cruise ship operator to have actual or constructive notice of a hazardous condition to be liable in negligence for passenger's injury, even where the operator is alleged to have created the condition at issue. *Pizzino v. NCL (Bahamas) Ltd.*, 709 Fed. Appx. 563 (11th Cir. 2017).

Plaintiff alleged that imperfections on the surface of the shipboard skating rink **together with** problems with the length of the laces on the ice skate he was provided by Defendant, proximately caused the subject incident and injury to his ankle. The jury was instructed as follows:

> Plaintiff must prove that Defendant improperly maintained the ice **and** provided skates to him with laces that were broken, **and** that Defendant knew or should have known of this dangerous condition, and that this dangerous condition caused Plaintiff to fall and caused his injuries.

[DE 317 (Trial Vol.6) p.95]. At trial, Plaintiff failed to prove that (1) either condition existed; and (2) that Defendant had notice of same.

### A. Constructive Notice Requires Evidence That the Subject Hazard Existed for Some Amount of Time

It is undisputed that there was no **actual** notice in this case, thus this case turns on the issue of constructive notice. Constructive notice can be proved by evidence showing that Defendant should have known of a dangerous condition, even though they lacked actual notice. **Constructive notice "requires that a defective condition exist for a sufficient interval of time to invite corrective measures**." *Monteleone v. Bahama Cruise Line, Inc.*, 838 F.2d 63, 65 (2d Cir.1988) (cited, with approval, by *Keefe v. Bahama Cruise Line, Inc.*, 867 F.2d 1318, 1322 (11th Cir. 1989);

---

[2] All emphasis is supplied unless otherwise indicated.

*Mirza v. Holland America Line Inc.*, 2012 WL 5449682, at *3 (W.D. Wash. 2012); *Cohen v. Carnival Corp.*, 945 F.Supp.2d 1351, 1355 (S.D. Fla. 2013)). Liability **cannot** be predicated on a cruise line's mere creation or maintenance of a defect. *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1990) (finding reversible error where jury was instructed that the cruise carrier could be found liable if it had "negligently created or maintained its premises," absent actual or constructive notice of the risk-creating condition*); Pizzino*, 709 Fed. Appx. at 564–65 (squarely rejecting any exception to the notice requirement).

In *Monteleone*, the plaintiff alleged she tripped over a defective screw that was protruding from a brass stairway tread nosing, causing her to fall and injure her finger. 838 F.2d at 64. **"[N]o defect was observed before the accident**," thus there was no evidence of actual notice. *Id*. As to constructive notice, "no witness testified to seeing the protruding screw prior to the accident," and "the only witness to inspect the scene immediately after the accident, found nothing amiss." *Id*. at 66. Because the record was "devoid of any evidence indicating that the condition of the screw existed long enough to put [the cruise line] on notice," there could be no liability. *Id*.; *see also Morhardt v. Carnival Corp.*, 304 F. Supp. 3d 1290, 1294 (S.D. Fla. 2017) (cruise ship passenger failed to establish actual or constructive notice of alleged defective condition of hair dryer in stateroom that electrocuted him); *Lipkin v. Norwegian Cruise Ling Ltd.*, 93 F. Supp. 3d 1311, 1324 (S.D. Fla. 2015) (summary judgment in favor of defendant appropriate where plaintiff failed to cite any evidence of actual or constructive notice of the risk-creating condition); *Thomas v. NCL (Bahamas) Ltd.*, 2014 WL 3919914, at *4 (S.D. Fla. 2014) (summary judgment granted for lack of actual or constructive notice); *Cohen v. Carnival Corp.*, 945 F. Supp. 2d 1351, 1355 (S.D. Fla. 2013) (summary judgment granted where plaintiff "presented no evidence that [defendant] had actual or constructive notice of the alleged risk-creating condition"); *Weiner v.*

*Carnival Cruise Lines*, 2012 WL 5199604 (S.D. Fla. 2012) (plaintiff presented no evidence that Carnival either knew, or should have known, of any liquid on the floor around the time of his accident); *Mercer v. Carnival Corp.*, 2009 WL 302274, at *2 (S.D. Fla. 2009) ("Plaintiff has failed to provide any factual support for his allegation that Defendant had notice of the allegedly dangerous condition and therefore has failed to show that Defendant breached its duty of care to Plaintiff").

### 1. There is NO Evidence Defendant had Constructive Notice of Any Defect on the Surface of the Ice

Plaintiff failed to offer any evidence that RCCL had constructive notice that the ice presented a dangerous condition and offered no evidence as to how long the alleged "groove" or "gouge" in the ice existed. There was no evidence that anyone made a prior complaint about the ice or that the condition existed for such a period of time it would have been discovered upon reasonable inspection. According to Ron Noel, RCCL's stage and production manager of Studio B (where the ice rink is located), no other incidents at the rink were reported. [DE 179-1 (Noel Depo) p.18-19]; *see also Cohen v. Carnival Corp.*, 945 F. Supp. 2d 1351, 1355 (S.D. Fla. 2013) (evidence of constructive notice could include "a record of any accident reports, passenger comment reviews or forms, or reports from safety inspections alerting [defendant] of any potential safety concern").

Plaintiff argued at trial that "constructive notice as to the groove can be inferred because the defendant could have discovered the groove if they would have actually had somebody on the ice inspecting it." [DE 316 (Trial Vol.5) p.147]. However, "mere implication" of actual or constructive notice is insufficient. *Adams v. Carnival Corp.*, 2009 WL 4907547, at *5 (S.D. Fla. 2009) (plaintiff needed "specific facts" rather than "mere implication" to demonstrate notice).

Plaintiff testified that before he started to skate he signed a waiver which advised him that

"ice is very slippery," and "skating may be considered a hazardous activity." [DE 316 p.74]. Despite these warnings (which he claims he did not read), Plaintiff would still have gone skating. *Id*. at 75-76. Plaintiff skated for about 15 minutes without a problem and claimed he "was not paying attention to the ice," and "[didn't] see grooves or gouge or whatever you call those problems in the ice." *Id*. at 96. He "lost his balance because of how unstable [his] loose skate was, and then when [he] tried to recover [his] balance, [his] foot got stuck […] in the ice." *Id*. at p.98.[3]

RCCL's human factor expert, Dr. Joseph Sala, viewed video of Mr. Lebron ice skating. He testified that the video showed Mr. Lebron skating down the rink, holding his daughter's hand. As they began to turn around the bend of the rink, Mr. Lebron's daughter starts to lose her balance, and began to fall backwards. Almost immediately, within the next frame, you see Mr. Lebron fall – "he begins to be pulled to the right to fall backwards, and is unable to reach the wall in that instance, and then, instead, goes down onto what appears to be his ankle." [DE 324 (Trial Vol.4) p.22-23].

Officer Ferrie, the ship's chief safety officer, performed a visual inspection of the ice immediately after the incident occurred. He testified:

> Q. About how far away from the area where Mr. Lebron fell were you standing when you did that visual inspection of the ice?
>
> A. Maybe three meters, maybe, maximum.
>
> Q. Were you able to see the area clearly where Mr. Lebron fell from where you were standing?
>
> A. Yes, I could see it clearly, yeah.

---

[3] In contrast to his trial testimony, in answers to interrogatories, Plaintiff averred that he lost his balance because of a "sudden jolt of the ship." [DE 316 p.109].

> Q. Was the ice dirty?
>
> A. **No, the ice was not dirty. No.**
>
> Q. Were you able to see any gouges or defects in the ice?
>
> A. Yeah, but there was nothing there. There were no - - **there were no defects on the ice whatsoever.**
>
> Q. Was anything wrong with the ice at all that you could see from your visual inspection?
>
> A. **No, there was nothing wrong with the ice**.

[DE 317 p.36].

None of Mr. Lebron's family members mentioned anything about the condition of the ice to Officer Ferrie at the time of the incident. *Id*. at 37.

Ron Noel testified that it is his responsibility to investigate any incidents that happen involving the ice rink or ice skates. [DE 179-1 p.9, 19-20]. RCCL "resurfaces the ice to avoid getting skate marks and "grooves" on the ice. The normal procedure is after the professional ice skaters practice, the ice is resurfaced, then immediately inspected; and then the professional ice skaters inspect the ice a second time prior to allowing the passengers to skate. *Id*. at 67-70. Three professional ice skaters are present at all passenger skate sessions, supervising/assisting the passengers and observing the skaters. *Id*. at 105-106, 122-23. They arrive 30 minutes prior to the session to set up and inspect/walk the ice prior to the skate session. No issue with the condition of the ice was reported on the day of Plaintiff's incident. *Id*. at 265-66.

The ice is resurfaced every two-and-one-half hours that it is in use, and the process of resurfacing takes a maximum of 20 minutes. The incident involving Plaintiff occurred during the 7 to 7:30 pm open skate session. Prior to his fall, the ice was last resurfaced beginning at 4:45 pm, and ended sometime after 5 pm; and from 5 to 6 pm, no one was skating on the ice. Passengers

were only skating for approximately an hour and a half prior to the time of the fall, well within the two-and-one-half hour time frame. *Id*. at 247-252.

Ron Noel is a stage and production manager for RCCL, whose office is in Studio B. He arrived at the ice rink within minutes of the accident, and immediately inspected the ice, and found no dirt or debris on the ice, and no defect or divot in the ice where Plaintiff fell. *Id*. at 9, 270, 277-279.

Plaintiff's expert, David Wescott, testified that RCCL's policies and procedures for maintaining and resurfacing the ice on the rink "were definitely as good as I have seen in […] the ice-skating industry," and that it had adequate "skate guards" present during the open skate – three guards for 17 skaters, during the 30-minute skate period. [DE 316 p.17-19]. RCCL keeps "good records" of the scheduled times for resurfacing the ice, and requires those charged with this responsibility to go out on the ice to do a visual inspection, and make any "necessary repairs to the ice […] at that time." *Id*. at 36-37.

Given there were no prior complaints regarding the ice, and inspection prior to the skate session revealed no defect, the alleged "groove" or "gouge" could have been made by the skater immediately in front of Mr. Lebron or by Mr. Lebron himself when he lost his balance and fell. CCTV revealed that **not one** skater fell in the same area of Mr. Lebron's accident in the hour prior to his fall. [DE 179-1 p.267-68]. The close-up video taken by Mrs. Lebron on her phone which captured her husband's fall, showed no dirt, debris or defects in the ice. *Id*. at 269-270. No reasonable jury could have found for Plaintiff under these circumstances.

Since the condition of the skates, and ice on an ice-skating rink on a cruise ship is "a condition in no way peculiar to maritime travel" a shipowner's culpability for injuries arising from this condition is evaluated under the same standard that applies to a landowner. *Rainey v. Paquet*

*Cruises, Inc.*, 709 F.2d 169, 172 (2d Cir.1983) (standard applicable to landowners applied where a passenger tripped over a stool on a ship's dance floor because there was no indication the stool reached the dance floor as a result of any "condition ... peculiar to maritime travel").  Thus, the case of *Mortiboys v. St. Michael's Coll.*, 478 F.2d 196 (2d Cir. 1973) is instructive.  In *Mortiboys* a small bump in the ice allegedly caused the plaintiff to fall while skating.  The court found that, before attempting to avoid the bump and falling,

> Plaintiff had not previously seen the lump, and **there is no evidence that anyone else saw it before or after the accident. [….]  It is a matter of speculation what caused the lump to be formed and whether it had been there for any substantial length of time**.

*Id.* at 197.  Judgment for the defendant was affirmed as there was "no evidence […] that the small lump on the ice had existed for a sufficient period of time to render the defendant negligent in failing to discover and eliminate the potential hazard."  *Id*. at 198; *see also McBride v. City of New York*, 17 Misc. 3d 1119(A), 851 NYS 2d 64 (N.Y. Sup. Ct. 2007) (judgment for defendant where the record was "devoid of any evidence that the slush [on the rink] in which plaintiff allegedly slipped existed for a sufficient length of time so that knowledge could be imputed to defendants").

So too here, Defendant had no constructive notice of any defect in the ice, and[4] judgment should be entered in favor of Defendant as a matter of law.

### 2. There Is No Evidence Defendant Had Constructive Notice of the Alleged Problem with the Laces on Plaintiff's Ice Skate, and in any event, it was an Open and Obvious Condition

---

[4] In addition to failing to adduce evidence at trial that Defendant had notice of any issues with the subject ice skates, the conditions that Plaintiff alleges caused his fall are open and obvious risks associated with ice skating. *See McCullough v. Omaha Coliseum Corp.*, 144 Neb. 92, 98, 12 N.W.2d 639, 643 (Neb. 1944) (citing *Welo v. Union News Co.*, 263 A.D. 328, 329 (N.Y. Sup. Ct. App. Div. 1942) (where the skater knows of imperfections in the ice's surface "even an inexperienced skater assumes the risk of injury by falling on minor imperfections in the ice").

Plaintiff introduced no evidence at trial as to how long the alleged problem with the short laces on the ice skate existed prior to this incident. RCCL testified it inspected the skates weekly. It also inspected the skates immediately after the subject incident and found that the laces were not broken, defective, or shorter than normal.

Plaintiff testified that he noticed the problem with the laces on the right skate immediately upon lacing up his skate but failed to say anything to the three RCCL employees present. [DE 316 p.88-91]. Plaintiff admitted that one of the employees was in close proximity to him (about a foot), but he still said nothing. *Id*. at 91-92. Knowing there was a problem with the laces on his skate, Plaintiff walked right past this employee and started to skate. *Id*. at 92. He immediately noticed a problem with his balance, but didn't consider it a "risk," so he skated for 10 to 15 minutes, completing six or seven laps around the rink before falling. *Id*. at 95.

Officer Ferrie testified that he personally inspected the subject skates following the incident, found them to be in good condition, were not broken, defective, or too short, and were immediately placed back into use after inspection. Officer Ferrie testified:

> Q. Officer Ferrie, did you also do a visual inspection of the ice skates?
>
> A. Yes, I did. I looked at the skates after looking at them from every angle, **I didn't find anything wrong with them**.
>
> Q. Did you do an inspection of the laces on the skates?
>
> A. I did. That's part of the overall inspection of the skates. The laces were there. **They were in good condition**. Actually, I remember as I was trying to put them down I had to sort of pull them back and flick the laces out because they were so long. I had to essentially flick them on the deck to put the skates down flat.
>
> Q. **[….] were the laces in any way frayed?**
>
> A. **No**, **they were not**.
>
> Q. And were they long enough to be tied up all the way to the top?

> A. I believe they were, yeah
>
> Q. What was your ultimate conclusion about the condition of the ice skates that Mr. Lebron had been wearing that day?
>
> A. Ultimately, **I believe the ice skates were in good condition. And I returned them to the Studio B staff because they were in good condition**.

[DE 317 p.30, 34-35].

When Officer Ferrie arrived at the scene, Plaintiff's family members were present, but nothing was said about the condition of the skates. *Id*. at 37.

After his inspection, Officer Ferrie went to the medical center to speak with Mr. Lebron, who was being attended to by the doctor and nurse. Mr. Lebron told Officer Ferrie that he was skating with his daughter, and he fell when he lost his balance trying to catch his daughter after she fell down. He made no complaint about the condition of his ice skates, or the condition of the ice. *Id*. at 38.

The ice skates handed out to passengers at the rink, are in good working condition, and the skates not fit for use are immediately disposed of and replaced. [DE 179-1 p.143-46]. The standard procedure is for one of the professional ice skaters to perform a visual inspection prior to handing the skates to the passengers, and upon return, the skates are dried, and once again visually inspected, with problem skates taken out of inventory. *Id*. at 169-70. Extra laces for the skates are ordered and kept on board and worn/frayed ones can be easily exchanged when needed. *Id*. at 262.

Mr. Noel conducted his own inspection of Mr. Lebron's skate, specifically the laces, which were not damaged, frayed, broken, or too short for the skate; there was no damage to or defect in the boot of the skate; and the blade was not loose. *Id*. at 272-77. Based on his inspection, Mr. Lebron's skates were put back in circulation for other skaters to use. *Id*. at 280.

RCCL's expert, David Wescott, opined that the rental skates provided to Mr. Lebron were "in good condition and very serviceable," the laces were "long enough to reach through the eyehooks" and could be laced up properly and fully, were in "good condition," and had absolutely no fraying. [DE 316 p.11-13]. Mr. Wescott testified that:

> The design of the rental skates is so that the laces do not need to be put through a lace hole on a regular basis. They are designed so that the wearer can come out and place their foot in there and utilize the skate hooks that you use to lace up…. **The fraying on the end of the skates, the laces, that is not going to affect at all how they are laced up onto the skate hooks.**

*Id*. at 13-14.

Mr. Wescott also opined that the safety video adequately instructed passengers on how to lace up their ice skates; that skaters are encouraged to ask questions and seek assistance; and that there are no industry standard which require that each skate be individually checked by a staff member, or require inquiry into each skater's level of experience before allowing them to skate. *Id*. at 14-17. "It's been our experience if anybody has any kind of questions with the skates, they will ask the staff. There is always staff in the area handing out the rental skates that can help them, and they are encouraged to do so." *Id*. at 37.

Furthermore, any hazard presented by the allegedly shorter than normal skate lace, was open and obvious to him. Where a hazard is open and obvious, a defendant has no duty to warn. *See Carroll v. Carnival Corp.,* 2017 U.S. Dist. LEXIS 109673, *11-14 (S.D. Fla. 2017) (granting summary judgment for cruise line because arrangement of lounge chairs was open and obvious to plaintiff where nothing prevented her from seeing the chairs plaintiff fell over); *Lancaster v. Carnival Corp.*, 85 F. Supp. 3d 1341, 1344-45 (S.D. Fla. 2015) (luggage in a crowded hallway, that plaintiff tripped over, was an open and obvious condition); *Lugo v. Carnival Corp.,* 154 F. Supp. 3d 1341, 1346 (S.D. Fla. 2015) ("danger posed by descending a bunk bed ladder that did not reach the floor of the cabin was open and obvious to plaintiff"); *Poole v. Carnival Corp.,* 2015

U.S. Dist. LEXIS 45927, at *12 (S.D. Fla. 2015) (defendant had "no duty to warn Plaintiff about something that she should have noticed through the ordinary use of her senses").

### 3. Defendant Routinely Maintained and/or Inspected the Ice Surface and the Ice Skates at Issue, thus Plaintiff's Reliance on *Sauro v. Arena Co.* is Misplaced.

Plaintiff relied on *Sauro v. Arena Co.*, 171 Conn. 168, 368 A.2d 58 (Conn. 1976) at trial, which is readily distinguishable. This Court has already noted that "the facts are really not the same as our particular situation." [DE 316 p.159]. In *Sauro*:

> [t]he defendant invited the public to skate on its indoor oval skating rink […]. [….] When [the plaintiff] started skating, the ice was […] in good condition. As the skating continued, […] the ice deteriorated[,] and it grew progressively softer […]. At about 2:30 p.m., as was the usual procedure, the skating area was cleared of skaters. It was ordinary procedure at the time of such a break to [resurface the ice]. **This procedure was not followed on the day in question, and nothing was done to correct the condition of the ice before the skaters went back on the rink,** although at least two attendants were at all times on the ice […]. [Then], one of the plaintiff's skates caught in a rut in the soft ice and he fell forward and was injured. [….]. Although there was no evidence that the defendant had actual notice of the existence of the particular rut or hole in the ice which caused the plaintiff's fall, […] the jury could reasonably find that it had constructive, if not actual, notice of the existing dangerous and unsafe condition of the ice on its rink and that it was negligent in permitting the existence of this hazardous condition […].

368 A.2d at 59. Because the defendant failed to follow its usual and routine procedure designed to maintain the condition of the ice surface, the court found that it had constructive notice of the unsafe condition of the ice which was not adhered to immediately before the plaintiff fell and injured herself. There was also evidence that the surface of the ice surface was "slushy" and uneven. *Id*.

Here, there is **no** evidence that Defendant failed to adhere to its usual and routine procedures regarding maintaining the ice in a safe condition and inspecting the skates for defects, and no evidence that the ice was "slushy" or uneven, or there were any issues with the surface of the ice. Likewise, the skates provided to passengers for use while skating on the subject ice rink

are regularly inspected, cleaned, and dried before being reused, and all skates provided to passengers for use on the subject ice rink are inspected weekly. [DE 179-1 p.36-37].

In *Monteleone*, the appellate court noted that there was evidence that "**the [subject] stairway was regularly inspected and cleaned**" and these efforts did not reveal the defective screw responsible for the subject fall. *Monteleone*, 838 F.2d at 64. (emphasis supplied). Here, there was evidence that RCCL made regular efforts to make the subject ice rink and ice skates safe for passenger use, and that had the alleged dangerous conditions existed for any amount of time, RCCL would have discovered and/or remedied the problem. As Plaintiff has failed to prove actual or constructive notice, judgment should be entered in favor of RCCL.

## **CONCLUSION**

For all these reasons, there is no evidence in the record that Defendant had constructive notice that the surface of the ice was unsafe or that the laces of Plaintiff's ice skates were defective. Defendant, Royal Caribbean Cruises, Ltd., respectfully requests this Honorable Court enter a directed verdict in its favor on the issue of notice.

Respectfully submitted,

By: /s/ *Lauri Waldman Ross*  
Lauri Waldman Ross, Esq. FBN 311200  
lauri@laurilaw.com  
RossGirten@Laurilaw.com  
Theresa L. Girten, Esq.  
theresa@laurilaw.com  
Ross & Girten  
9130 S. Dadeland Boulevard  
Two Datran Center, Suite 1701  
Miami, FL 33156  
Tel: 305-670-8010  
Counsel for Defendant  

By: /s/ *Darren W. Friedman*  
Darren W. Friedman Esq. FBN 146765  
dfriedman@fflegal.com  
Foreman Friedman, PA  
One Biscayne Tower, Suite 2300  
2 South Biscayne Boulevard  
Miami, Florida 33131  
Tel: 305-358-6555 / Fax: 305-374-9077  
Counsel for Defendant

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that the foregoing was electronically filed with the Clerk of the Court via CM/ECF on this 19th day of October, 2018. We also certify that the foregoing was served on all counsel or parties of record on the attached Service List either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notices of Filing.

By: /s/ *Darren W. Friedman*
Darren W. Friedman, Esq.

## SERVICE LIST

| | |
|---|---|
| Spencer Marc Aronfeld, Esq. | Darren W. Friedman, Esq. |
| aronfeld@aronfeld.com | dfriedman@fflegal.com |
| Matthias Hayashi, Esq. | sargy@fflegal.com |
| mhayashi@aronfeld.com | marista@fflegal.com |
| Raul G. Delgado, II, Esq. | Rachael M Fagenson, Esq. |
| rdelgado@aronfeld.com | rmitchell@fflegal.com |
| blozano@aronfeld.com | Clyde Dunton-Gallagher, Esq. |
| cleather@aronfeld.com | cgallagher@fflegal.com |
| slouis@aronfeld.com | FOREMAN FRIEDMAN, PA |
| mrodriguez@aronfeld.com | One Biscayne Tower – Suite #2300 |
| ARONFELD TRIAL LAWYERS | 2 South Biscayne Boulevard |
| 3132 Ponce de Leon Boulevard | Miami, Florida 33131 |
| Coral Gables, Florida 33134 | Tel: 305-358-6555/ Fax: 305-374-9077 |
| Tel: 305-441-0440/Fax: 305-441-0198 | Counsel for Defendant |
| Counsel for Plaintiff | |
| | Lauri Waldman Ross, Esq. |
| | lauri@laurilaw.com |
| | RossGirten@Laurilaw.com |
| | Theresa L. Girten, Esq. |
| | theresa@laurilaw.com |
| | Ross & Girten |
| | 9130 S. Dadeland Boulevard |
| | Two Datran Center, Suite 1701 |
| | Miami, FL  33156 |
| | Tel: 305-670-8010 |
| | Counsel for Defendant |